**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| In re:<br><br>**HILLSBOROUGH HOLDINGS<br>CORPORATION,**<br><br>    **Debtor.** | **Chapter 11<br>Jointly Administered<br>Case No. 8:89-bk-9715<br>through 8:89-bk-9746<br>and 8:90-bk-11997** |
| In re:<br><br>**JW ALUMINUM COMPANY,**<br><br>    **Debtor.** | **Case No. 8:89-bk-9718** |
| **JW ALUMINUM COMPANY,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**MICHAEL H. HOLLAND, MICHAEL<br>MCKOWN, JOSEPH R. RESCHINI, and<br>CARLO TARLEY, as Trustees of the<br>UNITED MINE WORKERS OF<br>AMERICA 1992 BENEFIT PLAN,**<br><br>**and**<br><br>**MICHAEL H. HOLLAND, MICHAEL<br>MCKOWN, WILLIAM P. HOBGOOD,<br>MARTY HUDSON, JOSEPH R.<br>RESCHINI, CARL E. VANHORN, and<br>GAIL R. WILENSKY, as Trustees of the<br>UNITED MINE WORKERS OF<br>AMERICA COMBINED BENEFIT<br>FUND,**<br><br>    **Defendants.** | **Adversary Proceeding<br>No. 8:17-ap-480-KRM** |

**PLAINTIFF JW ALUMINUM'S RESPONSE**

**TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff JW Aluminum Company ("JW Aluminum") hereby responds to the amended motion to dismiss (Dkt. 14) ("Motion to Dismiss") filed by Defendants, the Trustees of the United Mine Workers of America 1992 Benefit Plan and the Trustees of the United Mine Workers of America Combined Benefit Fund (collectively, the "UMWA Trustees"), and states as follows:

## I.    INTRODUCTION

1.    In this adversary proceeding, JW Aluminum requests a declaratory judgment that the claims asserted by the UMWA Trustees in *Holland v. United States Pipe and Foundry Company, LLC, et al.*, Civil Action No. 16-cv-1577, in the U.S. District Court for the District of Columbia (the "D.C. Litigation"), were discharged when the Confirmation Order in this Chapter 11 case became effective on March 17, 1995 (the "Effective Date"). Despite this discharge, the UMWA Trustees have alleged in the D.C. Litigation that JW Aluminum is liable under the Coal Industry Retiree Health Benefit Act (the "Coal Act"), 26 U.S.C. §§ 9701 *et seq.*, for paying premiums to two coal-miner healthcare plans administered by the UMWA Trustees (the Combined Fund and the 1992 Plan) and for establishing its own "individual employer plan" ("IEP"). The UMWA Trustees allege that JW Aluminum, which has never been in the coal business, is jointly and severally liable for these Coal Act obligations as a result of its former corporate affiliation with a now-defunct coal company, Walter Industries. Under the Coal Act, that alleged "related person" liability arose no later than February 1, 1993—more than two years prior to the Effective Date of the Confirmation Order.

2.    The UMWA Trustees' Motion to Dismiss argues that the Court cannot grant the declaratory relief requested by JW Aluminum for three reasons. For one, the UMWA Trustees contend that the Court lacked the power to discharge these claims "[b]ecause Coal Act premium payment obligations are taxes, [and] the federal Anti-Injunction Act ("AIA") limits federal courts'

subject matter jurisdiction to grant relief from them." Mot. at 16.  This is simply wrong.  Indeed, the UMWA Trustees litigated—and lost—this exact issue in *United Mine Workers of America Combined Benefit Fund v. Walter Energy, Inc.* ("*Walter II*"), 551 B.R. 631, 639 (N.D. Ala. Mar. 8, 2016).[1]  In that case, the court held that "Coal Act payments are not 'taxes' for purposes of the [] AIA[.]" *Id.* at 637.  It further held that, even if Coal Act premiums were "taxes," the AIA would not limit a bankruptcy court's power to discharge or terminate liability for paying unassessed premiums.  *Id.* at 639-40.  In doing so, it agreed with the Fourth Circuit's decision in *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 584 (4th Cir. 1996), which it recognized was the only federal circuit-court decision to consider this "precise issue." *Walter II*, 551 B.R. at 639 (citing *In re Leckie*, 99 F.3d at 584).  Having lost this argument in *Walter II* and in *Leckie*, the UMWA Trustees are collaterally estopped from relitigating it here.  And even if collateral estoppel did not apply, *Walter II* and *Leckie* are persuasive and should be followed in this case.

3.    Next, the UMWA Trustees characterize Coal Act premiums as "taxes," in an attempt to argue that the claims at issue in the D.C. Litigation arose after the Effective Date of the Confirmation Order.  The UMWA Trustees contend that, as taxes, Coal Act liabilities "arise periodically, as they are incurred, with each period's obligation constituting a separate debt."  Mot. at 2.  But the Trustees' characterization of Coal Act liabilities as "taxes" is both incorrect and inapposite.  As *Walter II* recognized, Coal Act liabilities cannot be uniformly characterized as "taxes" for all purposes relevant to the Bankruptcy Code.  551 B.R. at 638-39.  And even if the

---

[1] *Walter II* involved the Section 363 sale of Walter Industries' assets "free and clear" of future Coal Act liabilities. 551 B.R. at 637.  During the *Walter* bankruptcy, Walter Industries also obtained an order terminating its future Coal Act obligations under Sections 1113 and 1114.  *See In re Walter Energy, Inc.*, 542 B.R. 859 (Bankr. N.D. Ala. 2015) (*Walter I*).  The district court affirmed the Section 1113/1114 Order.  *UMWA 1974 Pension Plan & Tr. v. Walter Energy, Inc.* (*Walter III*), --- B.R. ----, No. 2:16-cv-0057, 2016 WL 2894091, at *14 (N.D. Ala. May 18, 2016), *appeal docketed*, No. 16-13483 (11th Cir. June 13, 2016).

"taxes" label were appropriate in this context, future Coal Act liabilities are still "claims" within the meaning of Section 101(5)(A) of the Bankruptcy Code—even if those liabilities are "unmatured" or "contingent." *In re Leckie*, 99 F.3d at 580-81.

4.      Finally, the UMWA Trustees try to salvage their claim that JW Aluminum must "establish" an IEP for the former beneficiaries of Walter Industries' IEP by analogizing this purported Coal Act obligation to an ongoing regulatory obligation, like environmental or safety compliance.  According to the UMWA Trustees, such obligations are unaffected by the 1995 discharge in this case.  This analogy fails because, unlike environmental or safety compliance, the Coal Act obligations at issue here do not arise out of JW Aluminum's current operations or its ongoing use or possession of property.  And even if the analogy between regulatory compliance and Coal Act obligations were apt, any IEP-related obligation of JW Aluminum was clearly reducible to a right to payment, and thus dischargeable as a "claim" in this Chapter 11 proceeding. Indeed, courts have repeatedly rejected the UMWA Trustees' similar argument that future Coal Act liabilities, including the obligation to maintain an IEP, cannot be modified or terminated in bankruptcy proceedings. *See, e.g.*, *Walter II*, 551 B.R. at 643; *Walter I*, 542 B.R. at 881-83; *Walter III*, 2016 WL 2894091, at *11-12.  There is no reason these obligations cannot be discharged, as JW Aluminum has alleged in this case.

## II.      BACKGROUND

5.      On December 27, 1989, JW Aluminum filed a Chapter 11 petition in this Court. Compl. (Dkt. 1) ¶ 15.  At the time of its filing, JW Aluminum and several other companies, including Walter Industries, Inc. ("Old Walter Industries"), were owned by Hillsborough Holdings Corporation ("Hillsborough").  *Id.* ¶ 13.  Old Walter Industries was a holding company that owned many other companies in a variety of industries, including Jim Walter Resources, Inc., a coal-mine

operator. *Id.* ¶ 14. During the bankruptcy proceedings, Old Walter Industries was merged into Hillsborough, and the surviving entity was renamed Walter Industries, Inc. ("Walter Industries").[2]

6.    On October 24, 1992, while JW Aluminum's Chapter 11 case was pending, Congress passed the Coal Act. *Id.* ¶ 21. The financial obligations in the Coal Act became fully effective on February 1, 1993. *See* 26 U.S.C. §§ 9704(i), 9708, 9711, 9712(b)(2); *see also UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 201 B.R. 163, 166 (S.D. W. Va. 1996), *aff'd*, 99 F.3d 573 (4th Cir. 1996).

7.    The Coal Act contains three statutory mechanisms to provide healthcare benefits for retired employees (and their dependents) of coal operators that signed collective bargaining agreements with the United Mine Workers of America, all of which are now being invoked by the UMWA Trustees in the D.C. Litigation:

   (a)    First, the Coal Act created the United Mine Workers of America Combined Benefit Fund ("Combined Fund") to provide health benefits to coal miners who had retired and who were receiving benefits from certain coal industry trust funds as of July 20, 1992. The Coal Act requires each "assigned operator"—the coal-wage-agreement signatory that last employed the miner—to pay premiums to the Combined Fund. 26 U.S.C. §§ 9702(a), 9704. "Related persons" were jointly and severally liable to the Combined Fund for these premiums as of the Coal Act's February 1, 1993 effective date. *Id*. § 9704(a).

   (b)    Second, the Coal Act required the "last signatory operator" of a miner who retired by September 30, 1994 and was receiving retiree health benefits coverage through an individual employer plan ("IEP") maintained pursuant to a coal wage agreement to continue to provide benefits coverage that is substantially similar to the coverage being provided by such IEP on January 1, 1992. *Id*. § 9711(a). "Related persons" were also jointly and severally liable for this obligation as of the Coal Act's February 1, 1993 effective date. *Id*. § 9711(c).

   (c)    Third, the Coal Act created the United Mine Workers of America 1992 Benefit Plan ("1992 Plan") to provide health benefits coverage for (i) retired coal miners who retired by September 30, 1994 and who otherwise would have been eligible for the Combined Fund, except that they retired after the cut-off date for participation in the Combined Fund, and (ii) coal miners who also retired by September 30, 1994, but who were not receiving benefits from the applicable "last signatory operator" through an IEP

---

[2] After the bankruptcy case was closed, Walter Industries changed its name to Walter Energy, Inc. For ease of reference, the Complaint (and, thus, this Response) refers to this entity consistently as "Walter Industries."

required under 26 U.S.C. § 9711. *Id.* § 9712. To fund the 1992 Plan and finance these benefits, the Coal Act required each coal operator that had signed a 1988 coal wage agreement to (i) pay annual prefunding premiums,[3] (ii) pay monthly per beneficiary premiums, and (iii) post certain security. *Id.* § 9712(d)(1)-(4). "Related persons" were jointly and severally liable to the 1992 Plan for these financial obligations as of the Coal Act's February 1, 1993 effective date. *Id.* § 9712(d)(4).

Compl. ¶ 22. Under the Coal Act, "related persons"—all of whom are "jointly and severally" liable for these Coal Act obligations—are defined to include companies that shared certain common ownership with certain coal mining operators as of July 20, 1992. 26 U.S.C. § 9701(c)(2); Compl. ¶ 24.

8.      On December 9, 1994, JW Aluminum and the other Debtors, along with various creditors, proposed the Amended Joint Plan of Reorganization (the "Consensual Plan"). Compl. ¶ 31 & Ex. A (Dkt. 1-1). Although the Consensual Plan imposes upon Walter Industries obligations for the funding of retiree health benefits, it does not require JW Aluminum to pay any retiree health benefits or any Coal Act liabilities.[4] Compl. ¶ 32 & Ex. A ¶ 5.4. Instead, the Consensual Plan provides that the confirmation of the Consensual Plan discharges all debts and claims against JW Aluminum arising before the Effective Date:

> 12.2 <u>Discharge</u>. ***The issuance of the Confirmation Order shall (a) operate as a discharge, pursuant to Section 1141(d)(1) of the Code, effective as of the Effective Date, of any and all debts*** (as such term is defined in Section 101(12) of the Code) ***of or Claims against one or more of the Debtors that arose at any time before the Effective Date,*** including, but not limited to, all principal and all interest, whether accrued before, on or after the Filing Date. Without limiting the generality of the foregoing, on the Effective Date, ***the Debtors shall be discharged from any debt that arose before the Effective Date,*** and any debt of a kind specified in Section

---

[3] Section 9712(d)(1)(A) of the Coal Act, as enacted in 1992, provided: "[C]ontribution requirements, which shall be applied uniformly to each 1988 last signatory operator, on the basis of the number of eligible and potentially eligible beneficiaries attributable to each operator, . . . shall include: (A) the payment of an annual prefunding premium for all eligible and potentially eligible beneficiaries attributable to a 1988 last signatory operator . . . ." Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, § 19143, 106 Stat. 2776, 3054-55 (1992).

[4] The Consensual Plan provides, for example, that only two debtors—Walter Industries and Jim Walter Computer Services, Inc.—shall have any obligations with respect to "continued funding of medical benefits" for retirees. *See* Compl. Ex. A ¶ 5.4 (titled "Funding of Retiree Health Benefits"). No other debtor, including JW Aluminum, is subject to this provision.

502(g), 502(h) or 502(i) of the Code, to the full extent permitted by Section 1141(d)(1)(A) of the Code. Nothing in the Consensual Plan shall be deemed to waive, limit or restrict in any way the discharge granted upon Confirmation of the Consensual Plan pursuant to Section 1141 of the Code and effective as of the Effective Date.

Compl. Ex. A ¶ 12.2 (emphasis added). The Consensual Plan also provides for a permanent injunction prohibiting any person from pursuing collection of the discharged debts and claims. *Id.* ¶ 12.3.

9.      Thereafter, on March 2, 1995, the Court entered its Order Confirming the Amended Joint Plan of Reorganization (the "Confirmation Order").[5] Compl. ¶ 37 & Ex. B. Like the Consensual Plan, the Confirmation Order includes specific provisions discharging all debts and claims against JW Aluminum that arose before the Effective Date and enjoining any holder of such debts and claims from taking any action to recover on them:

18. Except as otherwise expressly provided in the Modified Consensual Plan or this Order, pursuant to Article XII, Section 12.3 of the Modified Consensual Plan and Section 1141(d) of the Bankruptcy Code, ***the issuance of this Order shall operate as a discharge effective as of the Effective Date, of any and all Debts*** (as such term is defined in Section 101(12) of the Bankruptcy Code) ***or Claims against one or more of the Debtors that arose at any time before the Effective Date*** and from any Debt or Claim of a kind specified in Sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, including, without limitation, all principal of, and interest on, all indebtedness, whether accrued before, on or after the Filing Date. The discharge of the Debtors will be effective as to each Claim, regardless of whether a proof of Claim was filed or deemed filed, whether the Claim is an Allowed Claim or whether the Holder thereof voted to accept or reject the Consensual Plan. ***On the Effective Date, the Holder of every discharged Debt and Claim will be permanently enjoined from asserting against any and all of the Debtors or any of their respective assets, any other or further Claim based upon any law, rule or regulation or any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as provided in the [] Consensual Plan***.

---

[5] The Confirmation Order established April 17, 1995 as the bar date for filing Administrative Claims (the "Administrative Claims Bar Date"). *Id.* ¶ 44. The Consensual Plan broadly defines "Administrative Claims" to include, among other things, "any indebtedness or obligations incurred or assumed by any of the Debtors" and "the actual and necessary costs and expenses of . . . operating the business of each of the Debtors . . . ." Compl. Ex. A ¶ 1.18.

Compl. ¶ 38 & Ex. B ¶ 18 (emphasis added).  Following entry of the Confirmation Order, the Consensual Plan was consummated and became effective on March 17, 1995.  Compl. ¶ 17.

10.    Despite their active participation in the Chapter 11 case, the UMWA Trustees did not object to the terms of the Consensual Plan or to the entry of the Court's Confirmation Order. Compl. ¶ 36.

11.    On August 3, 2016, the UMWA Trustees filed the D.C. Litigation.  Compl. ¶ 43 & Ex. C.  The UMWA Trustees allege in that case that Walter Industries provided retiree health benefits coverage through an IEP that complied with the Coal Act's requirements, but that Walter Industries terminated its IEP on April 1, 2016.[6]  Compl. Ex. C ¶¶ 14-15.  At that time, the beneficiaries of Walter Industries' IEP were enrolled in the 1992 Plan.  *Id.* at ¶ 23.  The UMWA Trustees allege that Walter Industries has not paid the premiums for the health benefits coverage provided by the 1992 Plan to Walter Industries' IEP beneficiaries.  *Id.* at ¶ 27.  The UMWA Trustees also allege that, on April 14, 2016, Walter Industries ceased paying Combined Fund premiums.  *Id.* at ¶ 29.  Although JW Aluminum has never been in the coal business, the UMWA Trustees contend that JW Aluminum is a "related person" to Walter Industries, and thus is jointly and severally liable for its Coal Act obligations.  *Id.* at ¶ 16.  Based on this purported joint-and-several liability, the UMWA Trustees assert claims for payment of premiums to the 1992 Plan and the Combined Fund, and also seek to require JW Aluminum to establish an IEP for the former Walter Industries beneficiaries.  *Id.* at 8-10 (prayer for relief).

12.    On June 15, 2017, JW Aluminum filed this adversary proceeding.  JW Aluminum's Complaint seeks a judgment: (i) declaring that the claims the UMWA Trustees have asserted in

---

[6] In 2003, JW Aluminum was spun off from Walter Industries.  Compl. ¶ 42.  Since then, JW Aluminum has had no affiliation with Walter Industries or its coal-mining subsidiaries.  *Id.*

the D.C. Litigation have been discharged and (ii) enforcing this Court's discharge injunction and declaring that the UMWA Trustees' actions in pursuing discharged claims against JW Aluminum violate 11 U.S.C. § 1141 and discharge-related orders entered by this Court, thus entitling JW Aluminum to recover actual and punitive damages.  Compl. ¶ 4.

13.     On July 17, 2017, the UMWA Trustees moved to dismiss JW Aluminum's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### III.     ARGUMENT AND AUTHORITIES

#### A.     Standard

14.     Rule 8(a)(2) of the Federal Rules of Civil Procedure, made applicable by Rule 7008 of the Federal Rules of Bankruptcy Procedure, requires only a short and plain statement of the claim showing that a plaintiff is entitled to relief.  *Hyman v. Korshak & Assocs.* (*In re Island One, Inc.*), No. 6:12-ap-00156-KSJ, 2013 WL 652562, *2 (Bankr. M.D. Fla. Feb. 22, 2013).  To survive a motion to dismiss, a plaintiff need only plead enough facts to nudge its claims from the realm of the conceivable to the plausible.  *Estate of Jackson v. Gen. Elec. Corp.* (*In re Fundamental Long Term Care*), 512 B.R. 690, 702 (Bankr. M.D. Fla. 2014), *aff'd sub nom. Estate of Jackson v. Schron*, No. 8:16-cv-22-T-17, 2016 WL 4718145 (M.D. Fla. Sept. 8, 2016).  In resolving a motion to dismiss under Rule 12(b)(6), a court must accept the plaintiff's allegations as true and construe them in the light most favorable to it.  *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1245 (11th Cir. 2016).

#### B.     The AIA Did Not Limit the Court's Power to Discharge JW Aluminum's Coal Act Liabilities, Nor Does It Limit the Court's Power to Enforce that Discharge.

15.     The UMWA Trustees argue that the Court lacked jurisdiction under the AIA to discharge JW Aluminum's Coal Act liabilities.  *See* Mot. at 16-17.  Logically, this jurisdictional issue concerning the Court's power to discharge JW Aluminum's Coal Act liabilities and to

enforce that discharge in this adversary proceeding should be addressed at the outset. *See Nat'l Fed'n of Indep. Bus. v. Sibelius* ("*NFIB*"), 567 U.S. 519, 543  (2012) ("Before turning to the merits, we need to be sure we have the authority to do so.").  Nevertheless, the UMWA Trustees treat this issue as an afterthought—because their argument is meritless.

16.     Just last year, the UMWA Trustees litigated—and lost—the same issue in *Walter II*.  In that case, the UMWA Trustees objected to the proposed transfer of Walter Industries' assets under Section 363 of the Bankruptcy Code, free and clear of Coal Act liabilities.  551 B.R. at 637.  In doing so, they invoked the AIA, which "withdraws from federal courts' subject-matter jurisdiction the power to 'restrain[] the assessment or collection of any tax.'"  *Id.* (quoting 26 U.S.C. § 7421(a)).  The UMWA Trustees argued that the AIA operated as "a jurisdictional bar to the Bankruptcy Court's order of a sale free and clear of future Coal Act payments because those payments are in fact taxes."  *Id.*

17.     The cases on which the UMWA Trustees relied in *Walter II* are the same cases cited in their Motion to Dismiss to characterize Coal Act liabilities as "taxes."  *Id.* at 638 (citing *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998); *UMWA 1992 Pension Benefit Plan v. Rushton* (*In re Sunnyside Coal Co.*), 146 F.3d 1273, 1280 (10th Cir. 1998); *LTV Steel Co., Inc. v. Shalala* (*In re Chateaugay Corp.*), 53 F.3d 478, 498 (2d Cir. 1995)); *see also* Mot. at 11-12 (citing *Adventure Resources*, *Sunnyside*, and *Chateaugay* for proposition that Coal Act premiums are "taxes").  But *Walter II* recognized that "those decisions from the 1990s reached that conclusion without the benefit of the Supreme Court's ruling in [*NFIB*]."  551 B.R. at 638.  In *NFIB*, which presented the issue of whether the individual mandate provision in the Affordable Care Act was a "penalty" or a "tax" within the meaning of the AIA, the Supreme Court rejected a functional approach to determining whether a legally-mandated payment is a "tax," relying instead

on the label that Congress used to describe it.  *See* 567 U.S. at 564 ("It is up to Congress whether to apply the Anti-Injunction Act to any particular statute, so it makes sense to be guided by Congress's choice of label on that question.").  Applying this recent Supreme Court authority to the Coal Act, *Walter II* rejected the UMWA Trustees' attempt to analogize Coal Act "premiums" to "taxes."  551 B.R. at 638 (noting that the UMWA Trustees had argued that Coal Act premiums "are involuntary assessments, defined by the Internal Revenue Code, assessed periodically, and paid to further a congressional purpose").  *Walter II* held that, under *NFIB*, the "'best evidence'" of whether Congress intended that Coal Act "premiums" be considered "taxes" under the AIA was the label that Congress used.  *Id.* at 638-39 (quoting *NFIB*, 567 U.S. at 544).  Because Congress used the term "premium," Coal Act liabilities should not be considered "taxes" under the AIA.  *Id.*

18.    *Walter II* also held that, even if Coal Act liabilities were "taxes" under the AIA, the bankruptcy court would have jurisdiction to order those liabilities terminated because the AIA did not bar an action where Congress has not provided any alternative procedure to challenge the validity of the tax at issue.  551 B.R. at 639 (citing *In re Leckie*, 99 F.3d at 584).  In reaching this holding, the *Walter II* court relied on the Fourth Circuit's decision in *Leckie*—the only federal circuit case to consider this "precise issue."  *Id.* at 639-40 (citing *In re Leckie*, 99 F.3d at 584). *Walter II* recognized that *Leckie* had rejected the UMWA Trustees' argument that the AIA deprives a federal court of jurisdiction to issue a declaratory judgment regarding an entity's post-bankruptcy liability for Coal Act premiums.  *Id.* at 639-40 (citing *In re Leckie*, 99 F.3d at 584).[7]  Because Congress had not provided any alternative way to obtain such a determination, the AIA did not apply.  *Id.*

---

[7] *Walter II* noted that *Leckie* held that Coal Act liabilities were "taxes" under the AIA, but concluded that, like the other 1990s decisions, the Fourth Circuit had reached that conclusion without the benefit of the intervening Supreme Court decision in *NFIB*.  *Id.* at 639 n.8.

19.     The UMWA Trustees argue that *Walter II* was wrongly decided and ask this Court to resolve the AIA jurisdictional issue differently.  Mot. at 17 n.10.  But, having lost this issue in *Walter II* and in *Leckie*, the UMWA Trustees are not free to relitigate it here.  Collateral estoppel, or issue preclusion, "prevent[s] the relitigation of particular issues which were actually litigated and decided in a prior suit."  *Burstein v. Rumball*, 297 F. App'x 918, 920 (11th Cir. 2008).  "The party seeking to bar an issue on collateral estoppel grounds must establish four factors: (1) the issue was identical in both the prior and current action; (2) the issue was actually litigated in the prior action; (3) the determination of the issue was critical and necessary to the judgment in the prior action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding."  *Id.*   Additionally, "the burden of persuasion in the subsequent action [cannot be] significantly heavier than in the prior proceeding." *Id.*  Here, the UMWA Trustees had full and fair opportunities to litigate the issue of whether the AIA limits a federal court's ability to terminate or discharge Coal Act liabilities, and they did.  *See In re Leckie*, 99 F.3d at 584; *Walter II*, 551 B.R. at 637-40.  The *Walter II* and *Leckie* courts' determinations of the issue against the UMWA Trustees were critical and necessary to both judgments, as a contrary holding would have required the reversal of the Section 363 free-and-clear sales at issue in those cases.  *Id.*  And, of course, the burden of persuasion in *Walter II* and in *Leckie* is the same standard that applies here: preponderance of the evidence.[8]  Thus, the UMWA

---

[8] *Walter I*, 542 B.R. 859 (the bankruptcy court order), and *Walter III*, 2016 WL 2894091 (the district court order), terminating Coal Act liabilities under Sections 1113 and 1114, are currently on appeal to the Eleventh Circuit.  *See* No. 16-13483 (11th Cir.).  The case has been fully briefed and argued, though a decision has not been issued.  That pending appeal does not affect the finality of these orders, nor does it affect the finality of *Walter II*, the district court order allowing for the free-and-clear sale, for which no appeal is pending.  "[T]he established rule in federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal." *See Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988); *see also, e.g.*, *United States v. Virgin Islands*, 363 F.3d 276, 292 (3d Cir. 2004) (preclusion attaches to "order that was not appealed").

Trustees are collaterally estopped from relitigating in this case the AIA issues they lost in *Walter II* and in *Leckie*.[9]

20.     In sum, regardless of whether *Walter II* and *Leckie* are binding or merely persuasive, it is clear that the AIA did not deprive the Court of the power to discharge JW Aluminum's Coal Act liabilities in 1995 and does not deprive the Court of the power to enforce that discharge in this adversary proceeding.

21.     Any argument that the AIA prevents this Court—or any other bankruptcy court—from discharging tax liabilities is completely without merit.  The Bankruptcy Code specifically envisions the discharge of tax liabilities, *see* 11 U.S.C. § 523 (providing that only certain types of taxes are not dischargeable), and bankruptcy courts thus routinely discharge taxes.  *See, e.g.*, *Young v. United States*, 535 U.S. 43, 47 (2002) ("Old tax claims—those pertaining to returns due more than three years before the debtor filed the bankruptcy petition—become dischargeable, so that a bankruptcy decree will relieve the debtor of the obligation to pay."); *Dishong v. U.S. Dep't of Treasury IRS* (*In re Dishong*), 188 B.R. 51, 54 (Bankr. M.D. Fla. 1995) ("When taxes are dischargeable . . . the Bankruptcy Code terminates the debtor's *in personam* liability for those taxes"); *see also United States v. Int'l Horizons, Inc.* (*In re Int'l Horizons, Inc.*), 751 F.2d 1213, 1214 (11th Cir. 1985) (affirming bankruptcy court's refusal to allow untimely tax claim by IRS).

---

[9] Even if the UMWA Trustees were free to relitigate the issue of whether Coal Act "premiums" are "taxes" under the AIA, their attempt to distinguish *NFIB* is meritless.  The UMWA Trustees argue that, unlike the Affordable Care Act, the Coal Act refers only to "premiums," such that Congress's use of the term "premium" in lieu of "tax" is less significant.  *See* Mot. at 17 n.10.  But this assertion is incorrect; the term "tax" appears throughout the Coal Act.  *See* 26 U.S.C. §§ 9702(a)(4), 9705(a)(4), 9705(a)(5), 9707(f).  Just as it did in the Affordable Care Act, Congress knew exactly how to use the term "tax" in the Coal Act when it wanted to refer to a "tax," and its semantic decision to use the term "premium" instead of "tax" is significant.

**C.    The Coal Act Liabilities at Issue in the D.C. Litigation Arose Prior to Confirmation of the Plan and Thus Were Subject to Discharge.**

22.    The UMWA Trustees' characterization of Coal Act liabilities as "taxes" is also the lynchpin of their merits argument that the claims asserted in the D.C. Litigation arose after Confirmation of the Consensual Plan in this case.  According to the UMWA Trustees, Coal Act premiums "are taxes that are incurred on an ongoing basis," such that premiums assessed after Confirmation could not have been subject to discharge.  Mot. at 11-12.  Again, this focus on "taxes" misses the point.  JW Aluminum's request for declaratory judgment does not require the Court to determine whether the Coal Act liabilities at issue in the D.C. Litigation are "taxes."  The Court must decide only whether those alleged liabilities are "claims" within the meaning of the Consensual Plan and the Confirmation Order.[10]  They are, and were thus discharged.

**1.    The Coal Act liabilities were "claims" subject to discharge under the Confirmation Order, even if those claims were "unmatured" or "contingent."**

23.    The term "Claim" is defined in the Consensual Plan and the Confirmation Order to include any "claim against one or more of the Debtors within the meaning of Section 101(5) of the [Bankruptcy] Code . . . ."  Compl. Ex. A ¶ 1.48.[11]  In turn, Section 101(5) of the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ."  11 U.S.C. § 101(5)(A).  It is a broad definition, and intentionally so.  As the Supreme Court recognized, "Congress intended [in Section 101(5) to

---

[10] Similarly, Paragraph 18 of the Confirmation Order also discharges all "Debts," which are defined in Section 101(12) of the Bankruptcy Code as "liability on a claim."  Compl. Ex. B ¶ 18.  Section 1141(d)(1) of the Bankruptcy Code further provides that the confirmation of a plan "discharges the debtor from any debt that arose before the date of confirmation[.]"  For ease of reference, this Response refers primarily to "claims," although the same analysis applies to the discharge of "debts."

[11] The Confirmation Order adopted the definitions of terms in the Consensual Plan, as modified.  Compl. Ex. B at 2 n.1.

incorporate] the broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (citing *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990)); *see also In re Chateaugay*, 53 F.3d at 496-97 ("[T]he Supreme Court reviewed the legislative history of the Bankruptcy Code and noted Congress's intent to invest the term 'claim' with the 'broadest possible' scope so that 'all legal obligations of the debtor . . . will be able to be dealt with in a bankruptcy case.'") (quoting *Davenport*, 495 U.S. at 558); *St. Laurent v. Ambrose* (*In re St. Laurent II*), 991 F.2d 672, 678 (11th Cir. 1993) ("The legislative history of the Bankruptcy Code indicates that 'claim' was to be given the broadest possible definition." (internal quotation omitted)); *Buckner v. Westmoreland Coal Co.* (*In re Westmoreland Coal Co.*), 213 B.R. 1, 6 (Bankr. D. Colo. 1997) ("The bankruptcy system is intended to act as a comprehensive process for resolution of all of a debtor's financial obligations.  This is particularly the case in Chapter 11.").

24.      In light of this broad definition of "claim," it does not matter whether the premiums that the UMWA Trustees are seeking to collect through the D.C. Litigation were assessed before or after the Effective Date of the Confirmation Order in this case.  *See Stewart Foods v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141, 146 (4th Cir. 1995) (debtor's obligation to pay yearly sum for 10 years as severance to retired employee was a single claim in bankruptcy).  A creditor may have a "claim" under Section 101(5) even if a cause of action on that claim has not yet accrued.  *See Epstein v. Official Comm. of Unsecured Creditors* (*In re Piper Aircraft, Corp.*), 58 F.3d 1573, 1576 (11th Cir. 1995) (rejecting the "accrual test"—under which "there is no claim for bankruptcy purposes until a claim has accrued under state law"—for determining whether a claim exists prior to confirmation).  Thus, the relevant question in this case is not whether the UMWA Trustees could have filed the D.C. Litigation before the Effective Date of the Confirmation Order,

but whether the alleged *liability* that underlies the causes of action asserted in the D.C. Litigation existed prior to the Effective Date.

25.    The clear answer is that JW Aluminum's alleged liabilities under the Coal Act arose no later than the effective date of the Coal Act—February 1, 1993.  Coal Act liabilities are expressly made *joint and several* between coal operators and their "related persons."  *See* 26 U.S.C. § 9704(a) ("Any related person with respect to an assigned operator shall be jointly and severally liable for any [Combined Fund] premium . . . ."); *id.* § 9711(c)(1) ("[E]ach related person of a last signatory operator . . . shall be jointly and severally liable with the last signatory operator for the [provision of IEP coverage]."); *id.* § 9712(d)(4) ("[L]ast signatory operator[s] . . , and any related person . . . shall be jointly and severally liable" for 1992 Plan premiums.).  The joint-and-several nature of these liabilities means that a "related person" is liable for Coal Act obligations even if the coal operator is satisfying that obligation.  Accordingly, even though Walter Industries was providing an IEP and paying Coal Act premiums prior to the Effective Date of the Confirmation Order, related persons had joint-and-several liability for those obligations.  Thus, the UMWA Trustees had a "claim" within the meaning of Section 101(5) and the Confirmation Order as of the inception of the Coal Act—more than two years before the Chapter 11 discharge.  *See In re Westmoreland*, 213 B.R. at 14 ("The decisions of courts that have addressed bankruptcy treatment of Coal Act obligations uniformly conclude that Coal Act obligations create claims to be administered in the bankruptcy process.").

26.    This is even true if the purported Coal Act liabilities at issue were classified as "contingent."  *See In re SunCruz Casinos, LLC*, 342 B.R. 370, 378 (Bankr. S.D. Fla. 2006) (explaining that creditor was mistaken in thinking that "a 'claim' had to be both liquidated and matured before it could be asserted.").  Contingent claims are claims "in which a debtor will be

required to pay only upon the occurrence of a future event triggering the debtor's liability." *In re Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010).    As the Eleventh Circuit has held, "[c]ontingent rights to payment need not be currently enforceable in order to constitute a claim." *Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 558 (11th Cir. 2013).    Courts have recognized that the inclusion of "contingent" claims within the broad definition of "claims" in Section 101(5) is essential to achieving the finality Congress intended.    *See, e.g.*, *Cal. Dep't of Health Servs. v. Jensen* (*In re Jensen*), 995 F.2d 925, 929 (9th Cir. 1993) ("This 'broadest possible definition' of 'claim' is designed to ensure that 'all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case.'").    Accordingly, "any doubt as to the existence of a claim should be resolved in favor of finding that a contingent claim existed." *In re Wilbur*, 237 B.R. 203, 207 (Bankr. M.D. Fla. 1999) (citing *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 532 (9th Cir. 1998)).

27.    *SunCruz* is particularly instructive on this point.    In that case, the Bankruptcy Court for the Southern District of Florida rejected a creditor's argument that it was not required to file an administrative claim to preserve what the creditor described as a "theoretical" claim that had not yet accrued at the time of the administrative bar date.    342 B.R. at 378-79.    The debtors in *SunCruz* had entered into a contractual relationship with a maritime liability insurer eight months after the debtors filed for bankruptcy.    342 B.R. at 373.    Under the terms of their contract, if the debtors discontinued their liability insurance coverage, they were required to pay "Release Call" premiums to cover prospective unasserted liability claims.    *Id.* at 374.    Despite receiving notice of the administrative claims bar date and the hearing to confirm the plan of reorganization, the insurer failed to file an administrative claim because the vessels at issue remained insured at the time the administrative claims bar date passed.    *Id.* at 378-79.    Thereafter, when debtors discontinued their

liability insurance coverage, the insurer sent a demand for Release Call premiums to the debtors. *Id.* at 379. The insurer's counsel explained to the court that the insurer did not file an administrative claim by the court-ordered deadline because at the time of the administrative claims bar date, it only "had a theoretical claim":

> THE COURT: Why didn't the American Club file a contingent claim?
> . . .
> [COUNSEL]: At the time that it received notice in December 2004, from this Court, that there was going to be a confirmation plan submitted at the end of that month, so the Club had like two weeks' notice. ***It didn't know the amount of any claim it might have. It knew it had a theoretical claim*** . . . .

*Id.* at 378. Rejecting this argument, the bankruptcy court explained that a future right to payment does not need to be "liquidated and matured before it [can] be asserted" and held the insurer's claim was extinguished by the confirmation order. *Id.*

28.  In *Leckie*, the district court, in an order affirmed by the Fourth Circuit, recognized this same principal with respect to Coal Act liabilities. It held that, because "Defendants are liable for past *and future* Coal Act premiums due to [the UMWA Trustees] even though future premiums have not yet accrued and are not fixed in their amount" and "[p]ayment is contingent upon the number of surviving retirees," the UMWA Trustees "hold an unliquidated claim, contingent, at least in part for Coal Act premiums." *Leckie Smokeless*, 201 B.R. at 172 (emphasis added). The court specifically noted that "there is nothing in the Bankruptcy Code expressly limiting the definition of 'claim' to preclude future liabilities such as those due to [the Trustees] under the Coal Act" and that "there is nothing in the Coal Act explicitly stating that liabilities under that statute remain unaffected by bankruptcy." *Id.*

29.  In sum, regardless of whether JW Aluminum's "related person" Coal Act liabilities are classified as "unmatured" or "contingent," they gave rise to "claims" that arose prior to the Effective Date of the Confirmation Order and thus were discharged.

### 2.    The UMWA Trustees' characterization of Coal Act premiums as "taxes" does not change this analysis.

30.    The UMWA Trustees attempt to avoid the effect of the 1995 discharge on their claims in the D.C. Litigation by arguing that Coal Act premiums are taxes.  *See* Mot. at 2 ("[P]remium obligations under the Coal Act are taxes—meaning that they arise periodically, as they are incurred, with each period's obligation constituting a separate debt.").  As in the AIA context, however, this characterization is ultimately irrelevant.  Even if Coal Act premiums were accurately described as "taxes," they are still "claims" subject to discharge.

31.    That is the holding of the Fourth Circuit in *Leckie.  See* 99 F.3d at 579.  In *Leckie*, various coal companies that had filed for bankruptcy protection under Chapter 11 asked the bankruptcy court to approve a sale of their assets, free and clear of any future Coal Act liabilities. *Id.* at 577.  The UMWA Trustees objected based on the same arguments they make in this case:

> The Plan and Fund have argued that, because future Coal Act premiums have not yet been assessed, liability for those premiums does not yet exist, the Plan and Fund therefore cannot now assert claims to those premiums, and the [] courts therefore cannot now issue orders concerning liability for those premiums.

*Id.* at 580.  Even though the Fourth Circuit agreed with the UMWA Trustees that Coal Act premiums are "taxes," *id.* at 583, it held that future, unassessed Coal Act premiums were "claims" within the broad meaning of Section 101(5):

> In accordance with Congress's desire that we interpret the term 'claim' broadly, and in light of the statute's express indication that even unmatured and contingent rights to payment are to be regarded as claims, we hold that the Plan and Fund do have claims to future premium payments.

*Id.* at 581.  The UMWA Trustees are in no position to argue that *Leckie* was wrongly decided because, as in the AIA context, the UMWA Trustees are collaterally estopped from relitigating the issue.  The determination that unassessed Coal Act premiums give rise to present "claims" that may be administered (such as terminated, modified, or discharged) in accordance with the

Bankruptcy Code was essential to the Fourth Circuit's judgment. The UMWA Trustees had a full and fair opportunity to litigate this issue in *Leckie*, and having lost, are not free to ask this Court to reach a different conclusion.

32.     Following *Leckie*, numerous other courts have concluded that liability for Coal Act premiums—including both accrued premiums and future payments—is a debt that a bankruptcy court can adjust or eliminate in its entirety through different provisions of the Bankruptcy Code. *See In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 327-38 (Bankr. E.D. Va. 2016) (current and future Coal Act liabilities can be modified, and even terminated, under § 1114); *Walter III*, 2016 WL 2894091, at *11-12 (same);  *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 281-82 (Bankr. E.D. Ky. 2004) (same); *Walter II*, 551 B.R. at 640-42 (liability for current and future Coal Act premiums can be extinguished under § 363 sale).

33.     The UMWA Trustees ignore these holdings, even though they cite *Leckie* for the proposition that Coal Act premiums are "taxes." Mot. at 13. Indeed, the UMWA Trustees' Motion fails to cite *any* case in which a court's characterization or description of Coal Act premiums as "taxes" meant that unassessed premiums were not "claims" within the meaning of Section 101(5). The three 1990s cases on which the UMWA Trustees rely concern only whether Coal Act premiums are "taxes" for purposes of Section 503(b)(1)(B), such that they are entitled to administrative priority under Section 507(a)(1). *See Adventure Res.*, 137 F.3d at 793-94 ("We are more concerned at present, however, with that category of administrative expenses comprising 'any tax . . . incurred by the estate[.]' § 503(b)(1)(B)(i). Claims for taxes . . . are entitled to priority over all other unsecured claims. § 507(a)(1)."); *In re Sunnyside*, 146 F.3d at 1276-77 (holding that Coal Act premiums are "taxes" for purposes of Section 503(b)(1)(B); *In re Chateaugay*, 53 F.3d at 498 ("We must next determine whether Coal Act contributions are 'tax[es] . . . incurred by the

estate,' 11 U.S.C. § 503(b)(1)(B), entitled to administrative priority."). These cases are inapposite. Again, the issue in this case is whether unassessed Coal Act premiums give rise to "claims" that were discharged under the Confirmation Order, not whether they are "taxes" within the meaning of Section 503(b)(1)(B) and thus entitled to administrative priority under Section 507(a)(1). *Cf. Walter I*, 542 B.R. at 883 ("As is evident, these cases focus on the priority to which claims under the Coal Act are entitled in bankruptcy, an issue that is not before the Court.").

34.     In light of this distinction, the Court need not decide whether the cases on which the UMWA Trustees' argument is premised remain good law after *NFIB*. *See* Mot. at 11-14.[12] Nor must it decide whether the functional test advocated by the UMWA Trustees and adopted by these cases remains the appropriate standard for resolving Section 503(b)(1)(B) issues in the wake of *NFIB*. *See id.* at 12-13.[13] As the Fourth Circuit's decision in *Leckie* demonstrates, even if unassessed Coal Act premiums were to be considered as "taxes" for some purposes relevant to the Bankruptcy Code, this characterization does not change the fact that unassessed Coal Act

---

[12] Even before *NFIB*, at least one bankruptcy court questioned this line of cases holding that Coal Act premiums are taxes under Section 503(b)(1)(B). *See In re Westmoreland*, 213 B.R. at 12 n.11 ("*Chateaugay* is cited by the UMWA Trustees and several courts for its ruling that Coal Act obligations are taxes. But due to the peculiar circumstances in *Chateaugay*, such conclusion may have been as much a product of pragmatism as it was the result of careful legal analysis.").

[13] Even if the functional test survives *NFIB*, a proper application of that test would yield the same conclusion that Coal Act premiums are not "taxes." For example, under the UMWA Trustees' proposed standard—the four-factor analysis set forth in *County Sanitation District No. 2 of Los Angeles County v. Lorber Industries of California (In re Lorber Industries of California, Inc.)* for determining administrative priority under Sections 503 and 507—an obligation is characterized as a "tax" only if it is: (i) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (ii) imposed by, or under authority of the legislature; (iii) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and (iv) under the police or taxing power of the state. 675 F.2d 1062, 1066 (9th Cir. 1982). Here, the *Lorber* test is not satisfied—and thus Coal Act liabilities are not "taxes"—because, among other things, the Coal Act was not designed to raise money for a "public purpose," but for private nongovernmental endeavors. *See Walter II*, 551 B.R. at 639 ("At its core, the Coal Act essentially functions akin to a funding mechanism for a multi-employer benefit plan, not as a taxing scheme."). As *Walter II* recognized, Coal Act assessments are made, received, and enforced by the UMWA Trustees, which are private, nongovernmental trusts; Coal Act premiums "are used to pay for health and welfare benefits of retired mine workers who previously worked for private businesses," not government employees; and the Coal Act allows a coal company paying Coal Act premiums to take a tax deduction for federal income tax purposes, just as it can do for contributions to a multi-employer benefit plan. *Id.*

premiums fall within the broad definition of "claims" and thus are subject to JW Aluminum's Chapter 11 discharge.  *See* 99 F.3d at 580-81.

**D.     The Discharge Applies to All Coal Act Liabilities, Including any IEP-Related Obligation.**

35.     The UMWA Trustees[14] also argue that, even if JW Aluminum's alleged obligation to pay Coal Act premiums gives rise to a "claim" that could have been discharged, its alleged obligation to establish an IEP for retirees who had been covered by Walter Industries' now-defunct IEP does not constitute a "claim" in bankruptcy and thus could not have been discharged.  *See* Mot. at 17-18.  In making this argument, the UMWA Trustees attempt to analogize JW Aluminum's alleged IEP-related liability to "ongoing statutory obligations" that arise through the government's exercise of its regulatory authority, such as environmental and safety compliance.

36.     The UMWA Trustees' argument is contradicted by the Coal Act provisions on which they rely and not supported by any of the cases they cite.  To be clear, JW Aluminum is not arguing that its bankruptcy discharge in 1995 immunizes the company from complying with environmental and safety obligations that arise out of its current operations or its current possession and use of property.  Thus, the Trustees' reliance on the U.S. Supreme Court's decision in *Ohio v. Kovacs*, 469 U.S. 274 (1985), is misplaced.  The *Kovacs* Court, after holding that certain pre-existing environmental clean-up liabilities had been discharged in the debtor's bankruptcy, noted that its holding should not be interpreted as a suggestion that this discharge meant that the debtor or anyone else in possession of the site did not have to "comply with the environmental laws of the State."  *Id.* at 285.  Similarly, the Seventh Circuit in *In re CMC Heartland Partners*, stated that, under *Kovacs*, "[h]aving been a debtor in bankruptcy does not authorize a firm to

---

[14] This final argument is relevant only to claims of the 1992 Plan Trustees, as there is no IEP requirement relating to the Combined Fund.

operate a nuisance today." 966 F.2d 1143, 1146 (7th Cir. 1992). Of course, this doctrine has no application here, as the Coal Act obligations the UMWA Trustees seek to enforce are based on JW Aluminum's corporate affiliation with a coal operator nearly a quarter of a century ago, not on its current operations. JW Aluminum's request for relief in this adversary proceeding does not implicate the federal or state government's ability to ensure that JW Aluminum's ongoing operations and land use comply with environmental and safety regulations.

37.    Indeed, as with the dischargeability of claims for payment of premiums to the Combined Fund and the 1992 Plan, the real issue here is whether the UMWA Trustees' claim for establishing an IEP falls within the broad definition of "claim" in the Confirmation Order. To answer that question, it is important to define precisely the statutory obligation at issue, as well as the appropriate remedy to enforce that obligation. As the Coal Act provision cited by the UMWA Trustees makes clear, the Act does not impose an obligation on anyone, much less a "related person," to *establish* an IEP. *See* Mot. at 17-18 (citing 26 U.S.C. § 9711(a)). Rather it mandates that a "last signatory operator" otherwise required to maintain an IEP "pursuant to a 1978 or subsequent coal wage agreement shall *continue to provide health benefits coverage* . . . which is *substantially the same* as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992." 26 U.S.C. § 9711(a) (emphasis added). This "*coverage* shall continue to be provided for as long as the last signatory operator (and any related person) remains in business." *Id.* (emphasis added). In other words, the statutory obligation is merely to continue providing "*coverage*" that is "*substantially the same*" as the coverage provided under the IEP.

38.    Where, as here, a last signatory operator's IEP has been defunct for more than a year, there is no IEP to "continue." Accordingly, the relevant statutory obligation is to provide "coverage" that is "substantially the same" as the coverage that had been provided under the IEP.

*Id.* That obligation is satisfied by the payment of premiums for the enrollment of former IEP beneficiaries in the 1992 Plan. In fact, the Coal Act contains several provisions designed to ensure that the 1992 Plan provides coverage similar to the coverage required under IEPs. *See, e.g.*, 26 U.S.C. § 9711(d) (last signatory operator "shall not be treated as failing to meet [IEP-related] requirements . . . if benefits are provided to eligible beneficiaries under managed care and cost containment rules and procedures" described in section 9712(c) [which provides that the 1992 Plan "shall provide health care benefits coverage to each eligible beneficiary"]); *id.* § 9712(c)(4) (any last signatory operator required to maintain an IEP shall be permitted to use "managed care and cost containment rules and programs" developed under this section [*i.e.*, the 1992 Plan] if the operator elects to do so"). In sum, because the coverage provided under the 1992 Plan is substantially similar to the coverage required to be provided under an IEP, it is *that* coverage that "related persons" must provide under Section 9711(a) of the Coal Act.

39. The UMWA Trustees' allegations in the D.C. Litigation are consistent with this statutory framework. The UMWA Trustees allege that, when the Walter Industries IEP was terminated on April 1, 2016, its beneficiaries were enrolled in the 1992 Plan. *See* Compl. Ex. C, ¶ 23 ("Effective April 1, 2016, the 1992 Plan began providing health benefit coverage to those eligible retirees and dependents, who were previously receiving health benefit coverage from Walter [Industries'] IEP."). Accordingly, these beneficiaries have *continued* to receive the required health benefits *coverage* through the 1992 Plan. Absent a discharge, a related person's obligation would be to pay premiums to the 1992 Plan for this coverage. Nothing in Section 9711(a) requires a related person to establish a new IEP or to reinstate the defunct Walter Industries IEP.

40.    Indeed, JW Aluminum's alleged liability in the D.C. Litigation can arise only from a failure to have paid money.  The Coal Act's enforcement provision limits the UMWA Trustees' ability to a bring a civil action to claims "arising out of an obligation to pay any amount required to be paid by [the Coal Act]."  26 U.S.C. § 9721.  Thus, to the extent the UMWA Trustees' IEP claim in the D.C. Litigation is valid in the first instance, it is a claim based on a failure to pay.

41.    This interpretation of Section 9711(a), as imposing payment obligations, is also consistent with the potential remedies that the UMWA Trustees could seek in the D.C. Litigation. As the *Westmoreland* bankruptcy court noted in rejecting the Trustees' request to compel a coal operator to reinstate its own IEP, "[g]enerally, an equitable remedy is available only when the remedy at law, typically damages, is inadequate."  213 B.R. at 16 (citing *Bugher v. Feightner*, 722 F.2d 1356 (7th Cir. 1983)).  The *Westmoreland* bankruptcy court further noted that the UMWA Trustees had previously sought an injunction in federal district court to force Westmoreland to reinstate its IEP, but the district court declined to order that remedy, instead ordering Westmoreland to pay a weekly sum of money.  *Id.*  Accordingly, although the UMWA Trustees have requested that the D.C. court enter a mandatory injunction requiring JW Aluminum to "establish" an IEP, there is no statutory basis for such a request and no equitable right to that remedy given the availability of a money-damages award in the form of premium payments to the 1992 Plan.

42.    The reducibility of all Coal Act obligations, including IEP-related obligations, to a payment of money means that any claims for those obligations are dischargeable in bankruptcy. *See* 11 U.S.C. § 101(5)(B) (defining "claim" to include "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment").  As *Westmoreland* recognized, "[w]hen a creditor has both an equitable remedy to enforce or prohibit action as well as a right to

payment, it is the right to payment which constitutes the claim to be administered in bankruptcy." 213 B.R. at 16 (citing *Johnson v. Home State Bank*, 501 U.S. 78, 83-84 (1991)).  Even the cases cited by the UMWA Trustees recognize and apply this doctrine.  *See Kovacs*, 469 U.S. at 283 (environmental clean-up obligation that could be satisfied by payment of money was discharged); *see also Mark IV Indus., Inc. v. N.M. Env't Dep't* (*In re Mark IV Indus., Inc.*), 459 B.R. 173, 186 (S.D.N.Y. 2011) (analyzing whether regulatory agency had right to payment for environmental clean-up costs).

43.      In light of the structure of the Coal Act and the broad definition of "claim" under the Bankruptcy Code, it is unsurprising that the UMWA Trustees have repeatedly failed in their efforts in other cases to argue that Coal Act obligations—including IEP-related obligations—cannot be terminated or discharged in bankruptcy.  For example, in *Walter II*, the district court did not distinguish between the payment of premiums and the maintenance of an IEP in holding that the bankruptcy court properly approved the Section 363 transfer of Walter Industries' assets free and clear of *any* Coal Act liabilities.  *See* 551 B.R. at 643.  In *Walter I*, the bankruptcy court held that Coal Act obligations, including the obligation to maintain an IEP, could be modified or terminated under Section 1114 of the Bankruptcy Code.  542 B.R. at 881-83.  In doing so, the court noted that the only other published decision to consider this issue also held that statutory retiree benefits could be modified or terminated in bankruptcy.  *Id.* at 881-82 (citing *Horizon*, 316 B.R. at 271-76).  Because there is no relevant difference between the types of "claims" that are subject to discharge under Section 1141 and the types of "claims" that are subject to modification or termination under Section 1114 or Section 363, this Court should follow *Walter I* and *Walter II* in rejecting the Trustees' argument that IEP-related liability is "not a 'claim' and cannot be 'discharged' in bankruptcy."  Mot. at 18.

## IV.   CONCLUSION

Based on the foregoing, JW Aluminum respectfully requests that the Court deny the UMWA Trustees' Motion to Dismiss and grant JW Aluminum all such further relief to which it may be entitled.

DATED: August 11, 2017

*/s/* Scott A. Stichter
Scott A. Stichter (FBN 0710679)
sstichter@srbp.com
STICHTER, RIEDEL, BLAIN & POSTLER, P.A.
110 E. Madison Street, Suite 200
Tampa, Florida 33602
Phone: (813) 229-0144
Fax: (813) 229-1811
Email: sstichter@srbp.com
and
Mark M. Maloney (Ga. Bar No. 468104)
Kevin J. O'Brien (Ga. Bar No. 714849)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 572-4600
Fax: (404) 572-5100
Email: mmaloney@kslaw.com
            kobrien@kslaw.com
*Attorneys for Plaintiff JW Aluminum Company*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this 11th day of August, 2017, by the Court's CM/ECF system to all parties receiving electronic notice.

*/s/* Scott A. Stichter
Scott A. Stichter (FBN 0710679)