**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| In re:<br><br>**HILLSBOROUGH HOLDINGS<br>CORPORATION,**<br><br>    **Debtor.** | **Chapter 11<br>Jointly Administered<br>Case No. 8:89-bk-9715<br>through 8:89-bk-9746<br>and 8:90-bk-11997** |
| In re:<br><br>**JW ALUMINUM COMPANY,**<br><br>    **Debtor.** | **Case No. 8:89-bk-9718** |
| **JW ALUMINUM COMPANY,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**MICHAEL H. HOLLAND, MICHAEL<br>MCKOWN, JOSEPH R. RESCHINI, and<br>CARLO TARLEY, as Trustees of the<br>UNITED MINE WORKERS OF<br>AMERICA 1992 BENEFIT PLAN,**<br><br>**and**<br><br>**MICHAEL H. HOLLAND, MICHAEL<br>MCKOWN, WILLIAM P. HOBGOOD,<br>MARTY HUDSON, JOSEPH R.<br>RESCHINI, CARL E. VANHORN, and<br>GAIL R. WILENSKY, as Trustees of the<br>UNITED MINE WORKERS OF<br>AMERICA COMBINED BENEFIT FUND,**<br><br>    **Defendants.** | **Adversary Proceeding<br>No. 8:17-ap-480-KRM** |

**PLAINTIFF JW ALUMINUM'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff JW Aluminum Company ("JW Aluminum") hereby moves for partial summary judgment on its request for a declaratory judgment that (1) certain claims that the Trustees of the United Mine Workers of America 1992 Benefit Plan and the Trustees of the United Mine Workers of America Combined Benefit Fund (collectively, the "UMWA Trustees") asserted against JW Aluminum in *Holland v. United States Pipe and Foundry Company, LLC, et al.*, Civil Action No. 16-cv-1577, in the United States District Court for the District of Columbia (the "D.C. Litigation"), were discharged in this Chapter 11 case, and (2) the UMWA Trustees have violated this Court's discharge injunction by filing and prosecuting the D.C. Litigation.[1]

## I.   INTRODUCTION

1.      In the D.C. Litigation, the UMWA Trustees allege that JW Aluminum is liable for paying certain healthcare premiums for retired coal miners and their family members pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. §§ 9701 *et seq*. The UMWA Trustees do not allege that JW Aluminum is, or has ever been, in the coal business. Instead, they allege that JW Aluminum is jointly and severally liable for Coal Act obligations as a "related person" to a now-defunct coal company, Walter Industries.

2.      Under the Coal Act, any claim by the UMWA Trustees against JW Aluminum for "related person" liability arose, at the latest, when the Coal Act's financial obligations became fully effective on February 1, 1993 because, at that time, all "related persons" became jointly and severally liable for satisfying Coal Act obligations.   But the UMWA Trustees—despite their active participation in the Chapter 11 case—failed to object to the discharge of the debts and claims against JW Aluminum contained in the Amended Joint Plan of Reorganization (the "Consensual Plan") and failed to take any action to assert or preserve any claims against JW

---

[1] This motion seeks to resolve all issues in this case but one: the amount of damages (including attorneys' fees) to be awarded to JW Aluminum as a result of the UMWA Trustees' violation of the discharge injunction.

Aluminum.  Accordingly, the UMWA Trustees' Coal Act claims were discharged on March 17, 1995—the effective date (the "Effective Date") of the Order Confirming the Amended Joint Plan of Reorganization (the "Confirmation Order") in this case.  The UMWA Trustees' prosecution of these claims in the D.C. Litigation therefore violates the Court's discharge injunction.

## II.    SUMMARY JUDGMENT EVIDENCE

3.    In support of this motion, JW Aluminum refers the Court to the Declaration of Scott A. Stichter ("Stichter Decl.") and all exhibits attached thereto, on file, or to be filed simultaneously with this motion, all of which are incorporated by reference, as allowed by Federal Rule of Civil Procedure 10 and Federal Rule of Bankruptcy Procedure 7010.

## III.    UNDISPUTED FACTS

### A.    JW Aluminum files for Chapter 11 protection in 1989.

4.    On December 27, 1989, JW Aluminum filed a Chapter 11 petition in this Court. Stichter Decl. Ex. 2.  At the time of its filing, JW Aluminum and several other companies, including Walter Industries, Inc. ("Old Walter Industries"), were owned by Hillsborough Holdings Corporation ("Hillsborough").  Stichter Decl. Ex. 4, Ex. VIII.  Old Walter Industries was a holding company that owned many other companies in a variety of industries, including Jim Walter Resources, Inc. ("Jim Walter Resources"), a coal-mine operator.  *Id.*  During the bankruptcy proceedings, Old Walter Industries was merged into Hillsborough, and the surviving entity was renamed Walter Industries, Inc. ("Walter Industries").[2]  Stichter Decl. Ex. 4, Section VII.O.6

---

[2] After the bankruptcy case was closed, Walter Industries changed its name to Walter Energy, Inc.  For ease of reference, this Motion refers to this entity consistently as "Walter Industries."

**B.      Congress passes the Coal Act while JW Aluminum's bankruptcy case is pending.**

5.      On October 24, 1992, while JW Aluminum's Chapter 11 case was pending, Congress passed the Coal Act.  The financial obligations in the Coal Act became fully effective on February 1, 1993.  *See* 26 U.S.C. §§ 9704(i), 9708, 9711, 9712(b)(2); *see also UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 201 B.R. 163, 166 (S.D. W. Va. 1996) ("The Coal Act became effective February 1, 1993"), *aff'd*, 99 F.3d 573 (4th Cir. 1996).

6.      The Coal Act contains three statutory mechanisms to provide healthcare benefits for retired employees (and their dependents) of coal mine operators that signed collective bargaining agreements with the United Mine Workers of America, all of which are now being invoked by the UMWA Trustees in the D.C. Litigation:

(a)      First, the Coal Act created the United Mine Workers of America Combined Benefit Fund ("Combined Fund") to provide health benefits to coal miners who had retired and who were receiving benefits from certain coal industry trust funds as of July 20, 1992.  The Coal Act requires each "assigned operator"—the coal-wage-agreement signatory that last employed the miner—to pay premiums to the Combined Fund.  26 U.S.C. §§ 9702(a), 9704.  "Related persons" were jointly and severally liable to the Combined Fund for these premiums as of the Coal Act's February 1, 1993 effective date.  *Id*. § 9704(a).

(b)      Second, the Coal Act required the "last signatory operator" of a miner who retired by September 30, 1994 and was receiving retiree health benefits coverage through an individual employer plan ("IEP") maintained pursuant to a coal wage agreement to continue to provide benefits coverage that is substantially similar to the coverage being provided by such IEP on January 1, 1992.  *Id*. § 9711(a).  "Related persons" were also jointly and severally liable for this obligation as of the Coal Act's February 1, 1993 effective date.  *Id*. § 9711(c).

(c)      Third, the Coal Act created the United Mine Workers of America 1992 Benefit Plan ("1992 Plan") to provide health benefits coverage for (i) retired coal miners who retired by September 30, 1994 and who otherwise would have been eligible for the Combined Fund, except that they retired after the cut-off date for participation in the Combined Fund, and (ii) coal miners who also retired by September 30, 1994, but who were not receiving benefits from the applicable "last signatory operator" through an IEP required under 26 U.S.C. § 9711.  *Id*. § 9712.  To fund the 1992 Plan and finance these benefits, the Coal Act required each coal operator that had signed a 1988 coal wage

4

agreement to (i) pay annual prefunding premiums,[3] (ii) pay monthly per beneficiary premiums, and (iii) post certain security. *Id.* § 9712(d)(1)-(4). "Related persons" were jointly and severally liable to the 1992 Plan for these financial obligations as of the Coal Act's February 1, 1993 effective date. *Id.* § 9712(d)(4).

Under the Coal Act, "related persons"—all of whom are "jointly and severally" liable for these Coal Act obligations—are defined to include companies that shared certain common ownership with certain coal mining operators as of July 20, 1992. *See id.* § 9701(c)(2). In the D.C. Litigation, the UMWA Trustees allege that, on July 20, 1992, JW Aluminum was a subsidiary of—and thus purportedly a "related person" to—Walter Industries. Stichter Decl. Ex. 1, ¶ 16.

### C.    JW Aluminum proposes a Consensual Plan that imposes on it no obligations for retiree health benefits and that provides JW Aluminum a complete discharge.

7.    On December 9, 1994, JW Aluminum and the other Debtors, along with various creditors, proposed the Consensual Plan for all Debtors.[4]    *See* Stichter Decl. Ex. 6; *see also* Stichter Decl. Ex. 7 (the "Modification to the Consensual Plan"). Although the Consensual Plan imposes upon Walter Industries obligations for the funding of retiree health benefits, it does not require JW Aluminum to pay any retiree health benefits or any Coal Act liabilities.[5] Instead, the Consensual Plan provides that the confirmation of the Consensual Plan discharges all debts and claims against JW Aluminum arising before the Effective Date:

---

[3] Section 9712(d)(1)(A) of the Coal Act, as enacted in 1992, provided: "[C]ontribution requirements, which shall be applied uniformly to each 1988 last signatory operator, on the basis of the number of eligible and potentially eligible beneficiaries attributable to each operator, . . . shall include: (A) the payment of an annual prefunding premium for all eligible and potentially eligible beneficiaries attributable to a 1988 last signatory operator . . . ." Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, § 19143, 106 Stat. 2776, 3054-55 (1992).

[4] The Consensual Plan states that "[t]he Debtors' Chapter 11 Cases are being jointly administered pursuant to an order of the Court and the Consensual Plan is being presented as a joint plan of reorganization of [all of] the Debtors for administrative purposes only. . . . Pursuant to the Consensual Plan, Claims and/or Interests with respect to any Debtor shall be satisfied by such Debtor or its successor." Stichter Decl. Ex. 6, at 1. Thus, JW Aluminum had no responsibility under the Consensual Plan for payment or performance of any obligations of any other Debtor.

[5] The Consensual Plan provides, for example, that only two debtors—Walter Industries and Jim Walter Computer Services, Inc.—shall have any obligations with respect to "continued funding of medical benefits" for retirees. Stichter Decl. Ex. 6, ¶ 5.4 (titled "Funding of Retiree Health Benefits"). No other debtor, including JW Aluminum, is subject to this provision.

12.2 <u>Discharge</u>. ***The issuance of the Confirmation Order shall (a) operate as a discharge, pursuant to Section 1141(d)(1) of the Code, effective as of the Effective Date, of any and all debts*** (as such term is defined in Section 101(12) of the Code) ***of or Claims against one or more of the Debtors that arose at any time before the Effective Date***, including, but not limited to, all principal and all interest, whether accrued before, on or after the Filing Date. Without limiting the generality of the foregoing, ***on the Effective Date, the Debtors shall be discharged from any debt that arose before the Effective Date,*** and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Code, to the full extent permitted by Section 1141(d)(1)(A) of the Code. Nothing in the Consensual Plan shall be deemed to waive, limit or restrict in any way the discharge granted upon Confirmation of the Consensual Plan pursuant to Section 1141 of the Code and effective as of the Effective Date.

Stichter Decl. Ex. 6, ¶ 12.2 (emphasis added).

8.      The Consensual Plan also provides for a permanent injunction prohibiting any person from pursuing collection of the discharged debts and claims:

12.3 <u>Injunction</u>.  In order to preserve and promote the settlements contemplated by and provided for in the Consensual Plan, effective on the Effective Date, all Persons who have held, hold or may hold a Demand, debt or Claim, or who have held, hold or may hold Interests, shall be permanently enjoined, to the fullest extent permitted by law, from taking any of the following actions against or affecting the Released Parties [i.e., the Debtors and certain of their creditors] or the Assets (or assets or other property) of the Released Parties with respect to such Claims, Demands or Interests (other than actions brought to enforce any rights or obligations under the Consensual Plan or any of the Reorganization Documents or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Released Parties or the Assets (or assets or other property) of the Released Parties or any direct or indirect successor in interest to any of the Released Parties, or any Assets (or assets or other property) of any such successor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Released Parties or the Assets (or assets or other property) of the Released Parties or any direct or indirect successor in interest to any of the Released Parties or any Assets (or assets or other property) of any such transferee or successor . . . and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Consensual Plan or any of the Reorganization Documents.

Stichter Decl. Ex. 6, ¶ 12.3.

**D.    The UMWA Trustees never objected to the Consensual Plan or confirmation and never filed any Claims of any type against JW Aluminum, and the Consensual Plan was confirmed.**

9.     On March 2, 1995, the Court entered the Confirmation Order.  *See* Stichter Decl. Ex. 8.  The Confirmation Order confirms the Consensual Plan and includes specific provisions ordering the discharge of all debts and claims against JW Aluminum that arose before the Effective Date and enjoining any holder of such debts and claims from taking any action to recover on them:

> 18.  Except as otherwise expressly provided in the Modified Consensual Plan or this Order, pursuant to Article XII, Section 12.3 of the Modified Consensual Plan and Section 1141(d) of the Bankruptcy Code, *the issuance of this Order shall operate as a discharge effective as of the Effective Date, of any and all Debts* (as such term is defined in Section 101(12) of the Bankruptcy Code) *or Claims against one or more of the Debtors that arose at any time before the Effective Date* and from any Debt or Claim of a kind specified in Sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, including, without limitation, all principal of, and interest on, all indebtedness, whether accrued before, on or after the Filing Date.  The discharge of the Debtors will be effective as to each Claim, regardless of whether a proof of Claim was filed or deemed filed, whether the Claim is an Allowed Claim or whether the Holder thereof voted to accept or reject the Consensual Plan.  *On the Effective Date, the Holder of every discharged Debt and Claim will be permanently enjoined from asserting against any and all of the Debtors or any of their respective assets, any other or further Claim based upon any law, rule or regulation or any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as provided in the [] Consensual Plan*.

Stichter Decl. Ex. 8, ¶ 18 (emphasis added).

10.     Prior to confirmation, the UMWA Trustees never filed any objections to the Consensual Plan or confirmation.  Moreover, even though the Confirmation Order established April 17, 1995 as the Administrative Claims Bar Date, the UMWA Trustees never filed an Administrative Claim[6] (or a proof of claim or any other claim) against JW Aluminum for any

---

[6] The Consensual Plan broadly defines "Administrative Claims" to include, among other things, "any indebtedness or obligations incurred or assumed by any of the Debtors" and "the actual and necessary costs and expenses of . . . operating the business of each of the Debtors."  Stichter Decl. Ex. 6, at ¶ 1.18.  Further, Administrative Claims are

"related person" obligations or other liabilities under the Coal Act. Indeed, the UMWA Trustees

filed just one proof of claim even mentioning Coal Act liabilities—a claim against Jim Walter

Resources (one of the 33 Debtors)—for pre-petition, pre-Coal Act debts in which the UMWA

Trustees stated merely that Coal Act liabilities might give rise to Administrative Claims against

Jim Walter Resources ("Amended Claim No. 84").[7]  *See* Stichter Decl. Ex. 9.

11.     Following entry of the Confirmation Order, the Consensual Plan was

consummated and became effective on March 17, 1995.  *See* Stichter Decl. Ex. 10.  On

September 22, 1998, JW Aluminum filed its Certificate of Substantial Consummation.  *See*

Stichter Decl. Ex. 11.  On November 30, 1998, the Court entered its Final Decree in JW

Aluminum's bankruptcy case, and the case was closed.  *See* Stichter Decl. Ex. 12.  That Decree

states that "the confirmation of the Plan vests all of the property of the estate in the Debtor(s),

free and clear of all claims and interests of creditors, of equity security holders and general

partners" and that the "Debtor(s) is/are released from all dischargeable debts."  *Id.*

**E.     Walter Industries files for bankruptcy for a second time in 2015.**

12.     On July 15, 2015, Walter Industries filed for Chapter 11 protection in the United

States Bankruptcy Court for the Northern District of Alabama.  *See In re Walter Energy, Inc.*,

No. 15-bk-02741 (Bankr. N.D. Ala. Jul. 17, 2015) (Dkt. 1); *see also United Mine Workers of Am.

Combined Benefit Fund v. Walter Energy, Inc.* ("*Walter II*"), 551 B.R. 631, 635 (N.D. Ala.

---

subject to the Bankruptcy Code's broad definition of a "claim."  *See In re Worldcom*, 401 B.R. 637, 643-44 (Bankr. S.D.N.Y. 2009) (applying the Section 101(5)(A) definition of "claim" to administrative claims arising post-petition).

[7] Even if Amended Claim No. 84 could be construed an Administrative Claim against Jim Walter Resources for Coal Act liabilities (in addition to a proof of claim for pre-petition debts), the claim had no applicability to JW Aluminum because, under the Consensual Plan, "Administrative Claims apply separately to each Debtor."  Stichter Decl. Ex. 6, ¶ 2.1; *see also* Stichter Decl. Ex. 4, Section II.N.2 ("The Chapter 11 Cases will not be substantively consolidated and . . . (iii) any obligation of any Debtor will be deemed to be an obligation of such Debtor only and any Claim which is filed in connection with any such obligation will be an Allowed Claim only against the Debtor against which such Claim has been filed . . . .").

2016).  Walter Industries ultimately sold its assets, converted its Chapter 11 case to a Chapter 7

case, and ceased satisfying any Coal Act obligations.  *Id.*

**F.**      **More than 20 years after the Confirmation Order, the UMWA Trustees file the D.C. Litigation in violation of the discharge.**

13.     The UMWA Trustees filed their original complaint in the D.C. Litigation on

August 3, 2016, and an amended complaint in March 2017.  *See* Stichter Decl. Ex. 1.  The

UMWA Trustees allege that Walter Industries provided retiree healthcare benefits as required by

the Coal Act until April 2016 when—during the pendency of its 2015 bankruptcy—it ceased

doing so.  *See* Stichter Decl. Ex. 1, ¶¶ 15, 27, 29.

14.     The UMWA Trustees contend that JW Aluminum is a "related person" to Walter

Industries, and thus is jointly and severally liable for its Coal Act obligations.  Stichter Decl. Ex.

1, ¶ 16.  Based on this purported joint-and-several liability, the UMWA Trustees assert claims

for payment of premiums to the 1992 Plan and the Combined Fund, and also seek to require JW

Aluminum to establish an IEP for the former Walter Industries beneficiaries.  Stichter Decl. Ex.

1, at 8-10 (prayer for relief).

## IV.   ARGUMENT AND AUTHORITIES

**A.**      **Summary Judgment Standard**

15.     Rule 56 of the Federal Rules of Civil Procedure, made applicable by Rule 7056 of

the Federal Rules of Bankruptcy Procedure, provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  JW Aluminum is entitled to summary

judgment on both counts alleged in its Complaint:   (1)   Count I, for a declaration that JW

9

Aluminum's alleged debts for Coal Act claims were discharged, and (2) Count II, for a declaration that the UMWA Trustees violated the discharge injunction.[8]

### B.      JW Aluminum's alleged Coal Act liabilities were discharged.

16.      The Consensual Plan does not require JW Aluminum to pay or perform any Coal Act obligations, but instead provides for a broad discharge "of any and all debts . . . of or Claims against one or more of the Debtors that arose at any time before the Effective Date."  Stichter Decl. Ex. 6, ¶ 12.2.  Consistent with this provision, the Confirmation Order provides for the "discharge effective as of the Effective Date, of any and all Debts . . . or Claims against one or more of the Debtors that arose at any time before the Effective Date."  Stichter Decl. Ex. 8, ¶ 18; *see also id.* ¶ 16 ("[O]n the Effective Date, all Assets shall vest in and be retained by the Debtors free and clear of all Claims . . . and Interests of the Holders of Claims and the Holders of Interests  in accordance with Sections 1141(b) and (c) of the Bankruptcy Code."); 11 U.S.C. § 1141(d)(1) (providing that the confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation").

17.      Thus, the only question for the Court is whether the purported Coal Act liabilities that form the basis of the UMWA Trustees' claims in the D.C. Litigation fall within the broad scope of discharged "Debts" or "Claims" under the Consensual Plan, Confirmation Order, and Section 1141.  They do.

---

[8] The UMWA Trustees filed an amended motion to dismiss on July 18, 2017.  *See* Am. Mot. to Dismiss (July 18, 2017) (Dkt. 17).  Therein, the UMWA Trustees argue that the Court cannot grant the declaratory relief requested by JW Aluminum because, among other reasons, the Court lacked the power to discharge Coal Act liabilities.  The UMWA Trustees contend that "Coal Act premium payment obligations are taxes, [and] the federal Anti-Injunction Act ("AIA") limits federal courts' subject matter jurisdiction to grant relief from them."  *Id.* at 16.  This is simply wrong.  Indeed, the UMWA Trustees litigated—and lost—this exact issue in *Walter II*.  *See* 551 B.R. at 639.  See JW Aluminum's Response to Defendants' Motion to Dismiss filed on August 11, 2017, incorporated by reference herein, at Section III.B.

18.     The term "Claim" is defined in the Consensual Plan and the Confirmation Order to include any "claim against one or more of the Debtors within the meaning of Section 101(5) of the [Bankruptcy] Code . . . ."  Stichter Decl. Ex. 6, at ¶ 1.48.[9]  In turn, Section 101(5) of the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ."  11 U.S.C. § 101(5)(A).  It is a broad definition, and intentionally so.  As the Supreme Court recognized, "Congress intended [in Section 101(5) to incorporate] the broadest available definition of 'claim.'"  *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (citing *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990)); *see also LTV Steel Co., Inc. v. Shalala* (*In re Chateaugay Corp.*), 53 F.3d 478, 496-97 (2d Cir. 1995) ("[T]he Supreme Court reviewed the legislative history of the Bankruptcy Code and noted Congress's intent to invest the term 'claim' with the 'broadest possible' scope so that 'all legal obligations of the debtor . . . will be able to be dealt with  in a bankruptcy case.'" (quoting *Davenport*, 495 U.S. at 558)); *St. Laurent v. Ambrose* (*In re St. Laurent II*), 991 F.2d 672, 678 (11th Cir. 1993) ("The legislative history of the Bankruptcy Code indicates that 'claim' was to be given the broadest possible definition." (internal quotation omitted)); *Buckner v. Westmoreland Coal Co.* (*In re Westmoreland Coal Co.*), 213 B.R. 1, 6 (Bankr. D. Colo. 1997) ("The bankruptcy system is intended to act as a comprehensive process for resolution of all of a debtor's financial obligations.  This is particularly the case in Chapter 11.").

19.     In light of this broad definition of "claim," it does not matter whether the premiums that the UMWA Trustees are seeking to collect through the D.C. Litigation were assessed before or after the Effective Date of the Confirmation Order in this case.  *See Stewart*

---

[9] The Confirmation Order adopted the definitions of terms in the Consensual Plan, as modified.  Stichter Decl. Ex. 8, at 2 n.1.

*Foods v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141, 146 (4th Cir. 1995) (debtor's obligation to pay yearly sum for 10 years as severance to retired employee was a single claim in bankruptcy). A creditor may have a "claim" under Section 101(5) even if a cause of action on that claim has not yet accrued. *See Epstein v. Official Comm. of Unsecured Creditors* (*In re Piper Aircraft, Corp.*), 58 F.3d 1573, 1576 (11th Cir. 1995) (rejecting the "accrual test"—under which "there is no claim for bankruptcy purposes until a claim has accrued under state law"—for determining whether a claim exists prior to confirmation). Thus, the relevant question in this case is not whether the UMWA Trustees could have filed the D.C. Litigation before the Effective Date of the Confirmation Order, but whether the alleged *liability* that underlies the causes of action asserted in the D.C. Litigation existed prior to the Effective Date.

20.     The clear answer is that JW Aluminum's alleged liabilities under the Coal Act arose no later than the effective date of the Coal Act—February 1, 1993. Coal Act liabilities are expressly made *joint and several* between coal operators and their "related persons." *See* 26 U.S.C. § 9704(a) ("Any related person with respect to an assigned operator shall be jointly and severally liable for any [Combined Fund] premium . . . ."); *id.* § 9711(c)(1) ("[E]ach related person of a last signatory operator . . . shall be jointly and severally liable with the last signatory operator for the [provision of IEP coverage]."); *id.* § 9712(d)(4) ("[L]ast signatory operator[s] . . . and any related person . . . shall be jointly and severally liable" for 1992 Plan premiums.). The joint-and-several nature of these liabilities means that a "related person" is liable for Coal Act obligations even if the coal operator is satisfying that obligation. Accordingly, even though Walter Industries was providing an IEP and paying Coal Act premiums prior to the Effective Date of the Confirmation Order, related persons had joint-and-several liability for those obligations. Thus, the UMWA Trustees had a "claim" within the

meaning of Section 101(5) and the Confirmation Order as of the inception of the Coal Act—
more than two years before the Chapter 11 discharge. *See In re Westmoreland*, 213 B.R. at 14
("The decisions of courts that have addressed bankruptcy treatment of Coal Act obligations
uniformly conclude that Coal Act obligations create claims to be administered in the bankruptcy
process.").

21.    This is true even if the purported Coal Act liabilities at issue were classified as
"contingent." *See In re SunCruz Casinos, LLC*, 342 B.R. 370, 378 (Bankr. S.D. Fla. 2006)
(explaining that creditor was mistaken in thinking that "a 'claim' had to be both liquidated and
matured before it could be asserted").    Contingent claims are claims "in which a debtor will be
required to pay only upon the occurrence of a future event triggering the debtor's liability." *In re
Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010).    As the Eleventh Circuit has held,
"[c]ontingent rights to payment need not be currently enforceable in order to constitute a claim."
*Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 558 (11th Cir. 2013).    Courts have
recognized that the inclusion of "contingent" claims within the broad definition of "claims" in
Section 101(5) is essential to achieving the finality Congress intended. *See, e.g.*, *Cal. Dep't of
Health Servs. v. Jensen* (*In re Jensen*), 995 F.2d 925, 929 (9th Cir. 1993) ("This 'broadest
possible definition' of 'claim' is designed to ensure that 'all legal obligations of the debtor, *no
matter how remote or contingent*, will be able to be dealt with in the bankruptcy case.'").
Accordingly, "any doubt as to the existence of a claim should be resolved in favor of finding that
a contingent claim existed." *In re Wilbur*, 237 B.R. 203, 207 (Bankr. M.D. Fla. 1999) (citing
*Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 532 (9th Cir. 1998)).

22.    *SunCruz* is particularly instructive on this point.    In that case, the Bankruptcy
Court for the Southern District of Florida rejected a creditor's argument that it was not required

to file an administrative claim to preserve what the creditor described as a "theoretical" claim that had not yet accrued at the time of the administrative bar date. 342 B.R. at 378-79. The debtors in *SunCruz* had entered into a contractual relationship with a maritime liability insurer eight months after the debtors filed for bankruptcy. *Id.* at 373. Under the terms of their contract, if the debtors discontinued their liability insurance coverage, they were required to pay "Release Call" premiums to cover prospective unasserted liability claims. *Id.* at 374. Despite receiving notice of the administrative claims bar date and the hearing to confirm the plan of reorganization, the insurer failed to file an administrative claim because the vessels at issue remained insured at the time the administrative claims bar date passed. *Id.* at 378-79. Thereafter, when debtors discontinued their liability insurance coverage, the insurer sent a demand for Release Call premiums to the debtors. *Id.* at 379. The insurer's counsel explained to the court that the insurer did not file an administrative claim by the court-ordered deadline because at the time of the administrative claims bar date, it only "had a theoretical claim":

> THE COURT: Why didn't the American Club file a contingent claim?
> . . .
> [COUNSEL]: At the time that it received notice in December 2004, from this Court, that there was going to be a confirmation plan submitted at the end of that month, so the Club had like two weeks' notice. ***It didn't know the amount of any claim it might have. It knew it had a theoretical claim*** . . . .

*Id.* at 378. Rejecting this argument, the bankruptcy court explained that a future right to payment does not need to be "liquidated and matured before it [can] be asserted" and held the insurer's claim was extinguished by the confirmation order. *Id.*

23.     In *Leckie*, the district court, in an order affirmed by the Fourth Circuit, recognized this same principal with respect to Coal Act liabilities. It held that, because "Defendants are liable for past and future Coal Act premiums due to [the UMWA Trustees] even though future premiums have not yet accrued and are not fixed in their amount" and "[p]ayment is contingent

upon the number of surviving retirees," the UMWA Trustees "hold an unliquidated claim, contingent, at least in part for Coal Act premiums." *Leckie Smokeless*, 201 B.R. at 172. The court specifically noted that "there is nothing in the Bankruptcy Code expressly limiting the definition of 'claim' to preclude future liabilities such as those due to [the UMWA Trustees] under the Coal Act" and that "there is nothing in the Coal Act explicitly stating that liabilities under that statute remain unaffected by bankruptcy." *Id.*

24.     In sum, regardless of whether JW Aluminum's "related person" Coal Act liabilities are classified as "unmatured" or "contingent," they gave rise to "claims" that arose prior to the Effective Date of the Confirmation Order and thus were discharged.[10]

25.     JW Aluminum is thus entitled to judgment on Count I of its Complaint seeking a declaration that the UMWA Trustees' Coal Act claims against JW Aluminum were and are discharged.

**C.     The UMWA Trustees' prosecution of the D.C. Litigation violates this Court's discharge injunction.**

26.     Because the UMWA Trustees' claims against JW Aluminum for Coal Act liabilities were discharged, the UMWA Trustees' commencement and prosecution of those claims in the D.C. Litigation violates the Confirmation Order's permanent discharge injunction:

> On the Effective Date, the Holder of every discharged Debt and Claim will be permanently enjoined from asserting against any and all of the Debtors or any of their respective assets, any other or further Claim based upon any law, rule or

---

[10] In their amended motion to dismiss, the UMWA Trustees characterize Coal Act premiums as "taxes," in an attempt to argue that the claims at issue in the D.C. Litigation arose after the Effective Date of the Confirmation Order. The UMWA Trustees contend that, as taxes, Coal Act liabilities "arise periodically, as they are incurred, with each period's obligation constituting a separate debt." Am. Mot. to Dismiss at 2. The UMWA Trustees' characterization of Coal Act liabilities as "taxes" is both incorrect and inapposite. Coal Act liabilities cannot be uniformly characterized as "taxes" for all purposes relevant to the Bankruptcy Code. *Walter II*, 551 B.R. at 638-39. And even if the "taxes" label were appropriate in this context, future Coal Act liabilities are still "claims" within the meaning of Section 101(5)(A) of the Bankruptcy Code—even if those liabilities are "unmatured" or "contingent." *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 581 (4th Cir. 1996). See JW Aluminum's Response to Defendants' Motion to Dismiss filed on August 11, 2017, incorporated by reference herein, at Section III.C.2.

regulation or any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as provided in the [] Consensual Plan.

Stichter Decl. Ex. 8, ¶ 18.

27.    Similarly, the filing and maintenance of the D.C. Litigation violates the discharge injunction contained in the Consensual Plan—that "all Persons who have held, hold, or may hold a . . . debt or Claim . . . shall be permanently enjoined, to the fullest extent permitted by law" from taking any action to prosecute the claim or collect on the debt. *See* Stichter Decl. Ex. 6, ¶ 12.3.

28.    "A bankruptcy court may invoke its statutory contempt powers of § 105(a) to enforce a discharge injunction." *In re Dynamic Tours & Transp., Inc.*, 359 B.R. 336, 342 (Bankr. M.D. Fla. 2006) (citing *Hardy ex rel. IRS v. United States* (*In re Hardy*), 97 F.3d 1384, 1389 (11th Cir. 1996); *In re Riser*, 298 B.R. 469, 472 (Bankr. M.D. Fla. 2003)); *see also Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 966 (11th Cir. 2012) ("In the bankruptcy context, 'the creditor who attempts to collect a discharged debt is violating not only a statute but also an injunction and is therefore in contempt of the bankruptcy court that issued the order of discharge." (quoting *Cox v. Zale Del., Inc.*, 239 F.3d 910, 915 (7th Cir. 2001)) (citations omitted)).

29.    JW Aluminum is thus entitled to judgment on Count II of its Complaint seeking a declaration that the UMWA Trustees violated the Confirmation Order, the Consensual Plan, and 11 U.S.C. § 1141(d).

## V.    CONCLUSION

Based on the foregoing, JW Aluminum respectfully requests that the Court grant its motion for partial summary judgment, enter the declaratory judgments it seeks in this case, permit JW Aluminum to seek damages, including its attorneys' fees and other costs incurred as a

result of the UMWA Trustees' violation of the discharge injunction, and grant JW Aluminum all such further relief to which it may be entitled.

DATED: August 11, 2017

/s/ Scott A. Stichter
Scott A. Stichter (FBN 0710679)
sstichter@srbp.com
STICHTER, RIEDEL, BLAIN & POSTLER, P.A.
110 E. Madison Street, Suite 200
Tampa, Florida 33602
Phone: (813) 229-0144
Fax: (813) 229-1811
Email:  sstichter@srbp.com

and

Mark M. Maloney (Ga. Bar No. 468104)
Kevin J. O'Brien (Ga. Bar No. 714849)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 572-4600
Fax: (404) 572-5100
Email:  mmaloney@kslaw.com
          kobrien@kslaw.com

*Attorneys for Plaintiff JW Aluminum Company*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this 11th day of August, 2017, by the Court's CM/ECF system to all parties receiving electronic notice.

*/s/* Scott A. Stichter
Scott A. Stichter (FBN 0710679)