# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| **In re:**<br>**HILLSBOROUGH HOLDINGS CORPORATION,**<br>Debtor. | **Chapter 11**<br>**Jointly Administered**<br>**Case No. 8:89-bk-9715**<br>**through 8:89-bk-9746**<br>**and 8:90-bk-11997** |
| **In re:**<br>**JW ALUMINUM COMPANY,**<br>Debtor. | **Case No. 8:89-bk-9718** |
| **JW ALUMINUM COMPANY,**<br>Plaintiff,<br>v.<br>**MICHAEL H. HOLLAND et al.,**<br>Defendants. | **Adversary Proceeding**<br>**No. 8:17-ap-480-KRM** |

## JW ALUMINUM COMPANY'S REPLY IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

1. The UMWA Trustees' Opposition (Dkt. 25) confirms that JW Aluminum's claims are ripe for decision. The Trustees fail to identify any factual dispute that prevents the Court from deciding the dispositive legal issue in JW Aluminum's motion: Were the Trustees' Coal Act claims against JW Aluminum discharged by the confirmation of the Consensual Plan?

2. The plain language of the Plan answers this question in the affirmative, as it expressly discharges "any and all debts . . . of or Claims against one of more of the Debtors that

1

arose at any time before the Effective Date." Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 12.2. "Claim" is defined in the Plan to include any "claim against one or more of the Debtors within the meaning of Section 101(5) of the [Bankruptcy] Code . . . ." *Id.* ¶ 1.48. As the Supreme Court has recognized, Section 101(5) is intended to have the "broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). It specifically encompasses liabilities that are "unliquidated," "contingent," "unmatured," and "disputed." 11 U.S.C. § 101(5)(A).

3.     Ignoring this broad definition of "claim," the Trustees rely on their familiar refrain that Coal Act premiums are "taxes," and from there argue that liability for future premiums cannot be discharged. But, just as JW Aluminum demonstrated in its MTD Response, the Trustees' argument finds no support in the Bankruptcy Code or in the cases they cite.[1] The "three Courts of Appeals" decisions that the Trustees repeatedly reference analyzed whether Coal Act claims that the Trustees *did file* in pending bankruptcy proceedings were entitled to administrative priority under Sections 503(b)(1)(B) and 507(a)(1) of the Bankruptcy Code. The holdings in those cases did not address whether Coal Act claims that the Trustees *did not file* fell within the broad definition of "claim" in Section 101(5) and thus were discharged. And the Trustees fail to distinguish analogous cases holding that liability for future Coal Act premiums can be terminated or modified in bankruptcy—cases that would have been decided differently if the Trustees were correct that future obligations do not give rise to a dischargeable "claim" under Section 101(5).

4.     Wrong on this core legal issue, the Trustees attempt to save one of their claims in the D.C. Litigation by arguing that JW Aluminum has a duty to "establish and maintain" its own IEP—not just to pay premiums for the coverage now being provided to former beneficiaries of

---

[1] In light of the overlap between the Trustees' Amended Motion to Dismiss ("MTD") (Dkt. 14) and JW Aluminum's MSJ, JW Aluminum incorporates by reference the arguments and authorities in its MTD Response into this MSJ Reply.

2

Walter Industries' defunct IEP. As JW Aluminum already demonstrated in its MTD Response, the Coal Act does not require a "related person" to "establish" an IEP when the coal operator's IEP has been terminated. Rather, the "related person's" obligation is to pay premiums to the 1992 Plan for those retirees' coverage. Indeed, that is exactly what the Trustees allege happened after Walter Industries terminated its IEP. According to the UMWA Trustees' allegations in the D.C. Litigation, Walter Industries' former IEP beneficiaries were migrated to the 1992 Plan, and the Trustees seek payment of premiums for this coverage. But whether they seek to require JW Aluminum to pay premiums or to "establish and maintain" an IEP, the Trustees had a "claim" and cannot avoid the discharge of that claim by repackaging it as a claim for equitable relief.

5. The UMWA Trustees also attempt to avoid summary judgment by arguing that JW Aluminum's status as a "related person" must be determined in the D.C. Litigation before this Court can decide whether the Trustees' claims premised on "related person" liability were discharged. Again, Section 101(5) provides the answer, as it expressly encompasses "disputed" claims. Thus, JW Aluminum need not concede "related person" status to obtain a declaration from this Court that the Trustees' claims have been discharged. And the Court need not wait for these disputed claims to be resolved in order to enforce the discharge injunction in the Consensual Plan, which prohibits anyone who "may hold" a disputed claim from "commencing . . . any suit" with respect to such "Claim." Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 12.3.

## ARGUMENT AND AUTHORITIES

### I. The UMWA Trustees' Claims for Future Coal Act Premiums Were Discharged.

6. The UMWA Trustees attempt to avoid the effect of the discharge in this case by arguing that their Coal Act claims against JW Aluminum arose after the Effective Date of the Consensual Plan. MSJ Opp. (Dkt. 25) at 4-5. The statutory provisions and cases they cite do not

3

support their argument. The alleged joint-and-several "related person" liability on which the Trustees' claims in the D.C. Litigation are based arose on the effective date of the Coal Act, and JW Aluminum's alleged liability was discharged two years later on the Effective Date of the Consensual Plan. This simple and straightforward analysis compels entry of partial summary judgment for JW Aluminum, and the Court should ignore the Trustees' speculation about why Walter Industries—a coal operator with different legal obligations and commercial interests—paid Coal Act premiums after confirmation.

      **A.**    **The "Related Person" Liability Alleged by the Trustees in the D.C. Litigation Arose on the Effective Date of the Coal Act.**

      7.    To resolve the core legal issue in this proceeding, the Court must determine when the alleged liability that forms the basis of the Trustees' claims in the D.C. Litigation arose. The Trustees argue that the "plain statutory language makes clear that Coal Act premium obligations arise on a *monthly* basis in the case of the 1992 Plan, and on an *annual* basis in the case of the Combined Fund." *Id.* at 4. But the statutory language they cite governs when payments are due, not when the liability arises. *See* 26 U.S.C. § 9704(a) ("Each assigned operator *shall pay* to the Combined Fund for each plan year . . . ." (emphasis added)); *id.* § 9704(g)(1) ("The annual premium [for the Combined Fund] *shall be payable* in 12 equal monthly installments . . . ." (emphasis added)); 26 U.S.C. § 9712(d)(1) (requiring "*payment* of a monthly per beneficiary premium by each 1988 last signatory operator for each eligible beneficiary . . . who is receiving benefits under the 1992 UMWA Benefit Plan." (emphasis added)). These concepts are not the same, and the proper focus here is on when the alleged Coal Act *liability* arose, not when the Trustees sent *assessments* to JW Aluminum based on that alleged liability. *See, e.g.*, *Stewart*

*Foods, Inc. v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141, 146 (4th Cir. 1995) (obligation to make payments annually was single "claim" in bankruptcy).[2]

8. Under the Coal Act, "related person" *liability* is not reconsidered periodically. "Related person" status was determined—once and for all—as of July 20, 1992. 26 U.S.C. § 9701(c)(2). The joint–and-several liability that attached to "related persons" became fixed on February 1, 1993, when the Coal Act became effective. After that date, a "related person" was jointly and severally liable for the payment of all Coal Act premiums, including future premiums. *See id*. § 9704(a) ("Any related person with respect to an assigned operator shall be jointly and severally liable for any [Combined Fund] premium . . . ."); *id.* § 9712(d)(4) ("[L]ast signatory operator[s] . . . and any related person . . . shall be jointly and severally liable" for 1992 Plan premiums.).[3]

9. In light of this statutory framework, the UMWA Trustees cannot argue (as they attempt to do) that JW Aluminum "conflates statutory *contemplation* of liabilities with *creation* of those liabilities." MSJ Opp. (Dkt. 25) at 7. The joint-and-several "related person" liability

---

[2] Addressing *Stewart Foods*, the Trustees acknowledge that "[i]t is undisputed that a note payable over time gives rise to a single 'claim' in bankruptcy even if some of its installments have not yet come due." MSJ Opp. (Dkt. 25) at 9. Without citing any authority, they argue that "here, . . . we are dealing with separate statutory obligations arising monthly or annually as long as the statutory criteria for imposition of premiums exist." *Id.* But, as shown below, *infra* ¶¶ 8-9, the only "statutory criteria" for determining whether the Coal Act liability applies is "related person" status, which is determined as of July 20, 1992. If "related person" status exists as of that date, "joint and several" liability is fixed, starting February 1, 1993. There are no additional "statutory criteria" for determining *liability*, only for determining the *amount* of each *assessment*. *See Buckner v. Westmoreland Coal Co.* (*In re Westmoreland Coal Co.*), 213 B.R. 1, 15 (Bankr. D. Colo. 1997) ("Although the amount of future premiums to be assessed may vary due to the number of orphaned beneficiaries or the number of coal operators contributing, Westmoreland's obligation to pay and the Trustees' right to be paid does not change.").

[3] A case cited by the Trustees—*PBGC v. Oneida Ltd.*, 562 F.3d 154 (2d Cir. 2009)—demonstrates perfectly the timing of imposing liability. In *Oneida*, the Second Circuit considered the statutory premium an employer must pay to the Pension Benefit Guaranty Corporation for terminating a pension plan. 562 F.3d at 155-56. Normally, the liability for the premium attaches upon termination. *Id.* at 156 (citing 29 U.S.C. § 1306(a)(7)(A)). But the statute specifically provides that, if the termination occurs while the employer is in bankruptcy, the payment obligation "shall not apply to such plan until the date of the discharge or dismissal." *Id.* (quoting 29 U.S.C. § 1306(a)(7)(B)). The Second Circuit thus held that, because of this express statutory provision modifying when liability normally arises, the liability of a terminating debtor arises after discharge. *Id.* at 157. The Coal Act, by contrast, contains no such provision delaying its applicability to debtors or the imposition of liability on debtors (a provision Congress plainly knows how to enact).

that the Trustees allege in the D.C. Litigation was created—not merely contemplated—on February 1, 1993. And that liability continues, regardless of the amount of periodic premium assessments or whether the Trustees first sought recovery from the "related person's" co-obligors.

      **B.    The Trustees' Flawed Characterization of Coal Act Premiums as "Taxes" Does Not Change This Analysis.**

      10.    Unable to square their argument with the plain language of the Coal Act, the UMWA Trustees attempt to analogize Coal Act premiums to "taxes." As demonstrated in JW Aluminum's MTD Response, however, the Coal Act does not support this analogy. MTD Resp. (Dkt. 18) at 10-12. If Congress had intended for Coal Act obligations to be considered "taxes," it would have used that label. Instead, Congress chose to use "premiums," and this label is the "best evidence" that Congress did not intend for Coal Act "premiums" to be synonymous with "taxes." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 544 (2012).[4] Indeed, this exact issue—whether the Coal Act "premiums" being sought here by the Trustees are "taxes"—was litigated and lost by the Tustees in *UMWA Combined Benefit Fund v. Walter Energy, Inc.* ("*Walter II*"), 551 B.R. 631, 638-39 (N.D. Ala. Mar. 8, 2016). Accordingly, the Trustees are collaterally estopped from relitigating their "taxes" argument in this case. MTD Resp. (Dkt. 18) at 12-13. In short, this issue has been decided against the Trustees: Coal Act "premiums" are not "taxes."

      11.    Even if *Walter II* did not bar relitigation of this issue, the Trustees' analogy to income taxes and ad valorem property taxes is flawed. *Liability* for income tax is evaluated every tax year depending on a number of factors, including whether the taxable entity has

---

[4] The Trustees' Amended Complaint in the D.C. Litigation adopts Congress's labeling of Coal Act payments as "premiums," not "taxes," using the "premium" label at least *sixteen* times. Stichter Decl. Ex. 1 (Dkt. 20-1).

6

income, with it being possible to have liability in one year and no liability the next. Similarly, *liability* for ad valorem property tax is determined annually based on ownership of property. But, for "related persons," the joint-and-several liability for payment of Coal Act premiums was fixed on February 1, 1993, pursuant to a relationship that was finally determined on July 20, 1992. Liability is thereafter fixed as to the related person; it is not re-evaluated every year, regardless of what the "related person" did or how much money it made (or lost).

12. Moreover, the date on which a tax *liability* is created may differ from the date on which an *assessment* is made or when the tax *payment becomes due*. For the purposes of Section 101(5), the fact that the amount of tax payments may vary annually is irrelevant, as it is the fixing of *liability*, not the fixing of the *payment amount*, that determines when a tax "claim" accrues. As one the cases cited by the Trustees recognizes, a tax "claim" arises when liability for the tax becomes fixed, regardless of when payment is due. *In re Anchor Glass Container Corp.*, 375 B.R. 683, 687-89 (Bankr. M.D. Fla. 2007), *cited in* MSJ Opp. (Dkt. 25) at 7.

13. In addition, the Trustees' flawed "taxes" analogy is also ultimately irrelevant. Even if Coal Act premiums are "taxes," liability to pay future premiums is dischargeable. This is precisely what the Fourth Circuit held in *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573 (4th Cir. 1996). *Leckie* agreed with the Trustees that Coal Act premiums are "taxes," 99 F.3d at 583,[5] but still held that future, unassessed Coal Act premiums gave rise to a "claim" within the broad meaning of Section 101(5):

> In accordance with Congress's desire that we interpret the term 'claim' broadly, and in light of the statute's express indication that even unmatured and contingent rights to payment are to be regarded as claims, we hold that the Plan and Fund do have claims to future premium payments.

---

[5] As *Walter II* recognized, but the Trustees fail to acknowledge, *Leckie*'s holding on this issue was undermined by the Supreme Court's decision in *NFIB*. 551 B.R. at 638; *see* MSJ Opp. (Dkt. 25) at 10.

7

*Id.* at 581. In other words, the relevant issue is not whether Coal Act premiums are "taxes," but whether the liability for the payment of these premiums gives rise to a "claim" under Section 101(5). As a "claim," the liability for future Coal Act premiums can be modified, terminated, or discharged in bankruptcy. *Id.*; *see also In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 327-28 (Bankr. E.D. Va. 2016) (future Coal Act liabilities can be terminated under § 1114); *UMWA 1974 Pension Plan & Tr. v. Walter Energy, Inc.*, No. 2:16-cv-0057, 2016 WL 2894091, at *11-12 (N.D. Ala. May 18, 2016) (same), *appeal docketed*, No. 16-13483 (11th Cir. June 13, 2016); *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 281-82 (Bankr. E.D. Ky. 2004) (same); *Walter II*, 551 B.R. at 640-42 (liability for future Coal Act premiums can be extinguished in a § 363 sale).

14.     Indeed, the UMWA Trustees' MSJ Opposition fails to cite *any* case in which a court's characterization of Coal Act premiums as "taxes" meant that unassessed premiums were not "claims" within the meaning of Section 101(5). The Trustees repeatedly assert that their argument is supported by "three Courts of Appeals." *E.g.*, MSJ Opp. (Dkt. 25) at 1. But none of those three cases holds that liability for payment of future Coal Act premiums is not a "claim" or cannot be discharged. Those cases address only whether Coal Act premiums are "taxes" for purposes of administrative priority under Sections 503(b)(1)(B) and 507(a)(1). *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 793-94 (4th Cir. 1998) ("We are more concerned at present, however, with that category of administrative expenses comprising 'any tax . . . incurred by the estate[.]' § 503(b)(1)(B)(i). Claims for taxes . . . are entitled to priority over all other unsecured claims. § 507(a)(1)." (footnote omitted)); *UMWA 1992 Benefit Plan v. Rushton* (*In re Sunnyside Coal Co.*), 146 F.3d 1273, 1280 (10th Cir. 1998) (Coal Act premiums are "taxes" for purposes of Section 503(b)(1)(B)); *LTV Steel Co. v. Shalala* (*In re Chateaugay Corp.*), 53 F.3d 478, 498 (2d Cir. 1995) ("We must next determine whether Coal Act contributions are 'tax[es] . . . incurred by

8

the estate,' 11 U.S.C. § 503(b)(1)(B), entitled to administrative priority."). By contrast, the UMWA Trustees did not file an administrative claim in this Chapter 11 case, so the priority of such a claim is not at issue. *Cf. In re Walter Energy, Inc.*, 542 B.R. 859, 883 (Bankr. N.D. Ala. 2015) ("As is evident, these cases focus on the priority to which claims under the Coal Act are entitled in bankruptcy, an issue that is not before the Court.").

### C. The Trustees Were Required, Yet Failed, to Take Action to Protect Their Claim for Future Coal Act Premiums.

15. Unable to rely on cases in which they did file a claim against the debtor's estate, the UMWA Trustees cannot avoid the consequence of their failure to file a claim in this case. That failure is indefensible. Even if the Trustees initially planned to pursue payment of Coal Act premiums from Walter Industries and viewed "related persons" as being responsible for those premiums only if Walter Industries did not pay, the Trustees were still required to file a claim or to object to the confirmation of the Consensual Plan's discharge of that claim. Even claims that are classified as "contingent" are subject to discharge.

16. The Trustees could not reasonably have been confused as to the effect of inaction. The plain language of the Consensual Plan and the Confirmation Order incorporates Section 101(5)'s broad definition of "claim," which expressly includes "unliquidated," "contingent," and "unmatured" claims.[6] And the Trustees recognize as "unremarkable" and "uncontroversial" the cases cited by JW Aluminum, in which courts held that unassessed and contingent liabilities were "claims" under Section 101(5)(A) and thus subject to discharge.[7] MSJ Opp. (Dkt. 25) at 8-10.

---

[6] The release provisions of the Plan and Confirmation Order are similarly broad, covering all claims "whether known or unknown, foreseen or unforeseen, then existing or ***thereafter arising***." Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 6.1 (emphasis added); *see also id.* Ex. 8 (Dkt. 20-10) ¶ 36(b) (approving releases in paragraph 6.1 of the Plan).

[7] Addressing *In re SunCruz Casinos LLC*, 342 B.R. 370 (Bankr. S.D. Fla. 2006), which JW Aluminum noted is "particularly instructive," the Trustees concede that it supports the "uncontroversial proposition" that "a creditor

9

17. Nevertheless, the Trustees feign incredulity at the proposition that they should have taken steps in this case to protect their claims to future Coal Act premiums. *Id.* at 11 n.5 ("If that were correct, the Trustees would have been entitled to an enormous administrative priority claim covering decades' worth of future premiums."). But the Consensual Plan provided a clear mechanism by which the Trustees could have filed a contingent administrative claim, allowing JW Aluminum to negotiate the terms of how Coal Act obligations would be covered post-confirmation, if those obligations were not satisfied by Walter Industries. *See* Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 3.2 (holder of Allowed Administrative Claim shall receive, among other things, "such amount, at such other date and upon such other terms as shall have been agreed upon between the Holder of such Allowed Claim and the applicable Debtor and approved by a Final Order of the Court"). And, if the Trustees could not reach an agreement with the Debtors as to how future Coal Act premiums would be paid, they could have objected to the Plan, so that the Court could have addressed this issue in its Confirmation Order. But the implicit suggestion of the Trustees that those "decades' worth of future premiums" should be dealt with now, instead of during the Chapter 11 case twenty years ago, is anathema to the central purpose of the Bankruptcy Code and of the broad definition of "claim" in Section 101(5). *See, e.g.*, *Epstein v. Official Comm. of Unsecured Creditors* (*In re Piper Aircraft, Corp.*), 58 F.3d 1573, 1576 (11th Cir. 1995) ("Congress intended to define the term claim very broadly under § 101(5), so that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with

---

with a contingent contractual claim must assert that claim by the bar date to preserve it." MSJ Opp. (Dkt. 25) at 9. But they offer no argument as to why a *statutory* contingent obligation (assuming "related person" liability is properly characterized as "contingent," as opposed to "joint and several") does not give rise to the same "uncontroversial proposition"—the creditor must assert the contingent claim by the bar date. Moreover, the Trustees cannot limit *SunCruz* by asserting that it applies only to Coal Act obligations that arose during the bankruptcy. *See id.* at 10. Here, as in *SunCruz*, the *liability* arose in the bankruptcy; only the event leading to a payment demand arose post-confirmation. Thus, *SunCruz* cannot be distinguished from this case.

in the bankruptcy case.'" (citation omitted)); *cf.* Stichter Decl. Ex. 8 (Dkt. 20-10) ¶ 21 (exempting from plan discharge Debtors' liability to "Pension Plans" and the "PBGC").

18.     In sum, the UMWA Trustees are on the wrong side of the dispositive legal issue in this case. The alleged joint-and-several "related person" liability that forms the basis of their claims in the D.C. Litigation was created when the Coal Act became effective on February 1, 1993. Nevertheless, the UMWA Trustees took no action in this case to protect any Coal Act claims they might have had against JW Aluminum. Accordingly, those claims were discharged on the Effective Date of the Consensual Plan—March 17, 1995—and JW Aluminum is entitled to a declaratory judgment recognizing and enforcing this discharge.[8]

### D.  Walter Industries' Payment of Coal Act Premiums Is Not Relevant to JW Aluminum's Discharge.

19.     Unable to rebut this simple, straightforward analysis, the UMWA Trustees attempt to change the subject. Rather than focus on their inaction pre-confirmation, the Trustees focus on Walter Industries' actions post-confirmation. They note that Walter Industries would have been entitled to the same discharge, yet it continued to maintain coverage for retired coal miners through an IEP and to pay Coal Act premiums post-confirmation. MSJ Opp. (Dkt. 25) at 2-3. The Trustees assume that this must mean that Walter Industries did not believe its Coal Act liabilities had been discharged, which, according to the Trustees, must mean that those liabilities were not discharged—for Walter Industries or for any of its "related persons." *Id.* at 3.

---

[8] The UMWA Trustees also repeat their argument that the Anti-Injunction Act ("AIA") deprived the Court of jurisdiction to discharge Coal Act liabilities. MSJ Opp. (Dkt. 25) at 12-13. JW Aluminum's MTD Response addressed this AIA argument at length, showing that the Trustees are collaterally estopped by *Walter II* and *Leckie* from relitigating this issue and that, in any event, both cases correctly rejected the Trustees' argument because, even if Coal Act premiums are "taxes," the AIA does not bar their discharge in bankruptcy and, indeed, bankruptcy courts routinely discharge tax liabilities. MTD Resp. (Dkt. 18) at 9-13. The Trustees' MSJ Opposition does not address any of JW Aluminum's arguments.

11

20. Why Walter Industries paid Coal Act premiums post-confirmation is nothing more than a point of curiosity. It has no legal bearing on whether JW Aluminum's alleged Coal Act liabilities were discharged. That question is governed by the plain language of the Consensual Plan, the Confirmation Order, and the Bankruptcy Code—not the post-confirmation conduct of a third party.

21. Moreover, any speculation about Walter Industries' Coal Act payments must take into account a salient feature of Walter Industries: *it was a coal operator*. Through its wholly owned subsidiary Jim Walter Resources, Inc., Walter Industries continued to operate a coal business after the Effective Date of the Consensual Plan. As a coal operator, it had significant business motivations to comply with the Coal Act, which "related persons" like JW Aluminum, who were not in the coal business, did not share. For example, Walter Industries could have believed that maintaining its existing IEP and paying Coal Act premiums voluntarily would foster good relations with its workforce and the union representing them. Debtors are free to pay their discharged debts voluntarily, without reviving the legal obligation to pay. *See Francis v. Nat'l Revenue Serv., Inc.* (*In re Francis*), 426 B.R. 398, 404 (Bankr. S.D. Fla. 2010) ("Debtors always have the option of voluntarily paying back any discharged or dischargeable debts under section 524(f) of the Bankruptcy Code."). Walter Industries might have believed that continued payment of coal-miner retiree health benefits was a business, if not a legal, necessity.

22. Walter Industries' actions in its bankruptcy confirm, in fact, that it had no intention of ridding itself (or its operator-subsidiary) of these health-benefit obligations. The Coal Act had a markedly different effect on coal operators than it did on companies that were not in the coal business. As a practical matter, the Coal Act's funding mechanisms (the Combined Fund, the IEP obligation, and the 1992 Plan as a backup for defunct IEPs) simply replaced

contractual obligations most coal operators already had because, before the Coal Act, they were already paying premiums to the 1950 and 1974 UMWA Benefit Funds (the predecessors of the Combined Fund) and were already funding an existing IEP for retired employees under their 1978 and later coal wage agreements. As "retiree benefits," these obligations could have been terminated only through the process outlined in Section 1114 of the Bankruptcy Code. Neither Jim Walter Resources nor Walter Industries, however, took any steps under Section 1114 (as they did more than 20 years later in *Walter I*) to shed those liabilities. *See* 542 B.R. at 874-75. In contrast, "related persons" who were not in the coal business had no similar contractual obligations before the Coal Act, and therefore had no reason to honor similar obligations post-confirmation. Consequently, the fact that Jim Walter Resources and Walter Industries never took the position that their Coal Act obligations had been discharged could be explained by the fact that, in the end, they intended to remain responsible for the same obligations as under their coal wage agreements.

23. Walter Industries also could have believed—regardless of its intentions—that its own Coal Act liabilities survived post-confirmation because the Plan expressly provides that Walter Industries and its subsidiary Jim Walter Computer Services, Inc. (but no other debtors) must set aside funds for "the continued funding of medical benefits, under the post-retirement medical benefit plans of Walter Industries and [Jim Walter] Computer Services." Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 5.4. Or Walter Industries may have believed that Jim Walter Resources' (and only Jim Walter Resources') Coal Act liabilities survived because the UMWA Trustees filed a proof of claim against Jim Walter Resources (and only Jim Walter Resources) purporting to, among other things, preserve Coal Act claims. *See* Stichter Decl. Ex. 9 (Dkt. 26), at 9. Jim Walter Resources and the Trustees later settled that claim, *see* Mot. Approve Settlement Agmt.

(ECF No. 19764), and Walter Industries agreed to assume responsibility for making all of its subsidiaries' surviving payment obligations, *see* Stichter Decl. Ex. 6 (Dkt. 20-8) ¶ 4.6. The UMWA Trustees, however, never asserted any claim against JW Aluminum.

24.     Ultimately, the Court need not determine which of these potential reasons, if any, motivated Walter Industries to pay Coal Act premiums post-confirmation. Such speculation does not answer the core legal question in this case. Regardless of why Walter paid, JW Aluminum's alleged joint-and-several liability for those obligations was discharged.

**II.     The Discharge Applies to the UMWA Trustees' IEP Claim.**

25.     In their Motion to Dismiss, the UMWA Trustees argued that JW Aluminum's alleged obligation to "establish and maintain" an IEP could not have been discharged, even if JW Aluminum's alleged obligations to pay premiums to the 1992 Plan and the Combined Fund were discharged. MTD (Dkt. 14) at 17-19. In its MTD Response, JW Aluminum showed that the statutory provision quoted by the Trustees, 26 U.S.C. § 9711(a), negates their argument: Section 9711(a) confirms that a "related person" has no obligation to "establish and maintain" an IEP where, as here, the coal operator's program is defunct; a "related person's" obligation is to "continue to provide health benefits coverage . . . which is substantially the same as . . . the coverage provided by such plan as of January 1, 1992." MTD Resp. (Dkt. 18) at 23-24 (quoting 26 U.S.C. § 9711(a)). And a "related person" may satisfy that obligation by paying premiums to the 1992 Plan, which provides benefits for retirees previously covered through an IEP. *Id.* (citing 26 U.S.C. § 9711(d)).

26.     The UMWA Trustees' MSJ Opposition makes the same "establish and maintain an [IEP]" argument, simply pasting their Motion to Dismiss argument on this issue into their MSJ Opposition, with one notable exception: they have cut the block quote of Section 9711(a).

In other words, faced with the fact that the statutory language they cited does not support their argument, they have dropped the statutory cite instead of the argument. Moreover, the Trustees fail to cite any other legal authority—no statute, case, or *anything*—to support their assertion that the Coal Act requires JW Aluminum to "establish and maintain" an IEP. No such authority exists. As the Trustees have alleged in the D.C. Litigation, retirees previously covered by Walter Industries' IEP are now receiving coverage through the 1992 Plan, and any claim the Trustees might have against JW Aluminum is for payment of premiums to the 1992 Plan—a claim that is clearly a "claim" under Section 101(5) and the Consensual Plan.

27. Furthermore, in the D.C. Litigation, the Trustees assert claims exclusively under the civil enforcement provision of the Coal Act, 26 U.S.C. § 9721. As JW Aluminum noted in its MTD Response, that enforcement mechanism is limited to claims "arising out of an obligation to pay any amount required to be paid by" the Coal Act. *Id*. § 9721(1). The Trustees have ignored this fact, both in their MTD Reply and in their MSJ Response, and instead have highlighted that they also seek (in the alternative to payments) a ruling compelling JW Aluminum to establish an IEP. MSJ Opp. (Dkt. 25) at 13. But that relief, even if available, is irrelevant. *See Westmoreland*, 213 B.R. at 16 (remedy of IEP-reinstatement was not available where 1992 Plan payments could be ordered). The claims on which the relief is sought are plainly "claims" under Section 101(5) and the Consensual Plan and thus dischargeable. *See* 11 U.S.C. § 101(5)(A)-(B) (defining "claim" to include both a "right to payment" and a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment").[9]

---

[9] The Trustees also argue that JW Aluminum's alleged IEP-related liability is akin to ongoing regulatory requirements, such as those related to safety and environmental compliance, that apply to a debtor's post-confirmation operations. MSJ Opp. (Dkt. 25) at 13-14. This argument is copied verbatim from the Trustees' Motion to Dismiss. JW Aluminum's MTD Response explained that it was not seeking a discharge of liabilities that arise out of its current operations, but from alleged liability that was fixed upon the effective date of the Coal Act, as a result of JW Aluminum's corporate relationship to Walter Industries on July 20, 1992. MTD Resp. (Dkt. 18) at

15

### III. Any Dispute Over Whether JW Aluminum Is a "Related Person" Is Not Material to Its Claims in this Case, Because the Discharge Applies to "Disputed" Claims.

28. Wrong on their legal arguments, the UMWA Trustees attempt to manufacture a factual dispute, asserting that the Court "must deny [JW Aluminum's] Motion because [JW Aluminum] disputes it is a related person under the Coal Act." MSJ Opp. (Dkt. 25) at 14. This is not a factual dispute that is material to JW Aluminum's claims in this case. *See Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995) ("To preclude summary judgment, [a] factual dispute must be . . . relevant . . . , i.e., material to an issue affecting the outcome of the case . . . ."). Any dispute between the parties as to whether JW Aluminum is a "related person" to Walter Industries is material only to the Trustees' claims in the D.C. Litigation. Here, the Court is not deciding whether JW Aluminum is a "related person," and JW Aluminum need not concede that issue to proceed. The only question before the Court is whether this disputed claim was discharged.

29. The UMWA Trustees are correct that their D.C. Litigation claims are premised on their allegation that JW Aluminum was a "related person" to Walter Industries as of July 20, 1992. *See* MSJ Opp. (Dkt. 25) at 14. But the Trustees draw the wrong conclusion about the significance of that issue in this adversary proceeding, arguing:

> If [JW Aluminum] is correct in asserting that it is not a 'related person,' it *never* had any liability under the Coal Act, [the UMWA Trustees] *never* held a claim against [JW Aluminum] in the first instance, *no* Coal Act obligations could have been discharged, and there is *no way* the D.C. Litigation could possibly violate the discharge injunction. And if all this is true, this Court lacks subject matter jurisdiction to enter judgment. 11 U.S.C. § 1334.

*Id.* at 14-15 (footnote omitted).

---

22-23. The Trustees ignore JW Aluminum's argument and fail to address its distinction of the cases on which they rely.

16

30. In making these assertions about the "discharge" and the "discharge injunction," the Trustees *never* cite the actual "Discharge" provisions at issue. Doing so would unravel their argument. The Consensual Plan discharges "any and all . . . Claims" and enjoins "all Persons who . . . hold or may hold a . . . Claim" from "commencing . . . any suit" on the "Claim." Stichter Decl. Ex. 6 (Dkt. 20-8) ¶¶ 12.2-12.3. The Confirmation Order similarly discharges "any or all . . . Claims." *Id.* Ex. 8 (Dkt. 20-10) ¶ 18. "Claims" in both the Consensual Plan and the Confirmation Order include "claims" as defined in Section 101(5). And Section 101(5) specifically includes "disputed" claims. 11 U.S.C. § 101(5)(A) (defining "claim" as a "right to payment, whether or not such right is . . . disputed"). Thus, any Coal Act claim by the UMWA Trustees, even if "disputed," was discharged.[10]

31. Thus, the UMWA Trustees are wrong when they assert that the discharge does not apply to "'alleged' debts" or disputed claims.[11] MSJ Opp. (Dkt. 25) at 15. It clearly does. And they are also wrong when they assert they have not violated the discharge injunction by commencing a suit based on an "alleged debt" or disputed Claim. That is precisely what the discharge injunction prohibits. The UMWA Trustees cannot proceed in any way on their claim in the D.C. Litigation that JW Aluminum is liable for the payment of Coal Act premiums—even if JW Aluminum disputes the "related person" predicate for the alleged liability.

32. For the same reason, the Trustees' assertion that this "related person" dispute deprives the Court of "subject matter jurisdiction" to grant JW Aluminum's request for declaratory judgment (MSJ Opp. (Dkt. 25) at 15) is also incorrect. Neither of the cases the

---

[10] Section 101(5)'s definition of "claim" is broad so that all obligations of the debtor—even those in dispute—are addressed in bankruptcy, not another forum. *See Piper*, 58 F.3d at 1576. If the Trustees had taken steps to file a claim in JW Aluminum's bankruptcy case, the present dispute would have been resolved decades ago in this Court.

[11] The UMWA Trustees cannot avoid Section 101(5)'s definition of "claim" by referring to "alleged debts." MSJ Opp. (Dkt. 25) at 14-15. Section 101(12), which defines "debt," incorporates the definition of "claim." 11 U.S.C. § 101(12) ("The term 'debt' means liability on a claim.").

17

Trustees cite supports their argument, as neither involves a bankruptcy court's enforcement of a discharge injunction. Rather both involve situations in which plaintiffs were seeking declaratory judgments as to unfiled underlying claims. *See Methelus v. Sch. Bd. of Collier Cnty.*, No. 2:16-cv-379, 2017 WL 3421470, at *3 (M.D. Fla. Aug. 9, 2017) (threatened litigation was too "imaginary, illusory, and speculative" to satisfy Article III's "case or controversy" requirement); *Murray Indus., Inc. v. FDIC* (*In re Murray Indus., Inc.*), 122 B.R. 135, 136 (Bankr. M.D. Fla. 1990) ("case or controversy" requirement precluded court from declaring whether defendant's insurance policy would provide coverage if debtor brought claims against defendant's officers and directors). In this case, however, the disputed claims for which JW Aluminum seeks declaratory relief are not "hypothetical" or "speculative." The Trustees have filed those claims in the D.C. Litigation and are currently prosecuting them. Thus, the cases cited by the Trustees are inapposite, as there is no doubt that an actual "case or controversy" exists here. *See Star v. Dep't of Educ.* (*In re Star*), No. 06-30571-DOT, 2008 WL 2705092, at *2 (Bankr. E.D. Va. July 1, 2008) (explaining that a debtor may not seek an advisory opinion "as to what [a court's] ruling on dischargeability would be if a creditor were to attempt collection in the future," but that once "a creditor seeks to collect a discharged debt, debtor is free to assert the discharge as a possible defense").

33. In sum, the Court has subject matter jurisdiction, and JW Aluminum's claims are ripe for determination on this summary-judgment motion.

## **CONCLUSION**

Based on the foregoing and on the arguments and authorities in JW Aluminum's Motion for Partial Summary Judgment (Dkt. 19) and in JW Aluminum's Response to Defendants' Motion to Dismiss (Dkt. 18), JW Aluminum respectfully requests that the Court grant its motion for partial summary judgment and enter the declaratory judgment JW Aluminum has requested.

DATED: October 6, 2017

        */s/* Scott A. Stichter
        Scott A. Stichter (FBN 0710679)
        STICHTER, RIEDEL, BLAIN & POSTLER, P.A.
        110 E. Madison Street, Suite 200
        Tampa, Florida 33602
        Phone: (813) 229-0144
        Fax: (813) 229-1811
        Email:  sstichter@srbp.com

        and

        Mark M. Maloney (Ga. Bar No. 468104)
        Kevin J. O'Brien (Ga. Bar No. 714849)
        KING & SPALDING LLP
        1180 Peachtree Street
        Atlanta, Georgia 30309
        Phone: (404) 572-4600
        Fax: (404) 572-5100
        Email:  mmaloney@kslaw.com
                kobrien@kslaw.com

        *Attorneys for Plaintiff JW Aluminum Company*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this 6th day of October, 2017, by the Court's CM/ECF system to all parties receiving electronic notice.

／s／ Scott A. Stichter
Scott A. Stichter (FBN 0710679)