## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| In re:<br><br>**HILLSBOROUGH HOLDINGS CORPORATION,**<br><br>    Debtor. | **Chapter 11**<br>**Jointly Administered**<br>**Case No. 8:89-bk-9715**<br>**through 8:89-bk-9746**<br>**and 8:90-bk-11997** |
| In re:<br><br>**JW ALUMINUM COMPANY,**<br><br>    Debtor. | **Case No. 8:89-bk-9718** |
| **JW ALUMINUM COMPANY,**<br><br>    Plaintiff,<br><br>v.<br><br>**MICHAEL H. HOLLAND et al.,**<br><br>    Defendants. | **Adversary Proceeding**<br><br>**No. 8:17-ap-00480-KRM** |

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff JW Aluminum Company ("JWA") hereby notifies the Court of two recent decisions: (1) *In re Walter Energy, Inc.*, No. 16-13483, 2018 WL 6803736 (11th Cir. Dec. 27, 2018); and (2) *In re Westmoreland Coal Co.*, No. 18-35672, 2018 WL 6920227 (Bankr. S.D. Tex. Dec. 29, 2018).[1] These decisions constitute binding and persuasive authority, respectively, rejecting the UMWA Trustees' argument that the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), barred this Court from discharging, as part of its March 2, 1995 Confirmation Order,

---

[1] Copies of these decisions are attached to this notice as Exhibit 1 and Exhibit 2, respectively.

all debts and claims against JWA, United States Pipe and Foundry Company, LLC ("U.S. Pipe"), and JW Window Components, LLC ("JW Window"), for payment of Coal Act premiums.

1.      As background, in opposition to JWA's pending motion for summary judgment and in support of their pending motion to dismiss, the UMWA Trustees argue that the AIA deprived the Court of subject-matter jurisdiction to discharge the Coal Act liabilities of JWA, U.S. Pipe, and JW Window in this Chapter 11 proceeding. *See* Dkt. 14 ¶¶ 39-41; Dkt. 18 ¶¶ 2, 15-21; Dkt. 19 at 10 n.8; Dkt. 27 at 11 n.8. To prevail on this argument, the Trustees must show that Coal Act premiums (and any penalties for nonpayment of those premiums) are "taxes" for purposes of the AIA ***and*** that the Debtors had a viable alternative remedy to secure the same relief from liabilities based on those premiums. Dkt. 18 ¶¶ 15-21. These two recent decisions—the Eleventh Circuit's binding decision in *Walter Energy* and the United States Bankruptcy Court for the Southern District of Texas's persuasive decision in *Westmoreland*—confirm that the UMWA Trustees' reliance on the AIA is misplaced.

2.      In *Walter Energy*,[2] the Eleventh Circuit rejected an identical argument by the UMWA Trustees, who claimed that the AIA prevented the United States Bankruptcy Court for the Northern District of Alabama from terminating the debtor's obligation to pay future Coal Act premiums. 2018 WL 6803736, at *10. In reaching its conclusion, the Eleventh Circuit considered separately the Trustees' argument as it related to premiums under the 1992 Benefit Plan and premiums under the Combined Fund. *Id.* at *13-15. As for the 1992 Benefit Plan premiums, the court held that they are not "taxes" for purposes of the AIA, reasoning that (1) Congress labeled them "premiums," not "taxes," and (2) the parties identified no statutory provision indicating that

---

[2] Walter Energy, Inc. ("Walter Energy") filed for protection under Chapter 11 in 2015 in the United States Bankruptcy Court for the Northern District of Alabama. (Dkt. 19 ¶ 12).

Congress intended to treat these premiums as taxes for purposes of the AIA. *Id.* at *13-14 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 543 (2012)).

3.      As for Combined Fund premiums, the Eleventh Circuit did not decide whether they were "taxes" under the AIA. *Id.* at *14-15. Instead, the Eleventh Circuit held that the AIA did not deprive the bankruptcy court of jurisdiction to terminate the debtor's obligations to pay premiums—even if the premiums could be considered "taxes." *Id.* at *15. Citing *South Carolina v. Regan*, 465 U.S. 367 (1984), the Eleventh Circuit recognized that the AIA does not apply if it would deprive a party of an opportunity to obtain review of its claims. *Id.* at *12, 15. As the Eleventh Circuit noted, the bankruptcy court had terminated Walter Energy's Coal Act obligations pursuant to 11 U.S.C. § 1114. *Id.* at *15. That relief—the modification or termination of retiree benefit obligations—"could be awarded only by a bankruptcy court in a Chapter 11 bankruptcy action." *Id.* (citing 11 U.S.C. § 103(g)). It was not available in a federal tax-refund action. *Id.*

4.      These holdings by the Eleventh Circuit in *Walter Energy* foreclose the UMWA Trustees' argument that the AIA deprived this Court of jurisdiction to discharge JWA, U.S. Pipe, and JW Window of any liabilities for Coal Act premiums. The Eleventh Circuit's determination that 1992 Benefit Plan premiums are not "taxes" under the AIA is binding precedent. And, even if Combined Fund premiums constitute "taxes" under the AIA—which the court did not decide— the Eleventh Circuit's reliance on *Regan* applies with equal force here. Just as there was no means other than Chapter 11 proceedings for Walter Energy to seek termination of its Coal Act obligations, there was no means other than the 1989-1995 Chapter 11 proceedings for JWA, U.S. Pipe, and JW Window to seek discharge of their alleged joint and several Coal Act obligations. Indeed, just as Section 1114 relief is available only in a Chapter 11 proceeding, so, too, is the discharge relief provided under Section 1141(d). 11 U.S.C. § 103(g) (subchapter III of Chapter

11 applies "only in a case under such chapter"); 11 U.S.C. § 1141 (appears in subchapter III of Chapter 11).[3]

5.    In addition to *Walter Energy* foreclosing the UMWA Trustees' AIA argument, the United States Bankruptcy Court for the Southern District of Texas's decision in *Westmoreland* is further persuasive authority rejecting that argument.  The *Westmoreland* court held that none of the debtors' Coal Act obligations are "taxes" subject to the AIA, reasoning that Congress labeled Coal Act obligations "premiums," not "taxes," and thus "[u]nder the dictate of *NFIB*, the Court must therefore presume that Congress acted intentionally in labeling Coal Act obligations as 'premiums.'"  Notably, the *Westmoreland* court applied this analysis to the 1992 Benefit Plan premiums and to the Combined Fund premiums.  2018 WL 6920227, at *8.  In doing so, the court noted that the word "tax" appears in various other sections of the Coal Act (including provisions relating to the Combined Fund), demonstrating that "Congress understood how to call something a tax when they meant for that thing to be a tax[.]"  *Id.*  This holding echoes JWA's argument that Coal Act premiums are not "taxes" for the purposes of the AIA.  *See* JWA Resp. to MTD (Dkt. 18) ¶ 19 n.9 (citing same Coal Act provisions and noting that "Congress knew exactly how to use the term 'tax' in the Coal Act when it wanted to refer to a 'tax'").

6.    Finally, *Walter Energy* and *Westmoreland* also directly address the interplay between the Bankruptcy Code and the Coal Act.  Both courts held that Bankruptcy Code remedies can effectively modify or terminate Coal Act obligations.  *See Walter Energy*, 2018 WL 6803736,

---

[3] The Eleventh Circuit's decision also forecloses the UMWA Trustees' attempt to distinguish cases holding that the AIA does not limit a bankruptcy court's ability to approve a sale order under 11 U.S.C. § 363 free and clear of Coal Act liabilities.  *See United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 584 (4th Cir. 1996); *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.* (*In re Walter Energy*), 55 B.R. 631, 639-40 (N.D. Ala. 2016).  The UMWA Trustees argued that these holdings were limited to the context in which the Coal Act liabilities of third parties were at issue, not the debtor's own Coal Act liabilities. Dkt. 27 ¶¶ 20-22.  In *Walter Energy*, however, the Eleventh Circuit did not recognize any such distinction (even though the Trustees had made the same argument in that appeal), holding that the AIA was no jurisdictional bar to the ***debtor*** securing Chapter 11 relief from Coal Act obligations.  2018 WL 6803736, at *15.

at *22 ("Given the relationship between these two statutes, we must construe both statutes to be effective, rather than construing the Coal Act as implicitly amending and narrowing the definition of retiree benefits in § 1114.  It seems to us that if Congress had wished to exclude premiums owed to the [Coal Act] Funds from the reach of a bankruptcy court's authority under § 1114, it would have added language in § 1114—perhaps by limiting the definition of 'retiree benefits'—or in the Coal Act—*perhaps by providing that the obligation to pay premiums remained unaffected by operation of the Bankruptcy Code.  But Congress included no such express statutory language*.") (emphasis added); *Westmoreland*, 2018 WL 6920227, at *4 ("The application of § 1114 does not deprive the Coal Act of any meaning nor do the two statutes conflict.  If Congress had desired to impose a different scheme or limit the Court's authority to modify retiree benefits under the Coal Act, it could have easily done so.").

Respectfully submitted,

 /s/ *Scott A. Stichter*
Scott A. Stichter (Fl. Bar No. 0710679)
STICHTER, RIEDEL, BLAIN &
POSTLER, P.A.
110 E. Madison Street, Suite 200
Tampa, Florida 33602
Phone: (813) 229-0144
Fax: (813) 229-1811
Email: sstichter@srbp.com

and

Mark M. Maloney (Ga. Bar No. 468104)
Kevin J. O'Brien (Ga. Bar No. 714849)
Sarah L. Primrose (Fl. Bar No. 98742)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 572-4600
Fax: (404) 572-5100
Email: mmaloney@kslaw.com
      kobrien@kslaw.com
      sprimrose@kslaw.com

*Attorneys for Plaintiff JW Aluminum Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Supplemental Authority has been furnished on this 17th day of January, 2019, by the Court's CM/ECF system to all parties receiving electronic notice.

     /s/ *Scott A. Stichter*
Scott A. Stichter (FBN 0710679)

911 F.3d 1121
United States Court of Appeals, Eleventh Circuit.

IN RE: WALTER ENERGY, INC. et al., Debtor.
United Mine Works of America Combined
Benefit Fund, United Mine Works of America
1992 Benefit Plan, Plaintiff-Appellants,
v.
Andre M. Toffel, as Chapter 7 Trustee
for Walter Energy, Inc., Steering
Committee of First Lien Holders, Warrior
Met Coal, Inc., Defendant-Appellees.

No. 16-13483
|
(December 27, 2018)

**Synopsis**
**Background:** Chapter 11 debtors moved for authority to reject their collective bargaining agreements with labor union that represented workers employed in debtors' coal mining operations, as well as to terminate retiree benefits. The United States Bankruptcy Court for the Northern District of Alabama, Tamara O. Mitchell, J., 542 B.R. 859, granted motion, and funds appealed The District Court, R. David Proctor, J., 579 B.R. 603, affirmed. Funds appealed.

**Holdings:** The Court of Appeals, Jill Pryor, Circuit Judge, held that:

premiums that bankrupt coal mining company owed for its retired workers to Benefit Plan established by the Coal Industry Retiree Health Benefit Act did not qualify as "taxes" for purposes of the Anti-Injunction Act;

even if premiums and penalties that debtor owed to the Combined Fund qualified as "taxes," the Anti-Injunction Act did not deprive bankruptcy court of jurisdiction to enter order terminating debtor's payment obligation;

bankruptcy statute allowing debtor, on an appropriate showing, to modify its obligation for payment of "retiree benefits" enabled bankrupt coal mining company to seek order from bankruptcy court terminating its obligation to pay premiums; and

term "reorganization," as used in bankruptcy statute permitting court to modify a Chapter 11 debtor's obligation for payment of retiree benefits, had to be interpreted broadly to refer to all types of debt adjustment.

Affirmed.

**Procedural Posture(s):** On Appeal; Other.

**Attorneys and Law Firms**

John C. Goodchild, III, Philadelphia, PA, Stephanie Schuster, Washington, DC, Morgan Lewis & Bockius, LLP, for Plaintiffs-Appellants.

Raechel K. Anglin, Washington, DC, Julia Frost-Davies, Amelia C. Joiner, Boston, MA, Rachel Jaffe Mauceri, Philadelphia, PA, Morgan Lewis & Bockius, LLP, Glen M. Connor, Quinn Connor Weaver Davies & Rouco, LLP, Birmingham, AL, for Plaintiff-Appellant UMWA 1974 Pension Plan and Trust.

George Nicholas Davies, Quinn Connor Weaver Davies & Rouco, LLP, Birmingham, AL, for Plaintiffs-Appellants UMWA 1974 Pension Plan and Trust, United Mine Workers of America 1992 Benefit Plan.

Bryan Michael Killian, Morgan Lewis & Bockius, LLP, Washington, DC, for Plaintiffs-Appellants UMWA 1974 Pension Plan and Trust, United Mine Workers of America Combined Benefit Fund.

Paul A. Green, John Robert Mooney, Mooney Green Saindon Murphy & Welch, David Bruce Salmons, Morgan Lewis & Bockius, LLP, Washington, DC, for Plaintiffs-Appellants United Mine Workers of America Combined Benefit Fund, United Mine Workers of America 1992 Benefit Plan.

Scott Burnett Smith, Huntsville, AL, James B. Bailey, Jay Robert Bender, Cathleen Curran Moore, John DeForest Watson, III, Bradley Arant Boult Cummings, LLP, Jayna Partain Lamar, Robert K. Ozols, Maynard Cooper & Gale, PC, Birmingham, AL, Kelley A. Cornish, Robert N. Kravitz, Diane Meyers, Michael S. Rudnick, Stephen Shimshak, Claudia R. Tobler, Ann K. Young, Paul Weiss Rifkind Wharton & Garrison, LLP, New York, NY, for Defendant-Appellee Andre' M. Toffel.

Exhibit 1

Maurice L. Brimmage, Jr., Dallas, TX, Ira S. Dizengoff, Lisa G. Beckerman, New York, NY, James R. Savin, Washington, DC, Akin Gump Strauss Hauer & Feld, LLP, Donald Christopher Carson, Michael Leo Hall, Birmingham, AL, Forrest Stephen Latta, Mobile, AL, Burr & Forman, LLP, for Defendants-Appellees Steering Committee of First Lien Holders, Warrior Met Coal, Inc.

Appeal from the United States District Court for the Northern District of Alabama, D.C. Docket Nos. 2:16-cv-00057-RDP; 15-bkc-02741-TOM11

Before MARTIN, JILL PRYOR and ANDERSON, Circuit Judges.

**Opinion**

JILL PRYOR, Circuit Judge:

**\*1** Coal companies in the United States long ago promised in wage agreements to provide their employees with health care benefits at no cost to the employees and to continue to provide these benefits even after the employees' retirement. A quarter century ago, Congress turned this contractual obligation into a statutory one. *See* Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), Pub. L. No. 102-486, 106 Stat. 2776, 3036-56 (1992). Even before the Coal Act, coal companies struggled to pay the cost of these benefits. Unfortunately, this problem has grown more severe as coal revenues have declined and health care costs have skyrocketed.

In this case we confront the question of what happens to a coal company's statutory obligation to fund retiree health care benefits when the company files bankruptcy and pursues liquidation under Chapter 11. To answer this question, we must consider the interplay of two federal statutes, the Coal Act and the Retiree Benefits Bankruptcy Protection Act of 1988 ("RBBPA"), Pub. L. No. 100-334, 102 Stat. 610 (1988). The Coal Act requires coal companies to provide certain retirees with health care benefits for life; it created two multiemployer plans —the UMWA Combined Benefit Fund and the UMWA 1992 Benefit Plan (collectively, the "Funds")—to provide such benefits. These plans are funded by premiums paid by the coal companies and their related entities and by the federal government. The RBBPA prohibits a debtor who files bankruptcy from unilaterally terminating payments for retiree health care benefits. The RBBPA nonetheless permits a bankruptcy court to terminate a debtor's obligation to fund retiree health care benefits when it finds that the termination is necessary for the debtor's reorganization.

The question before us is whether the RBBPA authorizes a bankruptcy court to terminate a debtor's statutory obligation under the Coal Act to pay premiums to the Funds when the bankruptcy court finds that such termination is necessary for the coal company to sell its assets as a going concern and avoid a piecemeal liquidation. This difficult question requires a nuanced analysis of both bankruptcy law and the unique system that Congress created to fund health care benefits for coal retirees.

Debtor Walter Energy[1] petitioned for Chapter 11 bankruptcy and sought to sell substantially all of its assets as a going concern. But the sole potential purchaser would acquire the assets only if they were transferred free and clear of Walter Energy's Coal Act obligation to provide retiree health care benefits or pay premiums to the Funds. The bankruptcy court, exercising its authority under the RBBPA, terminated Walter Energy's obligation to pay premiums, which in effect shifted the cost of these benefits to the federal government. The Funds appealed to the district court, which affirmed the bankruptcy court.

**\*2** On appeal to our Court, the Funds advance three reasons why the bankruptcy court lacked the authority to terminate Walter Energy's obligation to pay premiums.

First, they argue that the Anti-Injunction Act, 26 U.S.C. § 7421(a), barred the bankruptcy court from modifying the premiums because the premiums qualify as taxes for purposes of that statute, meaning they may be challenged only after the taxes are collected. Second, they contend that because the premiums paid to the Funds are imposed by a statute and not undertaken as a voluntary contractual obligation, they do not qualify as retiree benefits under the RBBPA and thus the bankruptcy court had no authority to terminate them. Third, they assert that because Walter Energy sought to sell substantially all of its assets and liquidate under Chapter 11 of the Bankruptcy Code, instead of engaging in a classic Chapter 11 reorganization, the bankruptcy court had no authority under the RBBPA to terminate the payment obligation. We reject the Funds' arguments and hold that the bankruptcy court had the authority to modify the premiums that Walter Energy owed the Funds. Accordingly, we affirm the district court.

Exhibit 1

* * *

To address the very important and complex issues in this case, our opinion today necessarily is lengthy. In Part I, we provide a history of retiree health care benefits in the coal industry to explain how Congress came to transform coal companies' contractual obligation to provide retiree health care benefits into a statutory mandate. In Part II, we discuss the factual background and procedural history of this case. In Part III, we identify the applicable standard of review. In Part IV, we explain that we have jurisdiction to hear this appeal because the Anti-Injunction Act did not bar the bankruptcy court from terminating Walter Energy's obligation to pay premiums owed under the Coal Act. In Part V, we hold that the RBBPA authorized the bankruptcy court to terminate Walter Energy's obligation to pay premiums, even though the premiums were imposed by statute and Walter Energy was pursuing liquidation under Chapter 11, not a classic reorganization.

### I. RETIREE HEALTH CARE
### BENEFITS IN THE COAL INDUSTRY

Working in a coal mine is extremely dangerous. There is the risk of fire, flood, explosion, or mine collapse. There is also the unseen risk that the dust in the coal mine may cause long-term health problems including respiratory diseases. Given the dangers inherent in their work, coal miners sought and secured lifetime health care benefits from their employers. The coal industry struggled with how to pay for these benefits, with some coal companies filing bankruptcy in an attempt to shed this obligation. In response to the bankruptcy filings, Congress passed the RBBPA to limit when companies could rid themselves of the obligation to fund retiree health care benefits. Congress also passed the Coal Act, guaranteeing certain coal retirees health care benefits for life.

**A. Coal Employees, Including Retirees, Initially Secure Health Care Benefits in Wage Agreements.**
In the early twentieth century, coal workers paid their own health care costs. Some coal companies used a prepayment system in which workers paid for health care through payroll deductions. But the quality of this employer-provided health care was poor and led to worker unrest.

After miners organized nationwide strikes to demand health care benefits, President Harry Truman directed the federal government to take possession of all coal mines and to negotiate an agreement with the United Mine Workers of America ("UMWA"). The Secretary of Interior and the UMWA ultimately agreed that miners would be provided health care benefits.

With an agreement about benefits in place, the government returned the mines to private control. The coal companies agreed to a collective bargaining agreement with the UMWA, the National Bituminous Coal Wage Agreement of 1947 ("1947 NBCWA"), which established a multiemployer fund to provide pension and medical benefits to coal workers and their families. The coal companies funded these benefits using a pay-as-you-go system in which they paid a royalty on each ton of coal produced. The 1947 NBCWA agreement did not explicitly grant retirees health care benefits. Instead, the trustees of the multiemployer fund, who were selected by the UMWA and coal companies, were responsible for setting the level of benefits, including deciding whether retirees received benefits. Over time, the trustees added or removed benefits depending on the amount of coal that was produced and the royalties received.

**\*3** About 30 years later, the coal companies and the UMWA agreed in the National Bituminous Coal Wage Agreement of 1974 ("1974 NBCWA") to expand the scope of these benefits by agreeing that coal workers and retirees would be guaranteed health care benefits for life. [2] The 1974 NBCWA also restructured the multiemployer fund that provided these benefits to comply with the Employee Retiree Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Prior to the 1974 NBCWA, there was a single benefit fund that provided coal workers both pension and health care benefits. The 1974 NBCWA split this fund into four funds, with two funds providing pension benefits and two funds—the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust—providing health care benefits. [3] Despite these changes, the method for funding the benefits remained the same, with coal companies continuing to pay royalties to the multiemployer funds based on the volume of coal produced.

The new plans quickly encountered difficulty in covering the cost of retiree health care benefits. The royalties

Exhibit 1

paid to the plans decreased as coal production declined. At the same time, the plans' expenses increased due to a growing number of beneficiaries and rising health care costs. To address this problem, the UMWA and the coal companies agreed to restructure the system for health care benefits for coal employees and retirees in the National Bituminous Coal Wage Agreement of 1978 ("1978 NBCWA"). They agreed generally to move from a centralized, multiemployer health care benefit plan to individual employer plans for current employees and recent retirees. Under this system, each coal company was required to establish and finance its own individual health benefit plan, which would cover its employees, certain recent retirees, and future retirees. The 1978 NBCWA represented a "shift[ ] from a defined contribution obligation, under which employers were responsible only for a predetermined amount of royalties, to a form of defined benefit obligation, under which employers were to fund specific benefits." *E. Enters. v. Apfel*, 524 U.S. 498, 510-11, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality).

The 1978 NBCWA did not eliminate the multiemployer plans entirely, however. The 1950 Benefit Plan continued to operate and cover those retirees who were already enrolled in the plan—that is, miners who had retired before 1976. The 1974 Benefit Plan was restructured to provide health care benefits to "orphaned" retirees—that is, retirees whose last employer was no longer in business. The 1950 Benefit Plan and 1974 Benefit Plan were funded by contributions from the coal companies that signed the 1978 NBCWA.

Despite this restructuring, the 1974 Benefit Plan continued to operate at a severe deficit. Some coal companies refused to renew their wage agreements with the UMWA. The decisions of these coal companies not to sign the 1978 NBCWA or subsequent wage agreements affected the 1974 Benefit Plan in two ways. First, when a company chose not to renew its collective bargaining agreement, it was no longer obligated to provide health care benefits to its retirees. [4] Its retirees then became orphaned and eligible for benefits under the 1974 Benefit Plan, increasing the expenses of the 1974 Benefit Plan. [5] Second, when a coal company chose not to renew its wage agreement, it stopped paying premiums to the 1974 Benefit Plan to cover the cost of benefits for orphaned retirees, leaving the

remaining coal companies to shoulder a greater share of the cost of benefits for orphaned retirees.

## B. Coal Companies Attempt to Shed Retiree Health Obligations by Filing for Bankruptcy, Leading Congress to Amend the Bankruptcy Code.

**\*4** Desperate to reduce their expenses, some coal companies looked to reorganization under Chapter 11 as a way to rid themselves of the cost of retiree health care benefits. In 1986, a coal company known as LTV petitioned for Chapter 11 bankruptcy and immediately announced it would no longer pay for health care benefits for its approximately 78,000 retirees. Despite promising in wage agreements to provide its retirees with health care benefits for life, LTV stopped paying for the benefits, leaving its retirees as unsecured creditors whose only option was to try to recover the value of the promised benefits from LTV's bankruptcy estate. To protect LTV's retirees from having their health care benefits terminated, Congress quickly passed temporary legislation that required companies who petitioned for Chapter 11 bankruptcy, including LTV, to continue to pay their contributions for retiree health care benefits after filing for bankruptcy.

Congress enacted the RBBPA as permanent legislation to protect retiree health care benefits when a company files bankruptcy. [6] The RBBPA prohibits a Chapter 11 debtor in possession [7] from unilaterally terminating or modifying its obligation to pay for retired employees' health care benefits. *11 U.S.C. § 1114(e)(1)*. But the RBBPA permits these obligations to be modified either by an agreement between the debtor and an authorized representative of retirees receiving benefits or by order of the bankruptcy court. *Id.* [8]

The RBBPA narrowly circumscribes when a bankruptcy court may enter an order modifying or terminating a debtor's obligation to make payments for retiree health care benefits. A bankruptcy court may issue such an order only after (1) the debtor and the retiree's authorized representative negotiated and failed to reach an agreement and (2) the bankruptcy court finds that the modification or termination is necessary to permit the reorganization of the debtor, treats all affected parties equitably and fairly, and is clearly favored by the balance of the equities. *Id.* § 1114(g).

Exhibit 1

The RBBPA also dictates how a debtor's obligation to fund retiree health care benefits must be treated in a Chapter 11 plan for the plan to be confirmed. The plan must provide for continued payment of all retiree benefits "for the duration of the period the debtor has obligated itself to provide such benefits." *Id.* § 1129(a)(13). The amount of such payments must be either the amount that the debtor was paying prior to bankruptcy or, if the debtor's payments have been modified either by agreement or order of the bankruptcy court, the amount set forth in the agreement or order. *See id.*

### C. Congress Passes the Coal Act to Address Funding for Retiree Health Care Benefits in the Coal Industry.

The 1950 and 1974 Benefit Plans remained in a precarious financial position. In 1989, they were on the brink of insolvency, causing coal miners to strike. In response, the Secretary of Labor convened the Coal Commission to study issues associated with retiree benefits in the coal industry. *See* Sec'y of Labor's Advisory Comm'n on United Mine Workers of Am. Retiree Health Benefits, *A Report to the Secretary of Labor and the American People*, 1-4 (1990), available at *Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing Before the Subcomm. on Medicare & Long-Term Care of the S. Comm. on Fin.*, 102d Cong. 142-277 (1991).

 **\*5** The Coal Commission report accepted that retired coal miners were entitled to lifetime health care benefits: "Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned for their retirement years. That commitment should be honored." *Id.* at 1. But the Coal Commission explained that these benefits were in "jeopardy" because of the 1950 and 1974 Benefit Plans' massive deficits. *Id.* at 1, 3.

In response to the Coal Commission report, Congress passed the Coal Act, which turned coal companies' contractual obligation to provide health care benefits to workers who retired before October 1, 1994 into a statutory requirement.[9] The legislation was intended to "remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry." Coal Act, Pub.

L. No. 102-486 § 19142(b)(1), 106 Stat. 2776, 3037. The Coal Act added a statutory mandate that coal companies provide health care benefits to their retirees through individual employer plans and created two new multiemployer plans—the Combined Fund and the 1992 Benefit Plan.

#### 1. Individual Employer Plans

Since 1978, the coal companies and the UMWA agreed in national wage agreements that the coal companies would provide health care benefits to their retirees through individual employer plans. Under the Coal Act, a coal company that had signed the 1978 NBCWA or any subsequent NBCWA was required to continue to provide health care benefits, including to retirees, through its individual employer plan for as long as the company or a "related person" remained in business. *See* 26 U.S.C. §§ 9701(c)(2)(A), 9711(a). [10]

#### 2. The Combined Fund

The Coal Act again reorganized the multiemployer plans. Congress created the Combined Fund by merging the 1950 and 1974 Benefit Plans so that the beneficiaries of the 1950 and 1974 Benefit Plans received their benefits from the Combined Fund. [11] 26 U.S.C. § 9702(a)(2). The Coal Act guaranteed that the Combined Fund would provide these beneficiaries with "substantially the same" health care benefits that they had previously received. *Id.* § 9703(b)(1).

The Combined Fund is funded primarily by premiums collected from coal companies and money received from the federal government. *Id.* §§ 9701(c)(5), 9704(a), 9705(b)(1). Premiums are assessed against coal companies, referred to as signatory operators, who signed the 1978 NBCWA (or any subsequent NBCWA). *See id.* §§ 9701(b)(1), 9701(c)(1), 9704(a). A signatory operator is required to pay an annual premium to the Combined Fund to cover the cost of health care benefits for retirees assigned to the signatory operator. *Id.* § 9704(b). The Social Security Commissioner assigns each retiree covered by the Combined Fund to a signatory operator based on the retiree's employment history and complex rules set forth in the Coal Act. *See id.* § 9706(a)(1), (2). [12] Each year, a signatory operator is charged a "health benefit premium," which is calculated by multiplying the number of retirees

Exhibit 1

assigned to the signatory operator and an annual per beneficiary premium calculated by the Commissioner. *Id.* § 9704(b)(1).

**\*6** A signatory operator must pay premiums to the Combined Fund for as long as it has assigned beneficiaries and "conducts or derives revenue from any business activity, whether or not in the coal industry." *See id.* §§ 9701(c)(7), 9706(a). If a signatory operator ceases all business activities, the Commissioner may assess premiums against a "related person" of the signatory operator, meaning a "successor[ ] in interest" or "business ... under common control." *Id.* §§ 9701(c)(2)(A), 9706(a). The Coal Act thus contemplates that when a company sells substantially all of its assets, the purchaser inherits the obligation to pay Combined Fund premiums. To ensure that premiums are paid, a penalty of $100 per beneficiary per day is assessed if a company fails to timely pay its premiums. *Id.* § 9707(a)(1), (b).

Under the rules set forth in the Coal Act, certain retirees of the Combined Fund cannot be assigned to a signatory operator. These orphaned retirees may include retirees who never have had an employer who signed the 1978 NBCWA (or any subsequent wage agreement) or whose employer ceased all business activities and left behind no related person. The Coal Act nevertheless "provid[es] stable funding for the health benefits of these 'orphaned retirees.' " *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 154, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). Benefits for these orphaned retirees are funded by three different sources. First, when the Combined Fund was created, it received a total of $210,000,000 from a UMWA pension plan. 26 U.S.C. § 9705(a)(1). Second, Congress has authorized annual transfers from the Abandoned Mine Reclamation Fund ("Abandoned Mine Fund")[13] to the Combined Fund. *See id.* § 9705(b)(1); 30 U.S.C. § 1232(h)(2)(A). Third, if the proceeds received fail to cover the cost of benefits for orphaned retirees, the Commissioner may collect premiums from signatory operators to cover any shortfall. *See* 26 U.S.C. § 9704(d)(2)(B).

### 3. The 1992 Benefit Plan

The Coal Act also created the 1992 Benefit Plan, another new multiemployer plan. 26 U.S.C. § 9712(a)(1), (a)(2)(C). The 1992 Benefit Plan covers two groups of retirees: (1) retirees who were eligible to receive benefits from the 1950 or 1974 Benefit Plans but had not yet retired when the Coal Act was enacted and (2) orphaned retirees who would be entitled to coverage under an individual employer plan but are not receiving such coverage.[14] *Id.* § 9712(b)(2). Only individuals who retired by September 30, 1994, are eligible for the 1992 Benefit Plan. *Id.* The 1992 Benefit Plan provides beneficiaries with benefits that are "substantially the same as" the coverage that was previously offered under the 1950 and 1974 Benefit Plans. *Id.* § 9712(c)(1).

Like the Combined Fund, the 1992 Benefit Plan is funded by premiums from coal companies and transfers from the Abandoned Mine Fund. But the premiums owed to the 1992 Benefit Plan are assessed in a different manner. A smaller group of coal companies is required to pay premiums to the 1992 Benefit Plan—only those coal companies that signed the National Bituminous Coal Wage Agreement of 1988 ("1988 NBCWA"). *Id.* § 9712(d)(1), (d)(6); *see id.* § 9701(c)(3)(A). Each of these companies is responsible for paying a monthly premium for each retiree assigned to it; retirees are generally assigned to the signatory of the 1988 NBCWA that was the retiree's most recent employer. *See id.* § 9712(d)(1)(A). The company and any "related person" of the company are jointly and severally liable for these premiums. *Id.* § 9712(d)(4). The Act thus contemplates that when a company sells substantially all of its assets, the purchaser inherits the obligation to pay premiums to the 1992 Benefit Plan. But, unlike the Act's provision for the Combined Fund, no additional penalty is imposed if a company or its related person fails to pay its premiums. *Cf. id.* § 9707.

**\*7** Many beneficiaries of the 1992 Benefit Plan are unassigned to any signatory operator and are instead orphaned retirees. Several sources contribute to fund benefits for these retirees. First, companies that signed the 1988 NBCWA are required to provide security, such as a letter of credit, to the 1992 Benefit Plan to cover a portion of the projected future costs of health care benefits. *Id.* § 9712(d)(1)(B). Second, the 1992 Benefit Plan receives transfers from the Abandoned Mine Fund to cover the cost of providing health care benefits to orphaned retirees. *See id.* § 9712(a)(3); 30 U.S.C. § 1232(h)(2)(B). If

Exhibit 1

these transfers are insufficient to cover the cost of benefits, then the signatories to the 1988 NBCWA may be liable for additional backstop premium payments. *See* 🔖 26 U.S.C. § 9712(d)(1)(C).

## II. FACTUAL BACKGROUND

### A. Walter Energy Files Bankruptcy Amid a Global Downturn in the Coal Industry.

Walter Energy, the debtor in this case, produced and exported coal from underground and surface mines located in Alabama, West Virginia, Canada, and the United Kingdom. Beginning in 2011, the global coal industry experienced a sharp downturn, which caused coal prices to plummet. Facing sharp declines in revenue, Walter Energy tried to reduce its expenses by cutting costs, idling or closing mines, selling assets, laying off workers, and suspending dividends to investors. Even so, Walter Energy's revenue still was insufficient to cover the interest payments on its debt and its labor costs, which included wages set by collective bargaining agreements as well as benefits to its employees and retirees, including pensions and postretirement healthcare. Running out of the cash needed to continue operations, Walter Energy filed a petition for Chapter 11 bankruptcy.

### B. The Bankruptcy Court Permits Walter Energy to Sell Most of Its Assets in a Going-Concern Sale.

In the bankruptcy proceedings, Walter Energy sought to sell substantially all of its assets in a going-concern sale pursuant to 🔖 § 363 of the Bankruptcy Code. *See* 🔖 11 U.S.C. § 363. Warrior Met,[15] an entity owned by Walter Energy's first-lien creditors, submitted a "stalking horse" bid to purchase Walter Energy's assets.[16] Walter Energy and Warrior Met entered into an asset purchase agreement in which Walter Energy agreed to sell its core Alabama mining operations to Warrior Met for $1.15 billion. The consideration for the purchase price was a credit bid.[17] In addition, Warrior Met agreed to provide additional cash, fund various wind down trusts, and assume an estimated $115 million in liabilities.

Despite taking on approximately $115 million in liabilities, Warrior Met was willing to acquire the assets only if it would not be bound by Walter Energy's collective bargaining agreements, not be required to provide retiree

health care benefits, and released from any obligation to pay premiums to the Funds. At the time Walter Energy filed for bankruptcy, it provided health care benefits to 572 retirees and dependents through its individual employer plan. In addition, 32 other beneficiaries assigned to Walter Energy were covered by the Combined Fund with Walter Energy paying approximately $147,000 in annual premiums to the Combined Fund.[18]

**\*8** To complete the sale, Walter Energy negotiated with the UMWA and a retiree committee about the status of the collective bargaining agreements and retiree benefits. Walter Energy proposed amending the collective bargaining agreement so that it would not bind Warrior Met, terminating health and welfare benefits for retirees, and coordinating with the UMWA and the 1992 Benefit Plan to transition retirees covered by Walter Energy's individual employer plan to the 1992 Benefit Plan. Walter Energy's proposal, then, would result in its retirees being treated as orphaned retirees for the Combined Fund and the 1992 Benefit Plan. The UMWA rejected this offer, insisting, among other things, that Warrior Met provide retiree health care benefits.

The negotiations having failed, Walter Energy sought approval from the bankruptcy court to conduct a sale of substantially all of its assets under 🔖 § 363(b) of the Bankruptcy Code.[19] 🔖 11 U.S.C. § 363(b). Walter Energy also requested that the bankruptcy court enter an order terminating Walter Energy's collective bargaining agreements as well as its obligations to provide retiree health care benefits through its individual employer plan or pay premiums to the Funds. Walter Energy explained that if the court did not grant this relief, it would: be unable to complete the 🔖 § 363 sale, run out of money, and shut down its mines' operations, eliminating all jobs.[20] In contrast, if this relief were granted, Walter Energy contended that Warrior Met would be able to continue to operate at least some mines, preserving some jobs. Walter Energy also asked the court to terminate its obligation to fund retiree health care benefits after the sale occurred while it wound down operations, claiming there would be no money left to pay these obligations. The UMWA and the Funds opposed the motion, arguing that the bankruptcy court lacked the authority to modify the collective bargaining agreements or to terminate Walter Energy's Coal Act obligations.

Exhibit 1

The bankruptcy court entered an order allowing Walter Energy to reject the collective bargaining agreements and terminating its obligations to provide retirees insurance through an individual employer plan as well as to pay premiums to the Funds (the "1113/1114 Order"). In addition, the bankruptcy court ordered that Walter Energy was not obligated to pay premiums for retiree health care benefits to the Funds while it wound up its affairs. After this order, the 572 beneficiaries who had been receiving retiree health care benefits through Walter Energy's individual employer plan became beneficiaries of the 1992 Benefit Plan. The 32 beneficiaries of the Combined Fund who had been assigned to Walter Energy continued to receive benefits from the Combined Fund. Because the bankruptcy court had terminated both Walter Energy and Warrior Met's obligation to pay premiums to the Funds, all of Walter Energy's retirees and their dependents were orphaned, meaning that the obligation to pay for their health care benefits effectively shifted to the federal government. *See* 26 U.S.C. §§ 9705(b)(1), 9712(a)(3); 30 U.S.C. § 1232(h)(2)(A), (B).

The bankruptcy court also entered an order approving the sale of substantially all of Walter Energy's assets to Warrior Met (the "Sale Order"). Warrior Met acquired the property free and clear of all liens, claims, interests, and encumbrances; was not subject to the terms of Walter Energy's collective bargaining agreements; and was not required to provide retiree health care benefits or pay premiums to the Funds. Shortly after the sale was completed, Walter Energy stopped paying premiums to the Funds.

## C. The District Court Affirms the Sale Order and 1113/1114 Order.

**\*9** The Funds appealed to the district court both the Sale Order and the 1113/1114 Order. They also filed a motion asking the district court to stay the sale pending appeal, [21] but the district court refused to stop the sale. In separate opinions, the district court affirmed the bankruptcy court's orders.

First, the district court affirmed the Sale Order, rejecting the Funds' argument that the bankruptcy court lacked the power to authorize a sale of assets free and clear of Walter Energy's obligation to pay premiums under the Coal Act. *UMWA Combined Benefit Fund v. Walter Energy, Inc.* 551

B.R. 631, 640 (N.D. Ala. 2016). The Funds argued that the bankruptcy court lacked jurisdiction to authorize the sale under the Anti-Injunction Act. *Id.* at 637. The district court disagreed, concluding that the Coal Act premiums were not taxes for purposes of the Anti-Injunction Act, and thus the bankruptcy court had jurisdiction to enter the Sale Order. [22] *Id.* at 637-40.

Second, the district court affirmed the bankruptcy court's 1113/1114 Order. The district court concluded that the bankruptcy court had the authority under § 1114 to terminate Walter Energy's obligation to pay premiums under the Coal Act. This is the Funds' appeal of that decision. [23]

## D. Walter Energy Converts Its Bankruptcy Case to a Chapter 7 Petition.

While this appeal was pending, Walter Energy continued to wind down its operations. It filed a motion in the bankruptcy court to convert its bankruptcy petition to a proceeding under Chapter 7, explaining that after consummating the sale transaction, it had transferred or obligated itself to transfer every asset it owned and thus there was no compelling need to further administer the case in Chapter 11. The bankruptcy court granted the motion. [24]

**\*10** The Funds claim that the amount Walter Energy owes them continues to increase. They assert that, through April 2017, Walter Energy owed premiums of approximately $3.6 million to the 1992 Benefit Plan and approximately $104,000 to the Combined Fund. Furthermore, they contend that each month the amount that Walter Energy owes to the 1992 Benefit Plan increases by approximately $347,000 to reflect an additional monthly premium that Walter Energy failed to pay.

## III. STANDARD OF REVIEW

When we review an order of a district court entered in its role as an appellate court reviewing a bankruptcy court's decision, we independently examine the bankruptcy court's factual and legal determinations, applying the same standards of review as the district court. *In re FFS Data, Inc.,* 776 F.3d 1299, 1303 (11th Cir. 2015). We review *de novo* conclusions of law whether by the

Exhibit 1

bankruptcy court or the district court. *See* *In re Bilzerian*, 100 F.3d 886, 889 (11th Cir. 1996). We review the bankruptcy court's factual findings under the clearly erroneous standard. *Id.*

## IV. THE ANTI-INJUNCTION ACT'S JURISDICTIONAL BAR

Before turning to the Funds' arguments about whether the bankruptcy court was permitted under the RBBPA to terminate Walter Energy's obligation to pay premiums to the Funds, we must be sure that the bankruptcy court had jurisdiction to modify the premiums.

The Anti-Injunction Act generally prohibits suits challenging the assessment or collection of a tax before the tax is collected. *See* 26 U.S.C. § 7421(a) ("[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person...."). Instead, taxes ordinarily may be challenged only after they are paid, by suing for a refund. *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 543, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). The Anti-Injunction Act "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes." *Id.* When the Anti-Injunction Act applies, it deprives federal courts of jurisdiction. *See* *id.* (recognizing that Anti-Injunction Act issue must be considered before court could address merits); *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (explaining that the "object of [the Anti-Injunction Act] is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes"). Accordingly, we must address whether the Anti-Injunction Act applies before we can consider the merits of the Funds' claims.

The Funds contend that the premiums Walter Energy owed under the Coal Act qualify as taxes for purposes of the Anti-Injunction Act and that as a result the bankruptcy court lacked authority to terminate Walter Energy's obligation to pay future premiums. To determine whether the premiums owed to the Funds qualify as taxes for purposes of the Anti-Injunction Act, we look

to the Supreme Court's recent decision in *NFIB*, which recognized that even when an exaction qualifies as a tax for purposes of the Constitution, it does not necessarily qualify as a tax for purposes of the Anti-Injunction Act. *See* *NFIB*, 567 U.S. at 544-46, 132 S.Ct. 2566.

Applying *NFIB*, we conclude that premiums owed to the 1992 Benefit Plan do not qualify as taxes for purposes of the Anti-Injunction Act. The analysis for premiums owed to the Combined Fund is more complicated, though, because Congress directed that if a coal company fails to pay its premiums, a penalty shall be assessed and this penalty "shall be treated in the same manner as the tax imposed by section 4980B." 26 U.S.C. § 9707(f). Under *NFIB* this language probably indicates that the premiums and penalties owed to the Combined Fund should be treated as taxes for purposes of the Anti-Injunction Act. But we can leave this question for another day because even assuming that the premiums and penalties owed to the Combined Fund qualify as taxes for purposes of the Anti-Injunction Act, an exception to the Anti-Injunction Act applies. We thus conclude that the bankruptcy court had jurisdiction to terminate Walter Energy's obligation to pay premiums to the Funds.

### A. In *NFIB*, the Supreme Court Addressed When an Exaction Qualifies as a Tax for Purposes of the Anti-Injunction Act.

**\*11** The Anti-Injunction Act bars a lawsuit only when the exaction being collected qualifies as a tax. *See* 26 U.S.C. § 7421. In *NFIB*, the Court considered whether Congress had the authority to enact the Affordable Care Act's individual mandate—which imposed a penalty on individuals who failed to purchase health insurance— under its constitutional power to levy taxes. 567 U.S. at 546-47, 132 S.Ct. 2566. Before addressing the merits of the constitutional issue, the Court considered whether the Anti-Injunction Act barred the suit and held that the penalty for failing to comply with the individual mandate did not qualify as a tax for Anti-Injunction Act purposes. *See* *id.* at 546, 132 S.Ct. 2566.

The Court explained that the inquiry into whether an exaction qualifies as a tax for purposes of the Anti-Injunction Act, a statute, is separate and distinct from

Exhibit 1

whether the exaction qualifies as a tax for constitutional purposes. 🚩 *Id.* at 544, 132 S.Ct. 2566. To determine whether an exaction qualifies as a tax for purposes of the Constitution, courts apply a "functional approach," looking at the "substance and application" of the exaction, as opposed to the label that Congress used to describe it. 🚩 *Id.* at 566, 132 S.Ct. 2566 (internal quotation marks omitted). This functional approach ensures that "Congress may not ... expand its power under the Taxing Clause, or escape the Double Jeopardy Clause's constraint on criminal sanctions, by labeling a severe financial penalty a 'tax.' " 🚩 *Id.* at 544, 132 S.Ct. 2566. But the Court refused to apply such a functional approach to determine whether the exaction imposed by the Affordable Care Act qualifies as a tax for purposes of the Anti-Injunction Act. 🚩 *Id.*

Because both the Anti-Injunction Act and the Affordable Care Act "are creatures of Congress's own creation," the Supreme Court explained that the way "they relate to each other is up to Congress, and the best evidence of Congress's intent is the statutory text." 🚩 *Id.* To determine whether Congress intended for an exaction to be treated as a tax under the Anti-Injunction Act, the Supreme Court directed courts look to whether Congress directly or indirectly indicated that the exaction should be treated as a tax for purposes of that act. *See* 🚩 *id.* at 543-46, 132 S.Ct. 2566.

Looking to the statutory text of the Affordable Care Act, the Court concluded that Congress did not intend for the penalty imposed for failing to comply with the individual mandate to be a tax for purposes of the Anti-Injunction Act. Congress decided to describe the exaction imposed on individuals who chose to forgo health insurance "not as a 'tax' but as a 'penalty.' " 🚩 *Id.* at 543, 132 S.Ct. 2566. The Court treated this decision as "significant" because "[t]here is no immediate reason to think that a statute applying to 'any tax' would apply to a 'penalty.' " 🚩 *Id.* at 543-44, 132 S.Ct. 2566. The Court further regarded the fact that Congress labeled as taxes other exactions under the Affordable Care Act as evidence that Congress did not intend the penalty for failing to comply with the individual mandate to be a tax for purposes of the Anti-Injunction Act. 🚩 *Id.* at 544, 132 S.Ct. 2566.

The Supreme Court accepted that in narrow circumstances Congress could "describe something as a penalty but direct that it nonetheless be treated as a tax for purposes of the Anti-Injunction Act." 🚩 *Id.* The Court used as an example 🚩 § 6671 of the Internal Revenue Code, which states that "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities" set forth in subchapter 68B of the Internal Revenue Code. 🚩 *Id.* (citing 26 U.S.C. § 6671(a) ). The Court explained that this provision deemed the penalties set forth in subchapter 68B to be taxes for purposes of the Anti-Injunction Act, located in the Internal Revenue Code, even though Congress did not directly label the exactions set forth in subchapter 68B as taxes. 🚩 *Id.* at 544-45, 132 S.Ct. 2566. But § 6671 did not turn the penalty for failure to comply with the individual mandate into a tax for purposes of the Anti-Injunction Act because the individual mandate was not found in subchapter 68B of the Internal Revenue Code. 🚩 *Id.* at 545, 132 S.Ct. 2566.

**\*12** After accepting that Congress could indicate indirectly that an exaction should be treated as a tax for purposes of the Anti-Injunction Act, the Court considered a second potential argument about why the penalty for failing to comply with the individual mandate should be treated as a tax. The provision setting the penalty for failing to comply with the mandate stated that the penalty shall be "assessed and collected in the same manner" as an assessable penalty under subchapter 68B, 🚩 26 U.S.C. § 5000A(g)(1), and Congress directed that assessable penalties under subchapter 68B are "assessed and collected in the same manner as taxes," 🚩 *id.* § 6671(a). 🚩 *NFIB,* 567 U.S. at 545, 132 S.Ct. 2566. Although it was argued that these provisions together indicated that Congress intended the penalty for failing to comply with the mandate to be treated as a tax for purposes of the Anti-Injunction Act, the Court rejected the argument. 🚩 *Id.* The Court explained that " 🚩 § 5000A(g) is a directive only to the Secretary of the Treasury to use the same methodology and procedures to collect the penalty that he uses to collect taxes." 🚩 *Id.* (internal quotation marks omitted). Because the Anti-Injunction Act "says nothing about the procedures to be used in assessing and collecting taxes," the Court

concluded that Congress had not expressed an indirect intent that the penalty should be treated as a tax for purposes of the Anti-Injunction Act. 📌 *Id.* at 545-46, 132 S.Ct. 2566.

**B. An Exception to the Anti-Injunction Act Applies When No Alternative Remedy Is Available to Challenge the Tax.**
Even when an exaction appears to qualify as a tax under the Anti-Injunction Act, a party still may be permitted to challenge the exaction before it is collected. The Supreme Court has held that the Anti-Injunction Act will not bar a claim if its application would "entirely deprive [a party] of any opportunity to obtain review of its claims." 📌 *South Carolina v. Regan*, 465 U.S. 367, 380, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984).

In 📌 *Regan*, the Court recognized this exception and allowed South Carolina to sue the Secretary of Treasury when there was no alternative means for the State to challenge a federal tax imposed on the State's bearer bonds. 📌 *Id.* at 370-71, 104 S.Ct. 1107. A provision of the Internal Revenue Code generally exempted from a taxpayer's gross income interest earned on any state bond. 📌 *Id.* at 370, 104 S.Ct. 1107 (citing 📌 26 U.S.C. § 103(a) ). Congress amended the Code so that only bonds in registered, rather than bearer, form qualified for the exemption. 📌 *Id.* at 370-71, 104 S.Ct. 1107. Because South Carolina issued its bonds in bearer form, under this amendment, the interest investors earned on its bonds would be taxable. 📌 *Id.* at 371, 104 S.Ct. 1107. South Carolina claimed that as a result of the tax, it would have to pay its bondholders a higher rate of interest on its bearer bonds and, in effect, would be forced to issue its bonds in registered form. 📌 *Id.* at 371-72, 104 S.Ct. 1107. Invoking the Supreme Court's original jurisdiction, South Carolina sought leave to file a complaint against the Secretary of the Treasury to mount a constitutional challenge to the statute, arguing that the law violated the Tenth Amendment. 📌 *Id.* at 370, 104 S.Ct. 1107. In response, the Secretary argued that South Carolina's lawsuit was barred by the Anti-Injunction Act. 📌 *Id.* at 370, 104 S.Ct. 1107.

The Supreme Court concluded that the Anti-Injunction Act did not bar the action and allowed South Carolina to file its complaint. 📌 *Id.* Although South Carolina was attempting to enjoin the collection or assessment of a tax, the Court concluded that the Anti-Injunction Act did not bar the suit because the State had no alternative means for challenging the tax. 📌 *Id.* at 379-80, 104 S.Ct. 1107. The Court explained that the "circumstances of [the Anti-Injunction Act's] enactment strongly suggest that Congress intended the Act to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative legal avenue by which to contest the legality of a particular tax." 📌 *Id.* at 373, 104 S.Ct. 1107. South Carolina had no alternative remedy because the bondholders, not the State, were liable for the tax on the interest earned on the bonds. 📌 *Id.* at 378-80, 104 S.Ct. 1107. Because South Carolina did not owe the tax on the bonds, it could not pay the disputed tax and then file suit for a refund, raising its constitutional challenge to the tax. 📌 *Id.* Given that South Carolina was "unable to utilize any statutory procedure to contest the constitutionality" of the relevant statute, the Court held the Anti-Injunction Act did not bar the State's complaint. 📌 *Id.* at 380, 104 S.Ct. 1107.

**C. The Anti-Injunction Act Did Not Bar the Bankruptcy Court from Modifying the Premiums Owed to the 1992 Benefit Plan.**
*13 With this background about the scope of the Anti-Injunction Act in mind, we turn to whether the Anti-Injunction Act deprived the bankruptcy court of jurisdiction to modify the premiums that Walter Energy owed the Funds. We begin with the premiums owed to the 1992 Benefit Plan. Applying the Supreme Court's reasoning in 📌 *NFIB*, we conclude that these premiums do not qualify as taxes for purposes of the Anti-Injunction Act.

The Funds' primary argument is that the premiums owed to the 1992 Benefit Plan qualify as taxes for purposes of the Anti-Injunction Act because the premiums are functionally similar to taxes. Although this argument may explain why the exactions qualify as taxes for purposes of a constitutional inquiry, the Court made clear in 📌 *NFIB* that we do not use such a functional approach to

Exhibit 1

determine whether an exaction qualifies as a tax under the Anti-Injunction Act. Because both the Anti-Injunction Act and the Coal Act "are creatures of Congress's own creation," the way that these statutes "relate to each other is up to Congress." *NFIB*, 567 U.S. at 544, 132 S.Ct. 2566. We thus look to the text of the Coal Act to determine whether Congress intended for premiums owed to the 1992 Benefit Plan to be treated as taxes for purposes of the Anti-Injunction Act. [25]

Applying the proper approach from *NFIB*, we are convinced that Congress expressed no intent for the premiums owed to the 1992 Benefit Plan to be treated as taxes for purposes of the Anti-Injunction Act. We must treat as "significant" Congress's decision to label the exactions owed to the 1992 Benefit Plan not as taxes but as premiums. *See NFIB*, 567 U.S. at 544, 132 S.Ct. 2566. We have "no immediate reason to think that a statute applying to 'any tax'," that is the Anti-Injunction Act, would apply to an exaction labeled a premium." *Id.* at 543, 132 S.Ct. 2566.

**\*14** We acknowledge that even if Congress did not label an exaction as a tax, it nevertheless could direct that the exaction be treated as a tax for purposes of the Anti-Injunction Act. *See id.* at 544, 132 S.Ct. 2566. But the parties have identified no provision in the Coal Act or the Internal Revenue Code indicating that Congress intended to treat the premiums owed to the 1992 Benefit Plan as taxes under the Anti-Injunction Act. For example, Congress expressed that any reference to "tax" in the Internal Revenue Code, which includes the Anti-Injunction Act, should be deemed to refer to the penalties and liabilities in subchapter 68B. *See* 26 U.S.C. § 6671(a). But § 6671(a) does not help here because the provision requiring companies to pay premiums to the 1992 Benefit Plan is located in subchapter 99C, not subchapter 68B, of the Internal Revenue Code. *Cf.* *NFIB*, 567 U.S. at 544-45, 132 S.Ct. 2566. We conclude that Congress did not intend for the premiums owed to the 1992 Benefit Plan to qualify as taxes for purposes of the Anti-Injunction Act. The bankruptcy court thus had jurisdiction to terminate Walter Energy's obligation to pay such premiums.

### D. The Anti-Injunction Act Did Not Bar the Bankruptcy Court from Modifying the Premiums Owed to the Combined Fund.

We now turn to a more difficult question: whether the premiums owed to the Combined Fund qualify as taxes for purposes of the Anti-Injunction Act. Congress may have indirectly indicated that the premiums should be treated as taxes for purposes of the Anti-Injunction Act. But even if we assume that Congress indicated that the Combined Fund premiums should be treated as taxes, the Anti-Injunction Act did not bar the bankruptcy court from terminating or modifying Walter Energy's obligation to pay premiums to the Combined Fund because Walter Energy had no alternative way to seek relief under 11 U.S.C. § 1114.

### 1. Congress May Have Indicated Indirectly that the Combined Fund Premiums Should Be Treated as Taxes for Purposes of the Anti-Injunction Act.

As with the 1992 Benefit Plan, Congress did not directly indicate that the exactions owed to the Combined Fund should be treated as taxes because it labeled the annual exaction as a "premium," 26 U.S.C. § 9704(a), and the exaction imposed for a company's failure to pay the premium as a "penalty," *id.* § 9707(a)(1). But Congress may have indirectly indicated that the premiums and penalties should be treated as taxes for purposes of the Anti-Injunction Act when it provided that "[f]or purposes of this title," the penalty "shall be treated in the same manner as the tax imposed by section 4980B." *Id.* § 9707(f). [26] The Supreme Court accepted in *NFIB* that Congress could direct that an exaction "be treated as a tax for purposes of the Anti-Injunction Act." *NFIB*, 567 U.S. at 544, 132 S.Ct. 2566. It appears that Congress did precisely this by specifying that the penalty "shall be treated in the same manner as [a] tax" for purposes of Title 26, which includes the Anti-Injunction Act. *See* 26 U.S.C. § 9707(f). We thus assume for purposes of this appeal that Congress intended for the penalty set forth in § 9707(f) to be treated as a tax for purposes of the Anti-Injunction Act.

If Congress intended for the *penalties* owed to the Combined Fund to be treated as taxes for purposes of the Anti-Injunction Act, then the Anti-Injunction Act

Exhibit 1

also would bar a pre-enforcement suit challenging the assessment of the *premiums* owed to the Combined Fund. The Anti-Injunction would bar such a suit because a bankruptcy court order relieving a coal company of its obligation to pay Combined Fund premiums would effectively restrain the assessment and collection of a "tax" by making it impossible for the Combined Fund to assess or collect a tax—that is, the penalty imposed by the Coal Act for a company's failure to pay its premiums. *See Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1071-72 (D.C. Cir. 2015) (treating lawsuit raising challenge to regulation imposing a reporting requirement as "a challenge to the tax imposed for failure to comply with that reporting requirement" because "[i]nvalidating the reporting requirement would necessarily 'restrain' the assessment and collection of the tax"). We thus also assume for purposes of this appeal that Congress indicated that the premiums owed to the Combined Fund should be treated as taxes for purposes of the Anti-Injunction Act.

**2. An Exception to the Anti-Injunction Act Applies Because Walter Energy Has No Alternative Avenue to Seek to Terminate Its Obligation to Pay the Combined Fund Premiums.**

**\*15** Even assuming that the premiums and penalties owed to the Combined Fund qualify as taxes for purposes of the Anti-Injunction Act, we are persuaded that an exception to the Anti-Injunction Act applies here because Walter Energy had no available alternative remedy. Walter Energy could not obtain relief by waiting to be assessed Combined Fund premiums, failing to pay those premiums, being assessed a penalty, and then bringing a suit in district court against the Secretary of the Treasury seeking to be relieved from the obligation to pay retiree benefits pursuant to 🔖 § 1114 of the Bankruptcy Code.

Congress indicated in the Bankruptcy Code that the relief offered in § 1114—modifying or terminating retiree health obligations—could be awarded only by a bankruptcy court in a Chapter 11 bankruptcy action. 🔖 Section 1114 is codified in subchapter I of chapter 11 of the Bankruptcy Code, and Congress directed that the provisions in this subchapter "apply only in a case under [Chapter 11]." 🔖 11 U.S.C. § 103(g). If Walter Energy waited to pay its annual Combined Fund premium and then brought an action in district court against the Secretary of the Treasury, arguing that it was entitled to a termination of

its obligation under 🔖 § 1114, the district court would have to conclude, based on 🔖 § 103(g), that it had no power to award such relief in a case brought outside of a Chapter 11 proceeding. [27] Because Walter Energy has no alternative remedy to seek relief under 🔖 § 1114, we conclude that the exception to the Anti-Injunction Act identified in 🔖 *Regan* applies, and the bankruptcy court was permitted to terminate Walter Energy's obligation to the Combined Fund. Because the Anti-Injunction Act imposes no jurisdictional bar, we now proceed to the merits.

### V. LEGAL ANALYSIS

The Coal Act mandated that Walter Energy provide its retirees with retiree health care benefits or pay the Funds premiums to cover the cost of those benefits. *See* 🔖 26 U.S.C. §§ 9704(a), 🔖 9711(a), 🔖 9712(d)(1)(A). But the bankruptcy court concluded that it had the authority under 🔖 § 1114 of the Bankruptcy Code to erase Walter Energy's obligation to provide retiree health care through its individual employer plan, as well as its obligation to pay premiums to the Funds. We turn to whether the bankruptcy court had authority under 🔖 § 1114 to terminate Walter Energy's obligation to pay premiums to the Funds.

Under the RBBPA, a debtor company may not unilaterally terminate payments that qualify as "retiree benefits," but a bankruptcy court may enter an order terminating the debtor's obligation to make such payments if the court finds, among other things, that the termination "is necessary to permit the reorganization of the debtor." 🔖 11 U.S.C. § 1114(g)(3). The Funds argue that the bankruptcy court erred in entering such an order here because (1) the premiums Walter Energy paid to the Funds do not qualify as "retiree benefits," and (2) the termination was not necessary to permit Walter Energy's reorganization because Walter Energy sought to sell substantially all its assets in Chapter 11 bankruptcy, not engage in a classic reorganization. We address these arguments in turn.

Exhibit 1

**A. The Bankruptcy Court Had Authority to Terminate Walter Energy's Obligation to Pay Premiums to the Funds Because the Payments Qualify as "Retiree Benefits."**

The Funds first argue that the bankruptcy court lacked authority under § 1114 to terminate Walter Energy's obligation to pay premiums to the Funds because the premiums do not qualify as "retiree benefits" under § 1114. Section 1114 defines "retiree benefits" as:

> **\*16** payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program ... maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

*Id.* § 1114(a). Here, the bankruptcy court concluded that the premiums Walter Energy owed to the Funds qualified as "retiree benefits." But the Funds challenge the bankruptcy court's conclusion, arguing that Walter Energy did not "maintain[ ]" the Funds as required by § 1114(a). [28]

To address when Walter Energy "maintained" the Funds under § 1114(a), we must begin "where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (internal quotation marks omitted). When a statute does not define a term, "we look to the common usage of words for their meaning." *Id.* (internal quotation marks omitted). To determine the ordinary meaning of a term, we often look to dictionary definitions for guidance." *Id.* at 1223. But we must be mindful that to ascertain the plain meaning of a statute,

"[w]e do not look at one word or term in isolation, but instead we look to the entire statutory context." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). The canons of construction also serve as interpretative tools to assist us in understanding the broader statutory context. *CBS*, 245 F.3d at 1225.

We begin by looking to the ordinary meaning of the term "maintain." The parties agree that the term generally means "to keep in a state of repair, efficiency, or validity: preserve from failure or decline." Maintain, *Webster's Third New International Dictionary* 1362 (2002). The Funds concede that the premium payments are an important source of money for the Funds. The Funds nonetheless contend that Walter Energy did not maintain the Funds because it did not voluntarily incur the obligation to pay premiums. [29] They assert that the statutory context and canons of construction indicate that a company does not "maintain" a fund when its payments are required by statute rather than a voluntary contractual agreement. They also contend that the Coal Act shows that Congress did not intend for bankruptcy courts to be able to exercise their authority under § 1114 to modify premiums owed to the Funds. We disagree.

**1. The Statutory Context Supports the Conclusion That Making Payments Arising from a Statutory Obligation Constitutes "Maintaining" a Plan.**

**\*17** The Funds assert that when a company is obligated by a statute to make payments for health care benefits, it does not "maintain" the plan or fund. Their argument rests on the assertion that, because an employer generally undertakes a voluntary contractual obligation to make payments for retiree benefit plans or funds, a payment must be made under a voluntary obligation to qualify as "maintaining" a plan.

Certainly, the Funds are correct that Walter Energy's obligation to pay premiums to the Funds is different in nature from payments for other retiree benefits because Walter Energy has a statutory obligation to pay the premiums, instead of a contractual obligation. But it is not enough for the Funds to point out this difference. They must show that Congress intended to limit the definition of "retiree benefits" to payments made under a plan or fund only when the debtor voluntarily undertook the obligation to make such payments. The Funds claim

that evidence of such Congressional intent includes: (1) the remainder of § 1114, which indicates that the obligation must be able to be modified in a negotiation; (2) section 1129(a)(13), which specifies that a retiree benefit refers only to an obligation that the debtor has obligated itself to; and (3) the general purpose underlying the RBBPA, which was to protect retirees from having a company file bankruptcy and terminate benefits. [30] As we explain in more detail below, we have carefully considered these provisions and conclude that Congress drew no distinction between payments that a debtor makes under a contract and the specific type of statutory obligation created in the Coal Act. We thus disagree that Congress expressed an intent to exclude obligations established by a statute from the definition of "retiree benefits" simply by including the requirement that the debtor "maintain" the plan. [31]

**\*18** First, the Funds assert that other provisions in § 1114 show that Congress intended to limit the term "retiree benefits" to obligations that the debtor can negotiate and change, not those that are mandated by statute. Section 1114 permits a bankruptcy court to modify "retiree benefits" only if the debtor proposed the modification to an authorized representative of the affected retirees, the debtor negotiated the modification in good faith, and the authorized representative refused to accept the proposal without good cause. 11 U.S.C. § 1114(f), (g). The Funds argue that these provisions taken together show that an obligation must be negotiable to qualify as a "retiree benefit," and because Walter Energy's premium obligations are non-negotiable, they should not be treated as "retiree benefits."

Although we agree with the Funds that the structure of § 1114 shows that an obligation must be negotiable to qualify as a "retiree benefit," we conclude that the obligation to pay premiums is to some extent negotiable. As Walter Energy points out, the Funds have engaged in such negotiations in the past and, in fact, have agreed to modify a debtor's premium obligations. *See In re Bethlehem Steel Corp.*, No. 01-15288, 2004 WL 601656, at \*2 (Bankr. S.D.N.Y. Feb. 9, 2004) (reflecting that the Funds received $10 million in exchange for, among other things, agreeing not to bring any legal action to seek funding for health care benefits that the 1992 Benefit Plan

provided to the debtors' retirees). That the Funds have agreed to modify premiums in the past shows that the obligations are negotiable.

Second, the Funds argue that § 1129(a)(13) shows that Walter Energy's payment of premiums did not constitute "maintaining" the Funds. Section 1129 sets forth the requirements for when a bankruptcy court may confirm a Chapter 11 plan. When Congress enacted the RBBPA, it amended § 1129 to add the requirement that a confirmed plan must provide for the continuation of payment of all retiree benefits, at the level established either by agreement of the trustee and the retirees' authorized representative or by bankruptcy court order, "for the duration of the period the debtor has obligated itself to provide such benefits." RBBPA § 2(b), 102 Stat. 613 (codified at 11 U.S.C. § 1129(a)(13) ). Because § 1129(a)(13) indicates that a "retiree benefit" must be a payment that the debtor "obligated itself to provide," the Funds' argument goes, Congress intended that statutory obligations cannot qualify as retiree benefits.

It is a close question, but we are ultimately unpersuaded by the Funds' argument. The Funds are correct that coal companies never voluntarily undertook the obligation to pay the *premiums* due under the Coal Act. But the coal companies did in fact voluntarily obligate themselves—in earlier wage agreements—to provide the lifetime retiree health care benefits that are now delivered through the Funds. Given that coal companies did in some sense previously obligate themselves to provide the retiree health care benefits that are now delivered through the Funds, it is not inconsistent with § 1129(a)(13) to treat the premiums that a coal company pays to the Funds as retiree benefits.

Third, the Funds contend that we should construe the definition of retiree benefits narrowly to remain consistent with the purpose underlying the RBBPA, which is to "protect[ ] retiree benefits during Chapter 11 proceedings" and "solv[e] the legal problem the LTV bankruptcy squarely presented." Appellants' Br. at 30. In considering statutory context, the general policy underpinning the law may be relevant to our analysis. *See Kelly v. Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.    15

Exhibit 1

and policy." (internal quotation marks omitted) ). But the Funds' argument oversimplifies Congress's purpose in enacting the RBBPA. True, Congress enacted the RBBPA in the aftermath of LTV's filing bankruptcy and attempting to *unilaterally* terminate all retiree health payments to its retirees. We can infer from this context that Congress intended the RBBPA to prevent a debtor from unilaterally terminating payments for retiree health care benefits after filing bankruptcy. But we cannot say from this context that Congress intended § 1114 to provide absolute protection to retiree health care benefits in *all* circumstances. Instead, as the text of § 1114 reflects, Congress empowered bankruptcy courts to modify or terminate payments for retiree health care benefits in certain situations.

**\*19** In sum, the Funds argue that we should narrow the definition of "retiree benefits" to payments made on obligations that were voluntarily undertaken and exclude those obligations imposed by statute. We reject this argument because the Funds have failed to identify any statement or indication from Congress that the definition of "retiree benefits" should be limited in this way.

### 2. The Canons of Construction Provide No Support for Narrowing the Definition of "Maintain."

The Funds also contend that the canons of construction direct us to narrow the meaning of "maintain" to exclude obligations imposed by statute. They argue that we must apply a narrower definition of "maintain" to avoid an interpretation that renders a portion of the definition of "retiree benefits" meaningless and because the ordinary definition of "maintain" gives the definition of "retiree benefits" near infinite breadth. We disagree.

### a. The Canon to Avoid an Interpretation That Renders Statutory Language Superfluous, Void, or Insignificant Is Inapplicable.

First, the Funds argue that we cannot apply the ordinary meaning of "maintain" because it renders a portion of the definition of "retiree benefit" meaningless and mere surplusage. They contend that if a debtor can "maintain" a plan by making payments to the plan, the definition of "retiree benefits" becomes circular as retiree benefits are (1) payments a debtor makes (2) under a program to which the debtor makes payments. Of

course, we generally construe a statute so that "no clause, sentence, or word" is rendered "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (internal quotation marks omitted). But this canon does not apply when a statutory provision would remain operative under the interpretation in question in at least some situations. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 734 F.3d 1297, 1304 (11th Cir. 2013). Here, applying the ordinary definition of maintain renders no part of the definition of "retiree benefits" superfluous.

A close reading of § 1114(a) shows why. The first part of § 1114(a)'s definition limits "retiree benefits" to payments made in connection with a retired employee for a specific purpose—that is, "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death." 11 U.S.C. § 1114(a). The remainder of the definition imposes a separate requirement based upon the employer's relationship to the plan, fund, or program—that is, it must have been "maintained or established in whole or in part by the debtor" before the debtor filed its bankruptcy petition. *Id.* These two parts impose separate requirements because the first part of the definition looks to the purpose of the debtor's payment, and the second part focuses on the debtor's relationship with the entity receiving the payment.

Simple examples illustrate that both prongs of the definition continue to hold meaning under our interpretation. Say a debtor company decides to give a retired employee a single payment of $1,000 to cover the cost of a medical procedure. This payment qualifies as a "retiree benefit" under the first prong of the definition because it is a payment made for the purpose of providing the debtor's retired employee with health care benefits. But the payment fails to meet the second prong of the definition because it was a single payment and not made to a plan, fund, or program to which the debtor, prior to filing bankruptcy, provided ongoing support.

**\*20** Conversely, say a debtor, prior to filing bankruptcy, contributes $100 each pay period to fund an employee pension plan that provides its retirees with periodic cash

Exhibit 1

2018 WL 6803736, 66 Bankr.Ct.Dec. 160

payments. These payments would qualify as "retiree benefits" under the second prong of the definition because the debtor's monthly payments maintained the plan. But the first part of the definition would not be satisfied because the payments were not made "for the purpose of providing ... medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death." 🔖 11 U.S.C. § 1114(a).

We cannot agree with the Funds that by treating a debtor's ongoing financial support as sufficient to maintain a plan, we are rendering the first portion of the definition of retiree benefits superfluous, void, or insignificant. A careful read of 🔖 § 1114(a) illustrates that all parts of the statute continue to carry meaning.

### b. The Canon to Avoid an Interpretation That Gives a Term Infinite Breadth Is Inapplicable.

Second, the Funds argue that "maintain" must have a narrower meaning because applying the plain meaning would give the term maintain "near-infinite breadth." Appellants' Br. at 24. In certain circumstances, the Supreme Court has explained that "a non-hyperliteral reading is needed to prevent [a] statute from assuming near-infinite breadth." 🔖 *FERC v. Elec. Power Supply Ass'n*, ––– U.S. ––––, 136 S.Ct. 760, 774, 193 L.Ed.2d 661 (2016). But this canon of construction is inapplicable here.

In 🔖 *Electric Power Supply*, the Supreme Court considered the scope of the authority of the Federal Energy Regulatory Commission ("FERC"). Congress authorized FERC to regulate the sale of wholesale electric energy in interstate commerce and gave it the authority to implement rules or practices "affecting such rates." 🔖 *Id.* at 766 (internal quotation marks omitted). The case arose after FERC issued a rule regulating what power companies could pay users to encourage them to reduce their consumption during peak periods of power consumption. 🔖 *Id.* at 771. The rule was challenged on the ground that FERC lacked the authority to regulate the sale of retail, not wholesale, electric energy. 🔖 *Id.* at 772.

In concluding that FERC did not exceed its authority when it issued the rule, the Supreme Court interpreted the statute that gave FERC the authority to implement rules or practices "affecting" the sale of wholesale electric energy in interstate commerce. 🔖 *Id.* at 773-74. The Court explained that the statute could be interpreted as giving FERC the authority to regulate anything that could in any way affect the wholesale cost of electricity, which potentially would include fuel prices, steel prices, or labor practices. 🔖 *Id.* at 774. The Court could not "imagine" that Congress intended to give FERC authority to regulate all these areas that have only indirect effects on the wholesale cost of electricity. 🔖 *Id.* The Court instead applied a "common-sense construction" and limited FERC's jurisdiction to rules or practices that "directly affect" wholesale rates for electric energy. 🔖 *Id.* The Court explained that this interpretation was consistent with earlier decisions that had given "non-hyperliteral reading[s]" to phrases like "relating to" and "in connection with" in order to "prevent the statute[s] from assuming near-infinite breadth." 🔖 *Id.*

Nothing in 🔖 *Electric Power Supply* dictates that we narrow the definition of "maintain" here. Unlike the terms the Supreme Court discussed in 🔖 *Electric Power Supply*, "maintain" is not a term that has a "near-infinite breadth." 🔖 *Id.* The term "maintain" restricts the definition of retiree benefits to a specific class of payments—those made under a plan, fund, or program that the debtor, prior to filing bankruptcy, has kept in an existing state. The term "maintain" limits the universe of payments that could qualify as retiree benefits under 🔖 § 1114(a); thus, we may apply the ordinary definition of maintain. 🔖 *Id.*[32]

### 3. In the Coal Act, Congress Did Not Express an Intent That the Premiums Should Not Qualify as Retiree Benefits.

**\*21** The Funds also assert that Congress expressed in the Coal Act an intent to keep bankruptcy courts from using 🔖 § 1114 to modify or terminate premiums owed under the Coal Act, which they argue shows that Congress did not intend for the premiums to be treated as retiree benefits. They argue that three provisions of the Coal Act—🔖 §§ 9704, 🔖 9708, and 🔖 9722—show Congress intended that Coal Act premiums could not be modified

Exhibit 1

by a bankruptcy court and thus do not qualify as "retiree benefits." But after carefully considering these statutory provisions, we cannot agree that Congress expressed in the Coal Act an intent to bar bankruptcy courts from modifying these premiums.

First, the Funds point to 🔖 § 9704(e)(1), which, they assert, means that only the trustees of the Funds "maintain" the Funds. But they overstate the effect of 🔖 §9704. This provision simply directs that the Combined Fund's trustees must "establish and maintain ... accounts for each of the premiums." 🔖 26 U.S.C. § 9704(e)(1). Although this provision shows that the Combined Fund trustees must maintain the Fund's bank accounts, nothing in 🔖 § 9704 addresses who maintains the Funds themselves.

Second, the Funds assert that the Coal Act prohibits them from agreeing to—and a bankruptcy court from ordering —any modification to the premiums owed because 🔖 § 9708 specifies that liability for contributions to the Combined Fund is determined "exclusively" under the Coal Act, which indicates that a bankruptcy court lacks authority to modify the premiums that a coal company owes to the Funds. We understand 🔖 § 9708 differently.

🔖 Section 9708, when read in context, in no way prohibits a bankruptcy court from modifying the premiums that a company owes to the Funds. As we discussed above, coal companies had agreed in a series of wage agreements dating back to at least 1974 to provide their retirees with health care benefits for life. Because the Coal Act transformed this contractual obligation into a statutory mandate, in 🔖 § 9708, titled "Effect on pending claims or obligations," Congress addressed the status of coal companies' contractual obligations to the 1950 and 1974 Benefit Plans. 🔖 Section 9708 states:

> All liability for contributions to the Combined Fund that arises on and after February 1, 1993, shall be determined exclusively under this chapter, including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993. However, nothing in this chapter is intended to have any effect on any claims or obligations arising in connection with the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of February 1, 1993....

*Id.*

This section, read as a whole, shows that Congress intended 🔖 § 9708 to serve a specific, narrow purpose: to address the effect that the creation of the Combined Fund had on coal companies' existing and future obligations to the 1950 and 1974 Benefit Plans. In the first sentence, Congress explained that because the Combined Fund was replacing the 1950 and 1974 Benefit Plans, the Coal Act—not the wage agreements—would determine coal companies' liabilities for contributions going forward. The next sentence clarified that to the extent that a coal company owed obligations to the 1950 and 1974 Benefit Plans that pre-dated the creation of the Combined Fund, those obligations would remain. [33] We see nothing in 🔖 § 9708 indicating that Congress intended to bar bankruptcy courts from exercising their authority under 🔖 § 1114 to modify or terminate a coal company's obligation under the Coal Act to pay premiums to the Funds. [34]

**\*22**  Third, the Funds rely on § 9722 of the Coal Act to show that Congress intended to bar bankruptcy courts from modifying the premiums owed to the Funds. 🔖 Section 9722, titled "Sham transactions," provides that liability under the Coal Act shall continue without regard to a transaction "[i]f a principal purpose" of the transaction is to "evade or avoid liability" under the Coal Act. *Id.* 🔖 § 9722. The Funds argue that this provision bars the bankruptcy court's order, which terminated Walter Energy's obligation to pay premiums to the Funds, from having any effect, because the principal purpose of the bankruptcy court's order was to allow Walter Energy to avoid liability under the Coal Act. We disagree that 🔖 § 9722 applies here.

Exhibit 1

Section 9722 applies only when the principal purpose of the *transaction* is to evade or avoid liability under the Coal Act. The relevant transaction here is Walter Energy's sale of substantially all of its assets to Warrior Met. The bankruptcy court's findings establish that the purpose of the sale was to provide the best possible outcome for the various stakeholders because it would allow some of Walter Energy's mines to continue operating. Nothing in the bankruptcy court's findings suggest that the principal purpose of the § 363 going-concern sale was to evade or avoid liability under the Coal Act. Given the purpose of the broader transaction, we conclude that § 9722 imposed no bar on the Funds negotiating or the bankruptcy court ordering a modification to the premiums owed to the Funds.

The Funds have identified no provision in the Bankruptcy Code or the Coal Act in which Congress expressed that a bankruptcy court lacks the authority under § 1114 to modify or terminate the obligations that a debtor owes to the Funds under the Coal Act. Instead, the Funds ask us to treat the Coal Act as implicitly amending § 1114 by placing a restriction on a bankruptcy court's authority to modify or terminate a certain type of retiree benefits—that is, premiums owed to the Funds. But repeal or amendment by implication is "not favored" and will be presumed only when the legislature's intention to repeal or amend the earlier legislation is "clear and manifest." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (internal quotation marks omitted).

Additionally, it seems particularly inappropriate to conclude that the Coal Act implicitly amended the RBBPA given the relationship between the two statutory schemes. The Supreme Court has recognized the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Traynor v. Turnage*, 485 U.S. 535, 547-48, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (internal quotation marks omitted). Stated succinctly, "[w]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as

effective." *Id.* at 548, 108 S.Ct. 1372 (internal quotation marks omitted).

Here, we discern no clear and manifest indication that Congress intended the Coal Act, the later statute, to limit the scope of § 1114. Section 1114 was enacted as part of the RBBPA to address a narrow, precise, and specific subject—the status of a company's obligation to pay retiree health care benefits when it petitions for Chapter 11 bankruptcy. Although the Coal Act applies to only one industry, it is more generalized than the RBBPA because the Coal Act addresses the obligation of a coal company to provide retiree health care benefits regardless of whether the company filed bankruptcy. Given the relationship between these two statutes, we must construe both statutes to be effective, rather than construing the Coal Act as implicitly amending and narrowing the definition of retiree benefits in § 1114. It seems to us that if Congress had wished to exclude premiums owed to the Funds from the reach of a bankruptcy court's authority under § 1114, it would have added language in § 1114—perhaps by limiting the definition of "retiree benefits"—or in the Coal Act—perhaps by providing that the obligation to pay premiums remained unaffected by operation of the Bankruptcy Code. But Congress included no such express statutory language.

**\*23** After considering the statutory text of both § 1114 and the Coal Act as well as the canons of construction, we conclude that the premiums owed to the Funds qualify as retiree benefits. [35]

### B. The Bankruptcy Court Had Authority to Terminate Walter Energy's Obligation to Pay Premiums Because Walter Energy Was Reorganizing When It Pursued a Chapter 11 Liquidation.

The Bankruptcy Code permits a bankruptcy court to modify or terminate retiree benefits only if, among other things, the court finds that "such modification is necessary to permit the reorganization of the debtor." 11 U.S.C. § 1114(g)(3). The Funds argue that when a debtor files for Chapter 11 bankruptcy and then seeks to sell substantially all of its assets, it is not pursuing a "reorganization," and so the bankruptcy court lacks authority to modify or terminate retiree benefits under § 1114(g). But we

Exhibit 1

interpret the term "reorganization" to refer to all types of debt adjustment under Chapter 11, including a sale of assets on a going-concern basis. We thus conclude that the bankruptcy court had the authority under § 1114 to terminate Walter Energy's obligation. [36]

### 1. Under the Bankruptcy Code, a Corporate Debtor May Seek to Liquidate Under Chapter 7 or Chapter 11 or to Restructure Under Chapter 11.

**\*24** To understand what the term "reorganization" as used in § 1114(g) means, we begin by discussing the options available to a corporation that petitions for bankruptcy. A corporation may file for bankruptcy under Chapter 7, entitled "Liquidation," or Chapter 11, entitled "Reorganization."

When a corporate debtor petitions for bankruptcy under Chapter 7, the trustee generally sells all of the debtor's assets piecemeal and distributes the proceeds from the sale to the creditors. When a corporate debtor files under Chapter 7, it generally stops operating and the bankruptcy trustee sells its property for cash. *See* 11 U.S.C. § 704(a) (1) (directing trustee to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest"). The debtor's assets become property of the bankruptcy estate. *See id.* § 541(a)(1). The trustee then controls the bankruptcy estate, overseeing the sale of the estate's property. *Id.* § 704(a)(1). The trustee must distribute the cash proceeds generated from the sale of the estate's property according to the priority rules set forth in the Bankruptcy Code. *Id.* § 726. Although the Bankruptcy Code permits the trustee to sell the company as a going concern, as opposed to ceasing operations and selling the assets piecemeal, "[i]n practice ... this almost never happens ... as a firm with any hope of emerging from bankruptcy intact files under Chapter 11 instead." Richard Squire, *Corporate Bankruptcy and Financial Reorganization* 14 (2016).

There are more options available to a corporate debtor who proceeds under Chapter 11. The debtor may elect to sell its assets piecemeal and distribute the proceeds to its creditors, sell its assets as a going concern and distribute the proceeds to its creditors, or restructure its finances and continue to operate.

When a corporate debtor files under Chapter 11, the business generally continues to operate as a going concern. Again, the company's assets become property of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). But instead of a trustee, the debtor's existing management team often manages the estate. *Id.* §§ 1101(1), 1106, 1107(a).

In a classic reorganization or restructuring, the debtor negotiates with its creditors to reduce its debts, often by offering to exchange debt for equity in the company that emerges from bankruptcy. Squire, *supra*, at 14. A Chapter 11 bankruptcy proceeding ordinarily culminates in the confirmation of a reorganization plan. *See* 11 U.S.C. § 1129. The plan lays out the blueprint for restructuring the company by "determin[ing] how much and in what form creditors will be paid, whether stockholders will continue to retain any interests, and in what form the business will continue." *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983). In such a restructuring, the plan provides that the debtor's business continues to operate but may provide payments to creditors over time. *See Czyzewski v. Jevic Holding Corp.*, ─── U.S. ───, 137 S.Ct. 973, 979, 197 L.Ed.2d 398 (2017).

Chapter 11 also permits a debtor to liquidate by selling all or substantially all of its assets as a going concern under a sale pursuant to § 363 of the Bankruptcy Code. *See Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008). The debtor then may submit a plan to distribute the proceeds resulting from the sale. *Id.* Although such a transaction under Chapter 11 is referred to as a "liquidation" because the debtor sells substantially all of its assets through a § 363 sale, the transaction is different in kind from a Chapter 7 liquidation. When a debtor files under Chapter 11 and then pursues a § 363 sale, "the debtor liquidates in the sense that its assets are sold off, but not in the sense that its business is shut down." Squire, *supra*, at 17.

**\*25** The end result of a Chapter 11 liquidation may be that the debtor's secured creditors take control of the bankruptcy estate's assets but keep the business operating. When a debtor pursues a liquidation under Chapter 11 through a § 363 sale of substantially all of its assets, its secured creditors may "credit bid" for the assets that serve

Exhibit 1

as the collateral securing their loans. *See* 11 U.S.C. § 363(k); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) (explaining credit bidding). If the secured creditors submit the highest (or only) bid for the company and acquire the bankruptcy estate's assets, the creditors are, in effect, able to use the § 363 sale to trade their debt for control of the business. In these cases, the end result of a Chapter 11 liquidation bears a close resemblance to the end result of a classic reorganization in which creditors trade their debt for equity.

There is an important difference between a Chapter 11 liquidation and a classic reorganization, though. A creditor may be able to take control of the debtor's assets much more quickly in a Chapter 11 liquidation. A § 363 sale transferring all or substantially all of a debtor's assets may occur after a hearing. *See* 11 U.S.C. § 363(b)(1) (permitting a trustee "after notice and a hearing ... [to] sell ..., other than in the ordinary course of business, property of the estate"). In comparison, in a classic reorganization, the bankruptcy plan generally needs to be approved by all creditors, which may take more time. *See id.* § 1129(a)(8) (requiring each class of creditors to consent to a plan of reorganization, unless they are not impaired under the plan).

**2. The Term "Reorganization" as Used in § 1114(g)(3) Refers Both to Restructurings and Liquidations Under Chapter 11.**

With these background principles about corporate bankruptcy proceedings in mind, we now turn to the question before the Court: whether a bankruptcy court has authority to modify or terminate retiree benefits when a debtor who files bankruptcy under Chapter 11 intends to sell substantially all of its assets in a going-concern sale.

Section 1114 permits a bankruptcy court to modify or terminate a debtor's obligation to fund retiree benefits only if the court finds, among other things, that "such modification is necessary to permit the reorganization of the debtor." 11 U.S.C. § 1114(g)(3). The Funds contend that when a debtor intends to sell its assets as a going concern in a § 363 sale the debtor is not engaged in a reorganization and, as a result, the bankruptcy court has no authority to modify or terminate the debtor's obligation to fund retiree benefits. This issue turns on whether the term "reorganization" as used in § 1114 refers only to classic reorganizations or more broadly to any proceeding under Chapter 11, including when a debtor liquidates by selling its business as a going concern in a § 363 sale.

Because the Bankruptcy Code does not define the term reorganization, we turn to dictionary definitions for guidance. *See CBS*, 245 F.3d at 1223. The term reorganization is defined as follows: "[A] reconstruction of a business corporation, including a marked change in capital structure, often following a failure and receivership or bankruptcy trusteeship." Reorganization, *Random House Dictionary of the English Language* 1632 (2d ed. 1987); *see* Reorganization, *Merriam-Webster Dictionary Online* (2018) ("financial reconstruction of a business concern"); Reorganization, *Webster's Third New International Dictionary* 1923 (2002) ("[T]he rehabilitation of the finances of a business concern under procedures prescribed by federal bankruptcy legislation."). [37]

**\*26** We understand these definitions to mean that to qualify as a reorganization, at a minimum, the business concern must continue to operate. A classic reorganization, then, qualifies as a "reorganization" because the business generally continues to operate while making payments to creditors over time. *See Czyzewski*, 137 S.Ct. at 979. Likewise, a Chapter 11 liquidation where a debtor sells substantially all of its assets as a going concern also could qualify as a "reorganization" because the debtor's business continues operating as a going concern, albeit under new ownership. *See Piccadilly Cafeterias*, 554 U.S. at 37 n.2, 128 S.Ct. 2326. In contrast, a Chapter 7 liquidation in which a trustee generally ceases the debtor's operations and sells off its assets piecemeal would not qualify as a "reorganization" because the debtor's business does not continue operations. *See* Squire, *supra*, at 14.

The Funds urge us to interpret the term "reorganization" more narrowly because they contend that the context of the Bankruptcy Code shows that Congress intended the terms "reorganization" and "liquidation" to be entirely distinct with no overlap. They assert that "liquidation is the opposite of reorganization." Reply Brief at 12. But the Bankruptcy Code does not support this interpretation.

Exhibit 1

The Bankruptcy Code reflects that Congress recognized some overlap between the terms "reorganization" and "liquidation." Congress chose to title Chapter 11 "Reorganization." [38] Because Chapter 11 permits both classic reorganization as well as liquidations, this title suggests that Congress understood that the term "reorganization" also referred to some liquidations. *See* 11 U.S.C. § 1123(b)(4) (recognizing that a Chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale" to creditors). By titling Chapter 11 "Reorganization" and permitting debtors to use Chapter 11 to liquidate their estates, it seems to us that Congress intended for the term "reorganization" to include Chapter 11 liquidations.

The Funds argue that a Chapter 11 liquidation cannot qualify as a reorganization because in § 1129(a)(11) Congress provided that a bankruptcy court may confirm a plan only if the plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *Id.* § 1129(a)(11). They contend that our interpretation—which treats a Chapter 11 liquidation as a type of reorganization—violates the canon of construction that a statute should be construed so that no word is rendered superfluous because our interpretation renders the word "liquidation" in the phrase "liquidation or reorganization" meaningless. *See* *TRW, 534 U.S. at 31, 122 S.Ct. 441.* But we conclude that this canon is inapplicable here.

Section 1129(a)(11) imposes a "feasibility requirement," meaning that a bankruptcy court should not confirm a plan if it is likely to be followed by a future liquidation or further reorganization of the debtor. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *accord* *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). The purpose of this feasibility requirement is to ensure that a bankruptcy court confirms a plan only if it finds that the plan creates a "reasonable assurance of commercial viability." *T-H New Orleans*, 116 F.3d at 801 (internal quotation marks omitted). Under this requirement, a bankruptcy court may confirm a plan

only if there is a reasonable assurance that the plan will not be followed by a Chapter 7 liquidation, a Chapter 11 liquidation, or a Chapter 11 classic reorganization.

*27 Under our interpretation, the term "liquidation" is not rendered wholly meaningless or superfluous. The reference to "liquidation" in § 1129(a)(11) means there must be a reasonable assurance that after the plan the debtor will not seek a Chapter 7 liquidation or a Chapter 11 liquidation. And the reference to "reorganization" in that provision means there must be a reasonable assurance that after the plan the debtor will not seek a Chapter 11 classic reorganization or a Chapter 11 liquidation. Certainly, there is some overlap or redundancy between the two terms because a Chapter 11 liquidation qualifies as both a "liquidation" and a "reorganization." *See* Squire, *supra*, at 491 ("[L]iquidation need not mean *piecemeal* liquidation, and reorganization need not preclude a sale.").

But neither term is superfluous because each retains some independent meaning. After all, there are some "reorganizations" that are not "liquidations"—classic reorganizations under Chapter 11. And there are some "liquidations" that are not "reorganizations"—Chapter 7 liquidations. So we cannot say that treating the term "reorganization" as referring both to a classic reorganization as well as liquidation with a going concern renders the term "liquidation" in § 1129(a)(11) meaningless. Although courts should disfavor an interpretation of a statute that renders language superfluous, the canon is inapplicable here because each word in the statute retains some meaning. *See* *Black Warrior Riverkeeper*, 734 F.3d at 1304.

The Funds argue that we must define the term "reorganization" more narrowly to remain consistent with the Supreme Court's decision in *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), *superseded on other grounds by* 11 U.S.C. § 1113. In *Bildisco*, the Court stated that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *Id.* at 528, 104 S.Ct. 1188. Although the Court in *Bildisco* treated reorganization and liquidation as separate concepts, the

Exhibit 1

context of the Court's discussion (with its focus on loss of jobs) shows that the term "liquidation" was used to refer only to a Chapter 7 liquidation in which the debtor company stops operations, employees lose jobs, and the assets are sold piecemeal. Because the Court was not using the term "liquidation" to refer to a Chapter 11 liquidation in which the entity continues to operate as a going concern, albeit one with new management, *Bildisco* does not help the Funds.

The Funds argue next that the statutory context shows Congress did not intend for § 1114 to apply to Chapter 11 liquidations because § 1114 requires the debtor and authorized representative of the retirees to have engaged in good faith negotiations. The Funds contend that that it is impossible for such negotiations to occur in a Chapter 11 liquidation because the authorized representative is "hard pressed to decline" the debtor's demand to terminate retiree benefits when the termination of benefits is a required condition of the sale. Appellants' Br. at 37. The Funds' argument is based on the premise that negotiations cannot be meaningful when a termination of benefits is necessary to avoid shutting down the operations of the business. But this argument proves too much. A bankruptcy court may terminate retiree benefits under a Chapter 11 classic reorganization or liquidation only when the termination is "necessary to permit the reorganization of the debtor." *See* 11 U.S.C. § 1114(g)(3). Because the termination will be, by definition, necessary for the company to continue to operate, the authorized representative will always be "hard pressed" to decline. And so we cannot agree with the Funds that the fact that a termination of the benefits is necessary means that good faith negotiations are impossible.

**\*28** We also observe that no other court has concluded the Funds' interpretation. Other courts considering similar issues have concluded that a debtor who pursued a Chapter 11 liquidation was undergoing a reorganization such that a bankruptcy court could modify the debtor's obligation to fund retiree health care benefits under § 1114 or the debtor's collective bargaining agreements under § 1113.[39] *See In re Horizon Nat. Res. Co.*, 316 B.R. 268, 281-82 (Bankr. E.D. Ky. 2004) (concluding that "[s]ections 1113 and 1114 apply in liquidation Chapter 11 cases"); *In re Family Snacks, Inc.*, 257 B.R. 884, 895 (8th Cir. BAP 2001) ("While 'reorganization' is not a

statutorily defined term, it is generally understood to include all types of debt adjustment, including a sale of assets, piecemeal or on a going concern basis, under § 363 followed by a plan of reorganization which distributes the proceeds of the sale to creditors in accordance with the Bankruptcy Code's priority scheme."); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991) (concluding that § 1114's "placement in Chapter 11 requires its application to liquidating Chapter 11 cases"); *see also In re Chicago Constr. Specialties, Inc.*, 510 B.R. 205, 215-16 (Bankr. N.D. Ill. 2014) (rejecting argument that relief under § 1113 was unavailable to debtor pursuing liquidation through Chapter 11).

For purposes of § 1114(g), a Chapter 11 liquidation qualifies as a type of "reorganization." We thus conclude that the bankruptcy court had the authority to terminate Walter Energy's obligation to pay premiums to the Funds.

## VI. CONCLUSION

Walter Energy long ago promised its retirees that it would provide them with health care benefits for life. We acknowledge that our decision today allows Walter Energy to break that promise. Fortunately for Walter Energy's retirees, they nonetheless will continue to receive health care benefits at no cost from the Funds.

We render our decision today as a court interpreting the statutes that Congress has enacted, not as policymakers. The resolution of competing policy choices to determine whether a company, after promising its employees that they would receive health care benefits for life, should be permitted to file bankruptcy, shed this obligation, and leave the federal treasury on the hook for the cost of these retirees' health care is Congress's job, not ours. *See Burrage v. United States*, 571 U.S. 204, 218, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." (internal quotation marks omitted) ). We hold today only that § 1114 of the Bankruptcy Code and the Coal Act permitted the bankruptcy court to terminate Walter Energy's obligation to fund its retirees' health care and, in effect, shift that obligation to the federal

Exhibit 1

government. If changes in these laws are desirable from a policy standpoint, it is up to Congress to make them.

For the reasons set forth above, we conclude that the bankruptcy court had the authority under 🏴 § 1114 to modify Walter Energy's retiree benefits, which included the premiums that it owed to the Funds under the Coal Act. We therefore affirm the bankruptcy court and district court.

**AFFIRMED.**

**All Citations**

911 F.3d 1121, 2018 WL 6803736, 66 Bankr.Ct.Dec. 160

**Footnotes**

1    This case arises out of a bankruptcy petition filed by Walter Energy, Inc. and 22 related entities. For simplicity, we refer collectively to the debtors in this case as "Walter Energy."

2    Spouses and dependents of retirees were also guaranteed health care benefits.

3    The 1950 Benefit Plan covered miners who retired before January 1, 1976 and their dependents. The 1974 Benefit Plan covered those who retired on or after January 1, 1976.

4    See 🏴 ⚠ *Dist. 29, United Mine Workers of Am. v. Royal Coal Co.*, 768 F.2d 588, 589 (4th Cir. 1985) (concluding that operator who declined to renew its wage agreement was not required to provide health care benefits to retired miners beyond the expiration date of its previous wage agreement).

5    See *Dist. 29, United Mine Workers of Am. v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 826 F.2d 280, 283 (4th Cir. 1987).

6    The RBBPA applies not only to coal companies but also to companies in any industry.

7    The RBBPA also prohibits a Chapter 11 trustee from unilaterally terminating such payments. For ease of reference, we use the term "debtor" to refer both to a debtor-in-possession as well as a Chapter 11 trustee. We note that the RBBPA uses these terms interchangeably. See 🏴 11 U.S.C. § 1114(e)(1).

8    The process for modifying retiree health care benefits was modeled on 🏴 § 1113 of the Bankruptcy Code, which sets forth when a bankruptcy court may permit a debtor to reject a collective bargaining agreement. See 🏴 11 U.S.C. § 1113.

9    The Coal Act does not cover workers who retired after September 30, 1994. Coal Act, Pub. L. No. 102-486 § 19143(a), 106 Stat. 2776, 3051-53 (codified at 🏴 26 U.S.C. §§ 9711(b)(1), 🏴 9712(b)(2) ). Collective bargaining agreements set forth the retiree benefits for these workers.

10    The Coal Act contains a detailed definition of "related person," but that definition is not at issue here. See 🏴 26 U.S.C. § 9701(c)(2).

11    To be covered by the Combined Fund, a beneficiary must have retired by July 20, 1992 or been the spouse or dependent of an employee who retired by that date. See 🏴 26 U.S.C. § 9703(f).

12    The Act provided that a retiree could be assigned to a coal company who did not sign the 1978 NBCWA or any later collective bargaining agreement, *see* 🚩 26 U.S.C. § 9706(a)(3), but the Supreme Court struck down that provision as an unconstitutional taking. See 🏴 *E. Enters.*, 524 U.S. at 536, 118 S.Ct. 2131.

13    The Abandoned Mine Fund was established for reclamation and restoration of land and water resources degraded by coal mining. 🏴 30 U.S.C. § 1231(c)(1). A coal company pays a royalty, based on the amount of coal it produces, to the Secretary of the Interior to fund the Abandoned Mine Fund. 🏴 *Id.* § 1232(a). Royalties will be collected through September 2021. 🏴 *Id.* § 1232(b).

14    The 1992 Benefit Plan also covers spouses and certain dependents of such retirees. See 🏴 26 U.S.C. § 9712(b)(2).

15    Warrior Met was originally called Coal Acquisition, LLC but later changed its name. For simplicity, we refer to it by its new name, Warrior Met.

16    A stalking horse is a potential purchaser of a bankruptcy debtor's assets; the debtor uses the stalking horse to set a floor for later competing bids from other potential purchasers to prevent lowball offers.

Exhibit 1

17   Under a credit bid, the holder of a secured claim offers to purchase the property that secures its loan, with the value of its secured claim offset against the amount of its bid. See 🔖 *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012). Credit bidding protects a secured creditor against the risk that the collateral will be sold at a depressed price by enabling it "to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." 🔖 *Id.* at 644 n.2, 132 S.Ct. 2065.

18   At the time Walter Energy filed bankruptcy, it was paying no premiums to the 1992 Benefit Plan as there were no plan beneficiaries assigned to it. But, as required by the Coal Act, Walter Energy had provided security to the 1992 Benefit Plan in the amount of approximately $4.5 million, which was the estimated cost to provide health care benefits to Walter Energy's retirees and their dependents for one year.

19   🔖 Section 363(b) permits the sale of property of the estate not in the ordinary course of business after notice and a hearing. 🔖 11 U.S.C. § 363(b). Under certain conditions, the property may be sold free and clear of any security interest. *See* 🔖 *id.* § 363(f).

20   If the mines shut down, it appeared unlikely that they would ever open back up given the costs associated with reopening them.

21   The UMWA separately appealed the Sale Order and the 1113/1114 Order. While the UMWA's appeals were pending in the district court, it entered into a new collective bargaining agreement with Warrior Met and dismissed its appeals, leaving only the Funds' appeals before the district court.

22   The Funds appealed the district court's decision affirming the Sale Order. While their appeal was pending, the sale was completed. We permitted the Funds to voluntarily dismiss the appeal of the Sale Order.

23   We issued a jurisdictional question asking the parties to address whether the bankruptcy court's 1113/1114 Order was a final order or otherwise immediately appealable. "Although a district court, at its discretion, may review interlocutory judgments and orders of a bankruptcy court, a court of appeals has jurisdiction over only final judgments and orders entered by a district court or a bankruptcy appellate panel sitting in review of a bankruptcy court." *In re F.D.R. Hickory House, Inc.*, 60 F.3d 724, 725 (11th Cir. 1995) (internal citations omitted) (footnotes omitted); *see* 🔖 28 U.S.C. § 158(a), 🔖 (d). Walter Energy initially took the position that we lacked jurisdiction but now concedes that a final order is before us. We agree and conclude that we have jurisdiction to review the 1113/1114 Order.

24   After the bankruptcy court converted the case to a Chapter 7 proceeding, we substituted the trustee for Walter Energy as a party to this appeal. For ease of reference, we will continue to refer to this party as Walter Energy.

25   The Funds cite decisions from other circuits applying a functional approach to hold that the premiums owed under the Coal Act qualified as taxes. But only one of these decisions addressed whether the premiums qualified as a tax under the Anti-Injunction Act. *See* 🔖 *In Re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996). The Fourth Circuit's decision in 🔖 *Leckie* was issued before the Supreme Court's decision in 🔖 *NFIB*, however.

We find unpersuasive the remaining decisions the Funds cite, as none of them addressed whether Coal Act premiums qualified as taxes under the Anti-Injunction Act. Instead, they examined whether the premiums qualified as taxes to resolve unrelated issues. *See* 🔖 *Pittston Co. v. United States*, 199 F.3d 694, 701 (4th Cir. 1999) (considering whether Coal Act premiums were taxes such that a coal company could bring an action against the United States to recover premiums under a statute providing a cause of action to recover a "tax" that was wrongfully assessed); 🔖 *In re Sunnyside Coal Co.*, 146 F.3d 1273, 1278-80 (10th Cir. 1998) (considering whether the Coal Act premiums were taxes and thus entitled to administrative priority under the Bankruptcy Code); 🔖 *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 793-95 (4th Cir. 1998) (same); 🔖 *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1126, 1133-34 (4th Cir. 1996) (concluding that a pre-Coal Act private contract that transferred a coal company's liability for retiree health obligations was unenforceable because the Coal Act imposed a tax on the coal company); 🔖 *Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 695 (3d Cir. 1996) (determining that the Coal Act did not impose an unconstitutional taking in violation of the Fifth Amendment because the statutory scheme imposed "essentially a tax to continue a benefits program"); 🔖 *In re Chateaugay Corp.*, 53

Exhibit 1

F.3d 478, 498 (2d Cir. 1995) (considering whether the Coal Act premiums were "taxes" and thus entitled to administrative priority under the Bankruptcy Code).

26    Section 4980B imposes a "tax" on a group health care plan that fails to provide adequate continuation coverage to its beneficiaries. 26 U.S.C. § 4980B(a), (f).

27    This is not to say that a company could not raise other challenges to Combined Fund premiums or penalties in a post-assessment action against the Secretary of the Treasury.

28    The term "retiree benefits" also may refer to payments made under a plan, fund, or program "established in whole or in part by the debtor." 11 U.S.C. § 1114(a). Because the parties agree that Congress, not Walter Energy, created the Funds, the premiums can qualify as retiree benefits only if the Funds were maintained in whole or in part by Walter Energy. As such, we focus our analysis on the meaning of the term "maintained."

29    We observe that § 1114(a) specifies that the debtor must have maintained a fund "*prior* to filing a petition" under Chapter 11. 11 U.S.C. § 1114(a) (emphasis added). This means that a bankruptcy court lacks authority to modify or terminate a debtor's obligation to make payments to a fund, program, or plan when the payment obligation is triggered after the debtor filed bankruptcy. Here, Walter Energy undoubtedly maintained the Combined Fund prior to filing bankruptcy because for many years it paid annual premiums.

Answering the question of whether Walter Energy maintained the 1992 Benefit Plan prior to filing bankruptcy is more complicated. At the time Walter Energy filed bankruptcy, it was paying no premiums to the 1992 Benefit Plan, but it had provided a letter of credit as security. It appears that Walter Energy's obligation to pay premiums to the 1992 Benefit Plan arose only after it shut down its individual employer plan, which resulted in its retirees becoming beneficiaries of the 1992 Benefit Plan. *See id.* § 9712(b)(2)(B). At that point, the bankruptcy court had terminated Walter Energy's obligation to pay premiums to the 1992 Benefit Plan, and there is no indication in the record that Walter Energy ever paid a premium to the 1992 Benefit Plan. But the 1992 Benefit Plan raises no argument that § 1114(a) is inapplicable on the basis that Walter Energy's obligation to maintain the 1992 Benefit Plan was triggered only after it filed bankruptcy, not before. We thus consider the argument waived. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1303 (11th Cir. 2007) (explaining that a party waives arguments that it "fail[s] to raise ... properly on appeal").

30    The Funds also urge us to look to our cases interpreting the term "maintain" under ERISA. In the ERISA context, we consider whether an employer maintained an employee benefit plan to determine whether ERISA preempts state laws relating to the employee benefit plan. *See* 29 U.S.C. § 1144(a) (explaining that the provisions of ERISA preempt any state law that "relate[s] to any employee benefit plan"); *Metro. Life Ins. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (holding that § 1144(a) preempts state common law claims). ERISA defines an "employee benefit plan" to include, among other things, "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries ... medical, surgical, or hospital care or benefits...." 29 U.S.C. § 1002(1), (3).

The Funds argue that our prior ERISA decisions establish that a company must do more than pay premiums to be said to maintain a plan and urge us to apply this reasoning to § 1114(a). *See Randol v. Mid-West Nat'l Life Ins. Co. of Tenn.*, 987 F.2d 1547 (11th Cir. 1993). In *Randol*, we held that an employer "maintained" a plan for purposes of ERISA when it wrote the first check purchasing the policies, paid a portion of its employees' premiums, made payroll deductions to collect its employees' share of the premiums, and paid the premiums to the insurance company through a bank draft from its corporate account. *Id. at 1551.* But nothing in *Randol* addressed whether an employer who takes fewer actions—say, by only paying premiums—can be said to maintain a plan in whole or in part, which is the question presently before our Court. We cannot conclude from this ERISA decision that Walter Energy did not maintain the Funds.

31    *See In re Horizon Nat. Res. Co.*, 316 B.R. 268, 275 (Bankr. E.D. Ky. 2004) (explaining that the statutory definition of retiree benefits "makes no distinction between contractual and non-contractual benefits.").

32    The Funds also contend that the term "maintain" must be narrowed to avoid an interpretation that would treat every person's tax payment as maintaining the Funds. They argue that a broader interpretation of "maintain" would mean that every taxpayer maintains the Funds because the Funds receive transfers from general Treasury funds, which in

Exhibit 1

turn come from federal tax payments. Even if we accept that taxpayers in some sense "maintain" the Funds when they pay taxes, the Funds cannot show that 🔖 § 1114 assumes near-infinite breadth. This is because under 🔖 § 1114 a bankruptcy court may modify or terminate only "retiree benefits." 🔖 11 U.S.C. § 1114(e). An individual's tax payment does not qualify as a retiree benefit under 🔖 § 1114(a) because an individual does not pay her taxes for the purpose of providing retired employees with medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, or death.

33  🔖 Section 9708 applies only to the Combined Fund, which covered retirees who were beneficiaries of the 1950 and 1974 Benefit Plans. Congress did not include a corollary provision pertaining to the 1992 Benefit Plan because no beneficiaries of the 1992 Benefit Plan were receiving retiree health care benefits under a predecessor plan. *See* 🔖 26 U.S.C. § 9712(b)(1), (2).

34  Even if we assume that 🔖 § 9708 is ambiguous, making it appropriate to consider legislative history, *see United States v. Alabama*, 778 F.3d 926, 939 (11th Cir. 2015), our conclusion would not change. The conference report reflects that 🔖 § 9708 was intended to "relate[ ] to pending litigation involving the UMWA Benefit Plans and certain companies." 132 Cong. Rec. S34,004 (daily ed. Oct. 8, 1992) (Conference Report on Coal Act). The report explained that for period prior to February 1, 1993, "the plan documents, collective bargaining agreements[,] and litigation shall determine respective rights, duties[,] and obligations." *Id.* Nothing in the conference report suggests that 🔖 § 9708 was intended to limit the power of bankruptcy courts to exercise their authority under 🔖 § 1114 in disputes about a coal company's obligation for premiums due under the Coal Act.

35  In the alternative, the Funds argue that even if the premiums qualify as retiree benefits, the bankruptcy court lacked the authority to terminate the payments because Walter Energy never negotiated with the retirees' authorized representative about the obligations. A bankruptcy court is permitted to modify or terminate retiree benefits only after the debtor has negotiated with "the authorized representative of the retirees." 🔖 11 U.S.C. § 1114(g)(2). The Funds claim that Walter Energy failed to satisfy this requirement because it negotiated only with the UMWA, which was not the retirees' authorized representative. But the Funds failed to raise this argument in the bankruptcy court. Because the Funds raised the argument challenging whether the UMWA was the retirees' authorized representative for the first time on appeal to the district court, we, like the district court, decline to address the merits of the argument. *See* 🔖 *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

36  Although the Funds argue that Walter Energy's sale of substantially all of its assets in a 🔖 § 363 going to concern sale to Warrior Met did not qualify as a "reorganization" under 🔖 § 1114(g), they are not challenging the bankruptcy court's conclusion that the termination of the benefits was "necessary" for the going-concern sale to go forward. The bankruptcy court found, under the evidence before it, that Walter Energy's assets could not be sold if the purchaser was liable for paying premiums to the Funds. We acknowledge that there is some evidence suggesting that the termination of these benefits was not necessary to the transaction. Warrior Met made a credit bid of $1.25 billion to acquire Walter Energy's assets and assumed approximately $115 million in other liabilities. In comparison, the liability associated with the Coal Act premiums is considerably smaller. At the time Walter Energy filed bankruptcy, it was paying only about $147,000 in annual premiums to the Combined Fund. And the 1992 Benefit Plan claims that Walter Energy should be paying it approximately $347,000 in monthly premiums for its retirees.

But the question of whether the bankruptcy court erred in finding that the termination of these benefits was necessary is not before us because the Funds have not challenged the bankruptcy court's finding. We emphasize that nothing in this opinion should be read as addressing whether the bankruptcy court would have erred if it had found that the termination of the premiums was not necessary for the going-concern sale to go forward.

37  The RBBPA was enacted in 1988, but no party contends that the meaning of "reorganization" has changed since 1988. We thus have considered some dictionaries printed after the RBBPA's enactment.

38  We acknowledge that the title of Chapter 11 cannot trump the plain meaning of its text. But we may consider the title to "shed light" on an ambiguous word or phrase in the text. *See* 🔖 *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

2018 WL 6803736, 66 Bankr.Ct.Dec. 160

39      As we mentioned above Congress modeled 🏳 § 1114 on 🏳 § 1113, *see* supra note 8, so cases interpreting 🏳 § 1113
        are relevant to our understanding of 🏳 § 1114.

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 1

2018 WL 6920227
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. Texas, Houston Division.

IN RE: WESTMORELAND
COAL COMPANY, et al., Debtors.

TRUSTEES OF THE UNITED MINE WORKERS OF
AMERICA 1992 BENEFIT PLAN, et al., Plaintiffs,
v.
WESTMORELAND COAL
COMPANY, et al., Defendants.

CASE NO: 18-35672
|
ADVERSARY NO. 18-3300
|
SIGNED: December 28, 2018.
|
ENTERED 12/29/2018

**CHAPTER 11**

**MEMORANDUM OPINION**

**(Docket Nos. 22 and 25)**

DAVID R. JONES UNITED STATES BANKRUPTCY
JUDGE

**\*1** Before the Court is the question of whether the
Debtors' obligations under the Coal Industry Retiree
Health Benefits Act of 1992 (the "Coal Act") are subject
to the provisions of 11 U.S.C. § 1114. As set forth
below, the Court answers the question [1] in the affirmative.
Accordingly, the Court will grant the Debtor-Defendants'
Motion for Judgment on the Pleadings [Docket No. 22]
and deny the Plan Trustees' Cross-Motion for Judgment
on the Pleadings under Rules 12(c) and 56 [Docket No.
25]. A separate judgment will issue consistent with this
memorandum opinion.

**Relevant Procedural History**

1. On October 9, 2018, Westmoreland Coal Company and
36 affiliates [2] filed voluntary petitions under chapter 11
of the Bankruptcy Code. By Order entered the same day,
the Court approved the joint administration of the cases
pursuant to FED. R. BANKR. P. 1015(b) and LOC. R.
BANKR. P. 1015-1 [Docket No. 71, Case No. 18-35672].

2. On October 23, 2018, Michael H. Holland, Michael
O. McKown, Joseph R. Reschini, Marty D. Hudson,
William P. Hobgood, Carl E. Van Horn, and Gail
R. Wilensky, as trustees of the United Mine Workers
of America Combined Benefit Fund and Michael H.
Holland, Michael O. McKown, Joseph R. Reschini,
and Carlo Tarley as trustees of the United Mine
Workers of America 1992 Benefit Plan (collectively, the
"Plan Trustees") filed their complaint in this adversary
proceeding against the Debtors seeking a declaratory
judgment that the Debtors' obligations under the Coal Act
are not "retiree benefits" subject to 11 U.S.C. § 1114
[Docket No. 1]. In addition, the Plan Trustees seek an
award of attorney's fees and costs under 29 U.S.C. §
1132(g)(2) [Docket No. 1].

**\*2** 3. On November 12, 2018, the Debtors filed their
Motion for Judgment on the Pleadings on the Coal Act
Funds' Complaint for Declaratory Relief pursuant to
Federal Rule of Civil Procedure 12(c) [Docket No. 22].
In the motion, the Debtors request (i) a finding that §
1114 is applicable to their obligations under the Coal Act;
and (ii) the dismissal of this adversary proceeding [Docket
No. 22].

4. The Plan Trustees filed their response on November
27, 2018 [Docket No. 25]. Included in the response is a
cross-motion for judgment on the pleadings pursuant to
Federal Rules of Civil Procedure 12(c) and 56 [Docket
No. 25].

5. The Court conducted a hearing on the motions on
November 29, 2018. After hearing arguments, the Court
requested that the parties jointly submit the briefs filed
before the Eleventh Circuit in a pending appeal on the
identical issue involving Walter Energy, Inc. [3] The joint
submission of the parties is filed at Docket No. 47. In
addition, and in recognition of the importance of the issue
presented, the Court, *sua sponte*, raised the issue of a direct
appeal of this ruling to the Fifth Circuit Court of Appeals.

Exhibit 2

By joint notice filed at Docket No. 49, the parties indicated a preference that the Court certify its ruling for direct appeal pursuant to 28 U.S.C. 158(d)(2).

## Jurisdiction and Authority

6. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a). This proceeding is a core proceeding arising under title 11 pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). The Court has constitutional authority to enter a final judgment in this proceeding under the Supreme Court's holding in *Stern v. Marshall*, 131 S.Ct. 2594 (2011). No party asserts that the Court lacks the requisite jurisdiction or authority to issue a final judgment.

## Legal Standard

7. Rule 12(c) of the Federal Rules of Civil Procedure, as made applicable in this adversary proceeding by FED. R. BANKR. P. 7012(b), provides that "[a]fter pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "A motion brought pursuant to FED. R. CIV. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citing *Herbert Abstract Co., v. Touchstone Props., Ltd.*, 914 F.2d 74,76 (5th Cir. 1990)). In deciding a motion under Rule 12(c), the Court "must look only to the pleadings and accept all allegations contained therein as true. Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain." *Brittan Communications Intern. Corp. v. Southwestern Bell Tel. Co.*, 313 F.3d. 899, 904 (5th Cir. 2002) (citations omitted). In addition to the pleadings, the Court "may take into account documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of

public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Myeres v. Trexton, Inc.*, 540 FED. APPX. 408, 409 (5th Cir. 2013) (citations omitted).

**\*3**  8. When presented with a motion under Rule 12(c), the parties may offer matters outside the pleadings. FED. R. CIV. P. 12(d). If these matters are not excluded, the Court is required to treat the motion as a motion for summary judgment under Rule 56. *Id.* Under these circumstances, the Court is required to give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* The Court declines to treat the parties' competing Rule 12(c) motions as motions under FED. R. CIV. P. 56. The Court has limited its analysis to the pleadings and other permitted matters in accordance with the standard defined by the Fifth Circuit.

## The Coal Act

9. The Coal Act was the byproduct of a "a lengthy strike that followed Pittson Coal Company's refusal to sign the 1988 NBCWA[4]." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 511 (1998). The strike led to the creation of the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission"). *Id.* The Coal Commission was charged with making a recommendation regarding medical benefits for retirees that were originally covered under benefit trusts which preceded the Coal Act. *Id.*

10. After legislation incorporating the Coal Commission's recommendations was vetoed by President Bush, Congress passed the Coal Act. *Id.* at 513. (citations omitted). As the Supreme Court explained:

The Coal Act merged the 1950 and 1974 Benefit Plans into a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund (Combined Fund). See 26 U.S.C. §§ 9702(a)(1), (2). The Combined Fund provides 'substantially the same' health benefits to retirees and their dependents that they were receiving under the 1950 and 1974 Benefit Plans. *See* § 9703(b)(1), (f). It is financed by annual premiums assessed against 'signatory coal operators,'

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    2

Exhibit 2

IN RE: WESTMORELAND COAL COMPANY, et al., Debtors..., Slip Copy (2018)
Case 8:17-ap-00480-MGW    Doc 37    Filed 01/17/19    Page 37 of 42
2018 WL 6920227

*i.e.*, coal operators that signed any NBCWA or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans. *See* §§ 9701(b)(1), (3); 9701(c)(1). Any signatory operator who 'conducts or derives revenue from any business activity, whether or not in the coal industry,' may be liable for those premiums. §§ 9706(a), 9701(c)(7). Where a signatory is no longer involved in any business activity, premiums may be levied against 'related person[s],' including successors in interest and businesses or corporations under common control. §§ 9706(a), 9701(c)(2)(A).

*Id.* at 514. The stated purpose of the Coal Act was "to identify persons most responsible for [1950 and 1974 Benefit Plan] liabilities in order to stabilize plan funding and allow for the provision of health care benefits to ... retirees." *Id.* (citations omitted).

### 🔖 [Section 1114 of the Bankruptcy Code](#)

11. In 1988 Congress passed the Retiree Benefits Bankruptcy Protection Act of 1988 (the "Retiree Benefits Act") which added 🔖 [§ 1114 to the Bankruptcy Code](#). *See generally,* 7 COLLIER ON BANKRUPTCY ¶ 1114.01 [1], at 1114-7 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). The Retiree Benefits Act was a legislative reaction to a growing number of bankruptcy cases that drew a distinction between collective bargaining agreements covered by 🔖 [§ 1113 of the Bankruptcy Code](#) and "retiree benefits" which resulted in the unilateral rejection those retiree benefits. 7 COLLIER ON BANKRUPTCY ¶ 1114.10[2][a], [b], at 1114-39-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see also In re Certified Air Technologies, Inc.*, [300 B.R. 355, 370 (Bankr. C.D. Ca. 2003)](#). The most often cited example as the impetus for 🔖 [§ 1114](#) was the suspension of medical benefits to approximately 78,000 former employees by LTV Corporation after filing bankruptcy.[5]

*4 12. 🔖 [Section 1114](#) was meant to be a protective mechanism for retiree benefits when an employer enters bankruptcy. Specifically, 🔖 [§ 1114](#) provides an organized framework for the negotiation of retiree benefits between a debtor-employer and an authorized representative of the retirees. *See* 🔖 [11 U.S.C. § 1114(f)](#). If the debtor

makes a proposal in accordance with 🔖 [§ 1114(f)](#) and that proposal is not accepted without good cause, the Court *shall* enter an order that provides for the *modification* of retiree benefits under certain *limited* circumstances. 🔖 [11 U.S.C. § 1114(g)](#) (emphasis added).

13. As previously mentioned, the sole issue before the Court is whether the Debtors' Coal Act obligations are "retiree benefits" subject to 🔖 [§ 1114](#). The issues of whether (i) the Debtors can satisfy their obligations under 🔖 [§ 1114(f)](#); and (ii) modification of "retiree benefits" is appropriate are left for another day.

### Rules of Statutory Construction

14. Where Congress has not expressly limited the applicability of one statute within the context of another, the Court must apply the rules of statutory construction to determine the interaction of two statutes. "[C]ourts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." 🔖 *[Morton v. Mancari](#)*, [417 U.S. 535, 551 (1974)](#).

15. "In determining the scope of a statute, a court must begin with the statutory language itself. When the terms of the statute are clear, the statutory language is controlling, absent exceptional circumstances." 🔖 *[In re Westmoreland Coal Co.](#)*, [213 B.R. 1, 18 (1997)](#); *see also* 🔖 *[Fidelity Savings & Inv. Co. v. New Hope Baptist](#)*, [880 F.2d. 1172, 1175 (10](#)[th] [Cir. 1989)](#). Moreover, "[i]t is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.' " 🔖 *[Radzanower v. Touche Ross & Co.](#)*, [426 U.S. 148, 153 (1976)](#) (citing 🔖 *[Morton v. Mancari](#)*, [417 U.S. 535, 550-551 (1974)](#)).

16. 🔖 [Section 1114 of the Bankruptcy Code](#) was enacted in 1988 and the Coal Act in 1992. The Coal Act generally

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  3

Exhibit 2

covers the health and death benefits that must be provided to retired mine workers and their beneficiaries. 🔖 Section 1114 deals with the limited instance where the retirees' former employer is a debtor in a chapter 11 bankruptcy and a modification of benefits is necessary to effect a reorganization. The Court finds that the Coal Act is the more general statute, and 🔖 § 1114 of the Bankruptcy Code is the more specific. The application of 🔖 § 1114 does not deprive the Coal Act of any meaning nor do the two statutes conflict. If Congress had wanted to impose a different scheme or limit the Court's authority to modify retiree benefits under the Coal Act, it could have easily done so. *See In re Horizon Nat. Resources Co.,* 316 B.R. 268, 279 (Bankr. E.D. Ky. 2004); *In re Lady H Coal Co.*, 199 B.R. 595, 603 (S.D. Va. 1996).

**Analysis**

17. The parties do not dispute the relevant facts. The Debtors are subject to the Coal Act. Under the Coal Act, the Debtors are obligated to pay premiums into (i) United Mine Workers of America Combined Benefit Fund (the "Combined Fund") and (ii) the United Mine Workers of America 1992 Benefit Plan (the "1992 Plan") based on the number of existing retirees assigned to them as signatory operators under each of the plans. The Debtors are further obligated to post security in favor of the 1992 Plan in an amount equal to one year of premiums based on a historical three-year average. Finally, the Debtors are required to maintain an Individual Employer Plan (the "IEP") for certain retirees. Accepting these facts as true, the Plan Trustees make a series of legal arguments that Coal Act obligations are excluded from the operation of 🔖 § 1114. The Court will address each of the arguments below.

*Whether* 🔖 *§ 1114 Applies to Statutorily Created Benefits.*

**\*5** 18. Under the Coal Act, coal operators are required to provide certain benefits to their retirees. First, operators must pay premiums into the Combined Fund and the 1992 Plan based on the number of operator-assigned beneficiaries enrolled in each of these plans. 🔖 26 U.S.C. §§ 9704(a); 9712(d)(1)(A). Second, operators must

continue to provide benefits to certain retirees under an individual employer plan ("IEP") so long as the operator remains in business. 🔖 26 U.S.C. § 9711(a). Finally, operators must post security in the form of a bond, letter of credit, or cash escrow, in favor of the trustees of the 1992 Plan, in an amount equal to one year of premium liability based on a historical three-year average. 🔖 26 U.S.C. § 9711(c)(3). The Plan Trustees assert that 🔖 § 1114 does not apply to these obligations because they are statutorily mandated.

19. 🔖 Section 1114(a) states that:

> [f]or purposes of this section, the term "retiree benefits" means *payments to any entity* or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death *under any plan, fund, or program* (through the purchase of insurance or otherwise) *maintained or established in whole or in part* by the debtor prior to filing a petition commencing a case under this title."

🔖 11 U.S.C. § 1114(a) (emphasis added). To reach their conclusion, the Plan Trustees must necessarily insert a limitation on "retiree benefits" to restrict application of the statute to "contractual retiree benefits." Neither the parties nor the Court may intrude on this legislative function. In *In re Horizon Nat. Resources Co.*, the Court noted that "the statutory definition makes no distinction between contractual and non-contractual benefits" and that "benefits provided pursuant to the Coal Act constitute 'retiree benefits' within the meaning of 🔖 § 1114 of the Bankruptcy Code." 316 B.R. 268, 275-76 (Bankr. E.D. Ky. 2004). The Court finds this analysis persuasive and consistent with the applicable rules of statutory construction.

Exhibit 2

IN RE: WESTMORELAND COAL COMPANY, et al., Debtors..., Slip Copy (2018)
Case 8:17-ap-00480-MGW    Doc 37    Filed 01/17/19    Page 39 of 42

2018 WL 6920227

20. The text of § 1114 is unambiguous. The definition of "retiree benefits" contains no limitation to suggest that Congress intended for contractual benefits to be treated any differently than statutorily created ones. To the contrary, the express language of § 1114 contemplates benefits emanating from multiple origins. *See* 11 U.S.C. § 1114(b)(1). The Court finds that the Debtors' Coal Act obligations are "retiree benefits" under § 1114.

*Whether the Debtors' Payment of Premiums Constitutes "Maintenance in Part."*

21. The Plan Trustees next assert that neither the Combined Fund nor the 1992 Plan are plans "maintained or established in whole or in part" by the Debtors. While acknowledging that, with one exception, all current precedent has overruled this argument, the Plan Trustees assert that each of these decisions inappropriately relied upon prior wrongfully-decided decisions. For this Court, the ultimate question is whether the payment of premiums to a benefit program constitutes an act to maintain that program in part?

22. Neither the term "maintenance" nor the phrase "maintenance in part" are defined under the Bankruptcy Code. Likewise, the Court has not been directed to, nor has it been able to locate, any legislative history evidencing Congressional intent to give special meaning to these words. "The Fifth Circuit has instructed that "[f]inding no statutory definition and nothing in the entire statutory scheme or legislative history to indicate a contrary intent, we abide by the canon that words in a statute are to be given their 'ordinary, everyday' meaning." *In re DP Partners, Ltd. Partnership*, 106 F.3d 667, 673 (5th Cir.1997) (citing *Crane v. Commissioner*, 331 U.S. 1, 6 (1947)).

**\*6** 23. Black's Law Dictionary defines the verb "maintain" as "... other acts to prevent a decline, lapse or cessation from existing state or condition; bear the expense of; carry on; commence; continue; furnish means for subsistence or existence of ...." *Maintain*, BLACK'S LAW DICTIONARY (6th ed.1990). MERRIAM-WEBSTER DICTIONARY defines "maintain" as "to keep in an existing state; preserve from failure or decline;

to support or provide for; to sustain." *Merriam-Webster Dictionary*, (December 14, 2018, 2:29 P.M.), https://www.merriamwebster.com/dictionary/maintain. Indeed, the Plan Trustees' entire premise in this adversary is to compel the Debtors or their successor to continue to pay the required premiums so that retirees will continue to receive their benefits. From a practical perspective, to suggest that the Debtors' payment of premiums under the Coal Act does not operate to at least partially maintain the underlying benefit programs is to suggest that a table can stand without its legs. The Court finds equally persuasive the learned opinions of those courts that have previously addressed the issue. *In re Walter Energy, Inc.*, 542 B.R. 859 (Bankr. N.D. Ala. 2015), *aff'd*, *UMWA 1974 Pension Plan v. Walter Energy, Inc.*, 579 B.R. 603 (N.D. Ala. 2016), *aff'd*, *UMWA Combined Benefit Fund, et al v. Andre M. Toffel, as Chapter 7 Trustee for Walter Energy, Inc.*, 2018 WL 6803736 (11th Cir. 2018); *In re Horizon Natural Resources Co.*, 316 B.R. 268 (Bankr. E.D. Ky. 2004).

24. In an analogous situation, the United States District Court for the Southern District of New York opined on whether certain school district benefit plans were "established" and "maintained" by the town or school district. *Feinstein v. Lewis*, 477 F. Supp. 1256, 1260 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 573 (2d Cir. 1980). In that situation, the District Court held that "[a]lthough the Plans are jointly administered by the Union and the employers through the board of trustees, they are *exclusively funded and hence 'maintained' by the employers*." *Id.* (emphasis added).

25. The Court has considered the decision issued in *Buckner v. Westmoreland Coal Co. (In re Westmoreland Coal Co.)*, 213 B.R. 1 (Bankr. D. Co. 1997). In that case, the Court specifically noted that it was not presented with the issue of whether § 1114 applied to Coal Act obligations; rather, the issue was limited to whether an asserted claim under § 1114(e)(2) was entitled to administrative priority. *Id.* at 17-18. In its analysis, the Court stated that "I find nothing in the legislative history indicating that Congress intended § 1114 to apply to statutorily-imposed obligations or to benefits paid by an insurer following prepetition termination of a debtor's self-funded plan." *Id.* at 19. The *Buckner* court's statement was dicta and its analysis was not in

Exhibit 2

accord with accepted cannons of statutory construction. To the extent applicable to the instant situation, the Court rejects the reasoning of the *Buckner* court.

26. For the foregoing reasons, the Court finds that the payment of premiums and other value by the Debtors constitute maintenance in part of the Combined Fund and the 1992 Plan. The Plan Trustees' arguments to the contrary are rejected.

27. The Plan Trustees concede that the IEP is "maintained" by the Debtors but argue that this obligation should nonetheless be excluded from the definition of "retiree benefits" under § 1114(a). The Plan Trustee assert that although the IEP fits within the plain meaning of § 1114(a), it is absurd to think that private parties can negotiate a statutory obligation. This argument ignores the obvious. Section 1114 is a federal statute that authorizes the negotiation process. Moreover, this argument is premature. The only question before the Court is whether the Debtors' Coal Act obligations fall within § 1114(a). The Court rejects the Plan Trustees' absurdity argument.

*Whether the Posting of a Bond is a Form of Payment*

28. As an argument in the alternative, the Plan Trustees assert that the posting of a bond in favor of the 1992 Plan does not constitute "payment" and is therefore excluded from § 1114. As an initial matter, the Plan Trustees offer no basis that would suggest that a coal operator's obligations under the Coal Act are severable. Second, the bond is for a year's worth of benefit premiums and are subject to the same analysis as the premiums themselves. Third, a simple commercial analysis yields a consistent answer. A bond is nothing more than a simple contract. It binds the obligor to pay a sum certain upon the occurrence of an event. *See generally*, 12 AM. JUR. 2d. Bonds § 1. That obligation to pay is no different that the annual obligation to pay the calculated premium. The Court finds that the posting of security, in the form of a bond in favor of the 1992 Plan is a form of payment within the meaning of § 1114(a).

*Futility of IEP Modification*

*7 29. The Plan Trustees argue that if the IEP is found to be a "retiree benefit" under § 1114(a), it would yield a futile result within the statutory schemes. The argument is a house of cards that cannot stand. The argument goes as follows:

(i) If the Court allows the modification of the IEP under § 1114(g), it would result in an increase of premiums due under the 1992 Plan in a proportional amount.

(ii) Since the premiums due under the 1992 Plan are taxes and not subject to § 1114(a), the Debtors would be liable for those premiums under the 1992 Plan.

(iii) The application would yield a futile result.

First, the Court is not deciding whether any modification is appropriate. Second, paragraph (ii) assumes a legal status unsupported by applicable law. Third, paragraph (iii) is a conclusion unsupported by any legitimate argument or statutory language. This argument is not well-received and is rejected.

*Whether Coal Act Premiums are Federal Taxes Subject to the Anti-Injunction Act*

30. The Plan Trustees' final argument is that the benefit premiums due under the Coal Act are federal taxes subject to the Anti-Injunction Act. In support of their position, the Plan Trustees cite to a string of decisions issued between 1995 and 1998. *See In re Chateaugay Corp.*, 53 F.3d 478 (2 nd Cir. 1995); *Adventure Resources, Inc. v. Holland*, 137 F.3d 786 (4 th Cir. 1998); *In re Sunnyside Coal Co.*, 146 F.3d 1273 (10 th Cir. 1998); *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124 (4 th Cir. 1996); *Lindsey Coal Min. Co. v. Chater*, 90 F.3d 688 (3 rd Cir. 1996); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4 th Cir. 1996).

31. The Plan Trustees' reliance on these decisions is problematic for several reasons. First, although the *Chateaugay* decision is a foundation for the subsequent cases, it concerned the allowance of a claim in a bankruptcy case filed in 1986—a date prior to the

Exhibit 2

enactment of both § 1114 [6] and the Coal Act. *See In re Chateaugay Corp.*, 53 F.3d 478 (2nd Cir. 1995). Second, these decisions all predate the Supreme Court's decision in *National Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*")—a controlling decision that directly addresses the application of the Anti-Injunction Act to another federal statute. Finally, none of the post-*Chateaugay* decisions concern the application of § 1114 in a chapter 11 bankruptcy proceeding.

32. The Anti-Injunction Act ("AIA") states that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against who, such tax was assessed." 26 U.S.C. § 7421(a). The Supreme Court has found "the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible..." *Bob Jones University v. Simon*, 416 U.S. 725, 736 (1974). "The statute applies to 'any tax' and precludes attempts to impede the raising of revenues to fund governmental and government-sponsored endeavors." *UMWA Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 637-38 (N.D. Ala. 2016) (citing *Alexander v. Ams. United Inc.*, 416 U.S. 752, 760 (1974)).

**\*8** 33. In *NFIB*, the Supreme Court addressed the characterization of the Affordable Care Act's ("ACA") individual mandate. Specifically, the Supreme Court was asked to decide whether the individual mandate was "tax" and thus subject to the Anti-Injunction Act ("AIA") or a "penalty." *NFIB* at 543. The Supreme Court opined that "[t]he Anti-Injunction Act applies to suits 'for the purpose of restraining the assessment or collection of any tax.' " *Id.* Citing 26 U.S.C. § 7421(a) (emphasis in original). It concluded that "Congress, however, chose to describe the '[s]hared responsibility payment' imposed on those who forgo health insurance not as a 'tax,' but as a 'penalty.' There is no immediate reason to think that a statute applying to 'any tax' would apply to a 'penalty.' " *Id.* (citations omitted). "Congress's decision to label this exaction a 'penalty' rather than a 'tax' is significant because the Affordable Care Act describes many other exactions it creates as 'taxes.' Where Congress uses certain language in one part of a statute and different language

in another, it is generally presumed that Congress acts intentionally." *Id.* at 544. (citations omitted).

34. In *Walter Energy*, the District Court applied this logic to Coal Act obligations. In upholding a sale of the Debtor's assets free and clear of future Coal Act obligations, the District Court found that Congress's choice of the term "premiums" versus "tax" was fatal to the assertion that the Anti-Injunction Act applied. *UMWA Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631 (S.D. Ala. 2016). The Court further notes that the Coal Act is embodied within Title 26, otherwise known as the Internal Revenue Code. While at first blush, this fact might lend support to the Plan Trustees' argument, a careful analysis leads to the opposite conclusion. Under Title 26, the, the first five subtitles are titled "Income *Taxes*; Estate and Gift *Taxes*; Employment *Taxes*; Miscellaneous Excise *Taxes*; and Alcohol, Tobacco, and Certain Other Excise *Taxes*." *See*, 26 U.S.C. Subt. A-E. (emphasis added). The Coal Act is Subtitle J which is titled "Coal Industry Health Benefits." 26 U.S.C. Subt. J.

35. The word "tax" does not appear within the heading of Subtitle J. Interestingly, the word "tax" does appear elsewhere in Subtitle J. It appears in § 9702 to describe the tax treatment of Combined Fund as a tax-exempt organization. 26 U.S.C. § 9702(a)(4). It appears in § 9705 to describe the treatment of the transfer of funds from the prior benefit plans to the newly created Combined Fund. 26 U.S.C. § 9705 (a)(4)-(5). Finally, it appears in § 9707 to describe the treatment of penalties imposed by that section. 26 U.S.C. § 9707(f). It is undeniable that Congress understood how to call something a tax when they meant for that thing to be a tax within Title 26. Under the dictate of *NFIB*, the Court must therefore presume that Congress acted intentionally in labeling Coal Act obligations as "premiums." The Court therefore finds that the Debtors' obligations under the Coal Act are not taxes subject to the Anti-Injunction Act.

<u>**Direct Certification to the Fifth Circuit Court of Appeals**</u>

36. In response to the Court's inquiry, the parties filed a joint notice at Docket No. 49 requesting the Court to certify this decision to the Fifth Circuit Court of

Exhibit 2

Appeals, regardless of the outcome. The Court finds that this decision involves a matter of public importance and that no controlling decision has been issued by the Fifth Circuit Court of Appeal or the United States Supreme Court. The Court further finds that the resolution of this adversary proceeding will materially advance the underlying bankruptcy case—a case whose outcome affects thousands of citizens and has a material impact on the national economy. The Court certifies this judgment for direct appeal to the Fifth Circuit Court of Appeals pursuant to 📑 28 U.S.C. § 158(d)(2)(A)(i) and (iii).

**Conclusion**

37. For the reasons set forth above, the Court concludes that Debtors' obligations under the Coal Act are subject to 📑 Section 1114 of the Bankruptcy Code. The Court will grant the Debtors' Motion for Relief under 📑 Rule 12(c). The Court denies the Plan Trustees' Motion for Relief under 📑 Rule 12(c) and Rule 56. A judgment consistent with this opinion will issue separately. The Court further certifies its judgment for direct appeal to the Fifth Circuit Court of Appeals pursuant to 📑 28 U.S.C. §§ 158(d)(2)(A)(i) and (iii).

**All Citations**

Slip Copy, 2018 WL 6920227

Footnotes

1    For purposes of clarity, this memorandum opinion is limited solely to the question of whether 📑 11 U.S.C. § 1114 applies to the Debtors' obligations under the Coal Act. Nothing herein is intended to express an opinion about whether the Debtors are entitled to relief under 📑 § 1114.

2    The Debtors include Westmoreland Coal Company, Absaloka Coal, LLC, Buckingham Coal Company, LLC, Dakota Westmoreland Corporation, Daron Coal Company, Harrison Resources, LLC, Haystack Coal Company, Oxford Conesville, LLC, Oxford Mining Company – Kentucky, LLC, Oxford Mining Company, San Juan Coal Company, San Juan Transportation Company, Texas Westmoreland Coal Company, WCC Land Holding Company, Inc., WEI – Roanoke Valley, Inc., Western Energy Company, Westmoreland Coal Company Asset Corp., Westmoreland Coal Sales Company, Inc., Westmoreland Energy Services New York, Inc., Westmoreland Energy Services, Inc., Westmoreland Energy, LLC, Westmoreland Kemmerer Fee Coal Holdings, LLC, Westmoreland Kemmerer, LLC, Westmoreland Mining, LLC, Westmoreland North Carolina Power, LLC, Westmoreland Partners, Westmoreland Power, Inc., Westmoreland Resource Partners, LP, Westmoreland Resources, GP, LLC, Westmoreland Resources, Inc., Westmoreland San Juan Holdings, Inc., Westmoreland San Juan, LLC, Westmoreland Texas Jewett Coal Company, Westmoreland – Roanoke Valley, LP, WRI Partners, Inc. and Basin Resources, Inc.

3    After the conclusion of the November 29, 2018 hearing, the Eleventh Circuit issued its opinion finding that Walter Energy's obligations under the Coal Act are subject to 📑 § 1114. *See UMWA Combined Benefit Fund, et al v. Andre M. Toffel, as Chapter 7 Trustee for Walter Energy, Inc., et al.,* 2018 WL 6803736 (11th Cir. 2018).

4    The National Bituminous Coal Wage Agreement.

5    *In re LTV Corp.,* No. 86 B 11402 (Bankr. S.D.N.Y. July 17, 1986).

6    📑 Section 1114 was applicable to bankruptcy cases commenced after June 16, 1988.

End of Document          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 2